**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VINEYARD WIND 1 LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: _____ |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF THE ) | |
| INTERIOR, ) | |
| ) | |
| THE HONORABLE DOUGLAS BURGUM, ) | |
| *in his official capacity as Secretary of the* ) | |
| *Department of the Interior,* ) | |
| ) | |
| BUREAU OF OCEAN ENERGY ) | |
| MANAGEMENT, ) | |
| ) | |
| MATTHEW GIACONA, *in his official* ) | |
| *capacity as Acting Director of the Bureau of* ) | |
| *Ocean Energy Management,* ) | |
| ) | |
| BUREAU OF SAFETY AND ) | |
| ENVIRONMENTAL ENFORCEMENT, and ) | |
| ) | |
| KENNETH C. STEVENS, *in his official* ) | |
| *capacity as Principal Deputy Director of the* ) | |
| *Bureau of Safety and Environmental* ) | |
| *Enforcement.* ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**VINEYARD WIND 1 LLC'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Vineyard Wind 1 LLC ("Vineyard Wind"), for its Complaint against Defendants

United States Department of the Interior ("Interior"), the Bureau of Ocean Energy Management

("BOEM"), (collectively, "the Agency Defendants"), the Bureau of Safety and Environmental

Enforcement ("BSEE"), the Honorable Douglas Burgum in his official capacity as the Secretary

of the Department of the Interior, Matthew Giacona, in his official capacity as the Acting Director

of BOEM, and Kenneth Stevens in his official capacity as the Principal Deputy Director of BSEE alleges as follows:

## INTRODUCTION

1.  This action seeks declaratory and injunctive relief to stop the Agency Defendants from unlawfully abusing their authority by issuing an unprecedented and unsupported order directing Vineyard Wind to suspend activities related to its offshore wind energy project ("the Project"), including wind turbine construction. The Project is 95% complete and is already partially operational, currently having the capacity to produce 572 megawatts ("MW") of power for the New England electric grid. As of December 21, 2025, the date before BOEM's order, the Project was on schedule to be completed by March 31, 2026, bringing the Project to its planned 800 MW capacity from 62 wind turbine generators ("WTGs"), enough electricity to power approximately 400,000 homes.

2.  The Project is located approximately 14 miles offshore of Massachusetts on the Outer Continental Shelf ("OCS") in Lease Area OCS-A 0501, a federal lease issued by BOEM in 2015. Over the past decade, Vineyard Wind has worked closely with the Agency Defendants to develop the Project and, in reliance on the federal approvals and oversight process, has spent more than $4.5 billion in engineering, planning, permitting, and construction costs to ensure the Project's viability and success.

3.  Project construction began in 2021 pursuant to a Construction and Operations Plan ("COP") and related federal permits and authorizations issued by the Agency Defendants after years of extensive review, analysis, and public involvement. Those approvals were tested repeatedly in this Court, where numerous plaintiffs brought four related lawsuits challenging the COP and associated authorizations. In those cases, the Agency Defendants defended the legality of their actions, explaining that the COP, permits and authorizations were issued in accordance with

2

the governing statutes and supported by a voluminous administrative record. In each case, this Court agreed and entered summary judgment for Agency Defendants. Each of those decisions was affirmed on appeal to the First Circuit. *See Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28 (D. Mass. 2023), *aff'd*, 100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) (consolidated decision addressing lawsuit brought by the Responsible Offshore Development Alliance as well as the Seafreeze plaintiffs), *aff'd*, 123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2680 (2025); *Melone v. Coit*, 2023 WL 5002764 (D. Mass. Aug. 4, 2023), *aff'd*, 100 F.4th 21 (1st Cir. 2024).

4.   But following a change in Presidential administrations, the Agency Defendants have now reversed course. Consistent with promises made during his 2024 presidential campaign[1] to immediately block offshore wind power projects, President Trump issued a Presidential Memorandum on his first day in office titled *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363 (Jan. 29, 2025), which directed agencies to pause the issuance of new or renewed wind project approvals and to undertake a government-wide review of wind leasing and permitting practices. In response, the Agency Defendants proceeded to spend months trying to undo nearly two decades of work regarding both planned and future offshore wind construction. Among other things, the agencies paused issuance of new wind energy authorizations actions, which the District Court for the District of Massachusetts vacated as arbitrary and capricious and contrary to law. *See*

---

[1] Oliver Milman, *Trump Pledges to Scrap Offshore Wind Projects on 'Day One' of Presidency*, Guardian (May 13, 2024), https://www.theguardian.com/us-news/article/2024/may/13/trump-president-agenda-climate-policy-wind-power (attributing statements like "I hate wind" to President Trump and statements like "If I were in the offshore wind industry, I would probably be pretty, pretty nervous" to a former Trump administration energy official").

*New York v. Trump*, 2025 WL 3514301, at *1 (D. Mass. Dec 8, 2025).

5. White House spokesperson Taylor Rogers recently confirmed that agency actions implementing the Presidential Memorandum fulfill President Trump's campaign promises to halt wind: "For years, President Trump has been extremely transparent: wind energy is the scam of the century. Reversing the Green New Scam was a very popular promise President Trump made on the campaign trail to the American people, who were tired of the Left's radical and expensive climate agenda. On day one, President Trump issued very direct policy guidance on offshore wind, which the administration has been working diligently to carry out on behalf of the American people." Monte Reel & Mark Chediak, *Nuclear Energy, Fossil Fuels Join Forces Against Wind, Solar*, Bloomberg Bus. Week (Dec. 12, 2025).

6. On December 22, 2025, BOEM issued to Vineyard Wind a Director's Order ("the Order") suspending "all ongoing activities related to the Vineyard Wind 1 Project on the Outer Continental Shelf for 90 days" (and perhaps longer) for vague and undefined "reasons of national security." A copy of the Order is attached as Exhibit 1. BOEM stated that it issued the Order pursuant to 30 C.F.R. § 585.417(b), claiming the regulation authorizes BOEM to order a suspension of a lease when "necessary for reasons of national security or defense." The Order states only that in November, 2025, the Department of Defense ("DoD") (referred to in the Order by BOEM as the Department of War ("DoW"))[2] completed an "additional assessment regarding the national security implications of offshore wind projects, and provided senior leadership at the Department of the Interior with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Based on an "initial review of this classified

---

[2] Department of Defense is used in lieu of Department of War where citing or quoting records in which the Department is referenced therein as the Department of Defense.

information," BOEM determined that the unspecified harm to national security "can only be feasibly averted by suspension of on-lease activities." The Order states that BOEM will coordinate with the DoW over the next 90 days (and perhaps longer) to "endeavor to reach a determination on feasible mitigation measures" before "making a decision as to whether the project must be cancelled." On December 23, 2025, in response to the Order's invitation to "meet and confer" about the possibility of mitigation, Vineyard Wind's CEO emailed Director Giacona to request a meeting at the earliest opportunity. Director Giacona and other officials from BOEM and Interior agreed to meet with Vineyard Wind on December 30, but they refused to either identify the supposed national-security threat posed by the Project or discuss possible mitigation measures.

7.  The Order must be set aside because it is arbitrary and capricious, an abuse of discretion, and contrary to law. Upon information and belief, the Order's invocation of "national security" is a pretext for halting offshore wind development, rather than a response to any identified, Project-specific threat. Because the Order provides no reasoned explanation grounded in facts available to Vineyard Wind and contradicts previous findings by Agency Defendants that the Project does not threaten national security, the court should immediately enjoin it to prevent ongoing irreparable harm. The Order is causing Vineyard Wind to incur approximately $2.0 million *per day* in, including direct and in costs, including direct and in direct costs associated with the vessels, GE Vernova, lost revenue, interest (including the $9 million in monthly interest described below), Project personnel, organizational management, logistical set-up, insurance costs, etc. If allowed to remain in effect, and construction is paused for 90 days, Vineyard Wind be unable to complete construction of the Project before it loses access to a specialized installation vessel that is under contract with Vineyard Wind

only until March 31, 2026.   The inability to timely complete construction of the Project in turn jeopardizes the revenues and financing necessary for the Project to remain viable, with resulting financial consequences that would threaten the financial viability of the entire Project and, consequently, Vineyard Wind's ability to survive.

8. For these reasons, and those detailed below, Vineyard Wind is entitled to declaratory and injunctive relief, including a temporary restraining order and preliminary injunction barring enforcement of this unlawful Order.

## PARTIES

9. Plaintiff Vineyard Wind is based in New Bedford, Massachusetts and is jointly owned by Copenhagen Infrastructure Partners P/S, and Avangrid Renewables, LLC. Vineyard Wind obtained BOEM Lease Area OCS-A 0501 through its predecessor, Offshore MW LLC, through a competitive auction. Subsequently, Vineyard Wind sought and obtained all permits and authorizations to construct and operate the Project on BOEM Lease Area OCS-A 0501 and successfully defended those permits and authorizations in litigation.

10. Defendant United States Department of Interior ("Interior") is a federal cabinet-level executive department created in 1849 and tasked by Congress with managing federal lands and natural resources, including offshore lands and resources subject to federal jurisdiction. This includes implementing the Outer Continental Shelf Lands Act. It is headquartered in Washington, D.C.

11. Defendant Douglas Burgum is the current Secretary of the Interior and reports directly to the President of the United States. As the head of the United States Department of the Interior, the Secretary supervises the Department's various bureaus and agencies, including BOEM and BSEE. The Secretary is also tasked by Congress to manage federal lands and natural resources, including offshore lands and resources subject to federal jurisdiction.

12. Defendant BOEM is an agency within Interior, established in 2010 as one of the successor

agencies to the Minerals Management Service. *See* Interior Secretarial Ord. 3299 § 3 (May 19, 2010). Its primary function is to manage the development of Outer Continental Shelf energy, mineral, and geological resources by implementing the Outer Continental Shelf Lands Act. BOEM has regulatory authority over the Project and, among other things, issued the Project's lease and approved the Project's COP, including various revisions thereto.

13.  Defendant Matthew Giacona is the Deputy Director of BOEM and is currently serving as its Acting Director. As Acting Director, he supervises and manages BOEM's operations and decisions, including issuance of the Order.

14. Defendant BSEE is an agency within Interior, established in 2011 as one of the successor agencies to the Minerals Management Service. *See id*. Its primary function is to improve safety and ensure environmental protection related to the offshore energy industry on the U.S. Outer Continental Shelf. BSEE has regulatory authority over the Project and, among other things, reviews aspects of the Project's construction related to installation of wind turbine blade sets.

15. Defendant Kenneth Stevens serves as the Principal Deputy Director of the Bureau of Safety and Environmental Enforcement and is currently serving as its Acting Director. As Acting Director, he supervises and manages BSEE's operations and decisions, including those regarding continued construction of the Project.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law and asserts claims under the Administrative Procedure Act ("APA"), 5  U.S.C. §§ 701–706, and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et. seq*.

17. The United States has waived its sovereign immunity under 5 U.S.C. § 702 and 43 U.S.C. § 1349(a)(1).

18. This Court may provide declaratory and injunctive relief pursuant to the APA, 5 U.S.C. § 552 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the OCSLA, 43 U.S.C. § 1349(a), Federal Rules of Civil Procedure 57 and 65, and its inherent equitable powers. This Court has jurisdiction to order prospective relief in the form of a declaratory judgment and an injunction against the Agency Defendants and the defendant individuals acting in their official capacity as officers of an agency of the United States.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Vineyard Wind is a resident of this district and a substantial part of the events giving rise to this action occurred and continues to occur in this District because the Project whose activities are suspended by the Order is located in this District.

20. Exhaustion of administrative remedies is not a prerequisite to this action because neither OCSLA, the APA, nor BOEM's regulations mandate an administrative appeal of an order like the Director's Order that takes effect immediately and is not rendered inoperative by the filing of an administrative appeal. *See* 43 U.S.C. § 1349; 5 U.S.C. § 704; 30 C.F.R. § 585.118.

21. Vineyard Wind provided Agency Defendants with notice of this action pursuant to 43 U.S.C. § 1349(a)(2).

## LEGAL BACKGROUND

### The Outer Continental Shelf Lands Act

22. The Outer Continental Shelf consists of the submerged lands beneath the ocean, generally from three to 200 miles seaward of the coastline. Under OCSLA, the United States holds the Outer Continental Shelf as a "vital national resource reserve … for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3).

23. OCSLA was originally enacted in 1953, in part, to authorize offshore oil and gas leasing. Congress amended OCSLA in 2005 by directing the Secretary, in consultation with the U.S. Coast Guard and other relevant federal agencies, to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," including offshore wind. *Id.* § 1337(p)(1)(C).

24. "The Secretary shall ensure that any activity under this subsection [governing leases for offshore wind leases] is carried out in a manner that provides for" 12 statutory criteria. *Id.* § 1337(p)(4). These include "safety," "protection of the environment," "coordination with relevant Federal agencies," "protection of national security interests of the United States," "prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas," "consideration of … any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation," and "public notice and comment on any proposal submitted for a lease." *Id.*

25. The Secretary also "shall provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease" issued for an offshore wind energy project. 43 U.S.C. § 1337(p)(5).

26. The Secretary was also required—in consultation with the Secretary of Defense, the Secretary of the department in which the Coast Guard is operating, and the heads of other relevant agencies and departments—to "issue any necessary regulations to carry out this subsection [governing leasing for offshore wind energy projects]." *Id.* § 1337(p)(8). The Secretary issued regulations that are in 30 C.F.R. part 585 (BOEM) and 30 C.F.R. part 285 (BSEE).

27. As relevant here, the regulations purport to allow BOEM to order a suspension of a lease (a) "when necessary to comply with judicial decrees prohibiting some or all activities under [the]

lease," or (b) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. BOEM must give the lessee a written order that "explain[s] the reasons for its issuance and describe the effect of the suspension order on [the] lease … and any associated activities." *Id.* § 585.418(c); *see also id.* § 585.415(c) (during period of suspension, lessee may only conduct activities that are "expressly authorized under the terms of the … suspension").

28. BOEM's authority to suspend the lease is constrained by OCSLA. OCSLA states that all leases "shall contain or be construed to contain a provision" giving the Secretary of the Interior, "upon a recommendation of the Secretary of Defense, during a state of war or a national emergency declared by the Congress or the President" to "suspend operations under any lease" and provide "payment of just compensation to the lessee whose operations are thus suspended." 43 U.S.C. § 1341(c). This provision is expressly incorporated by Vineyard Wind's lease. There is no declared state of war or national emergency beyond the Presidentially-declared national energy emergency, illustrating the dire need for the Project.

29. OCSLA also states that the United States reserves the right to designate, "through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense; … and if operations or production under any lease theretofore issued on lands with any such restricted area shall be suspended, any payment of rentals, minimum royalty, and royalty prescribed by such lease likewise shall be suspended during such period of suspension of operation and production, and the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States."  43 U.S.C. § 1341(d). This provision

is expressly incorporated into Vineyard Wind's lease. The Secretary of Defense has not designated Vineyard Wind's lease as an area where operations need to be restricted for national defense.

## The Administrative Procedure Act

30. The Administrative Procedure Act provides any "person suffering [a] legal wrong because of agency action" or otherwise "adversely affected or aggrieved by agency action" a right to judicial review of such action in federal court. 5 U.S.C. § 702.

31. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, … or otherwise not in accordance with law; contrary to constitutional right … in excess of statutory jurisdiction, authority, or limitations … without observance of procedure required by law; [or] unsupported by substantial evidence" or the record before the agency. *Id.* § 706.

## The Declaratory Judgment Act

32. The Declaratory Judgment Act states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Under the statute, "[a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*

33. Additionally, the statute provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

## FACTUAL BACKGROUND

34. In 2009, BOEM began evaluating the possibility of developing wind energy in the Outer Continental Shelf offshore of Massachusetts pursuant to its authority under the OCSLA.

35. BOEM established an intergovernmental renewable energy task force comprised of elected officials from state, local, and tribal governments and representatives of affected federal agencies to coordinate with BOEM throughout the lease evaluation process. The task force consulted with DoD, National Marine Fisheries Service ("NMFS"), and the Commonwealth of Massachusetts, among others.

36. In December 2010, BOEM published a Request for Interest in the *Federal Register* to determine if there was commercial interest in wind energy development in an approximately 2,224 square nautical mile area of the Outer Continental Shelf offshore of Massachusetts. 75 Fed. Reg. 82,055 (Dec. 29, 2010). In response to public engagement and agency consultation, BOEM reduced the planning area by 50 percent.

37. In February 2012, BOEM published a Call for Information and Nominations in the *Federal Register* to solicit industry interest in acquiring commercial leases for developing wind energy projects in the Massachusetts offshore area. 77 Fed. Reg. 5,820, 5,821 (Feb. 6, 2012). BOEM also published a Notice of Intent to prepare an Environmental Assessment under the National Environmental Policy Act ("NEPA") of the impact of commercial leasing and site assessment activities in the Massachusetts offshore area. *Id.* at 5,822. During the NEPA review, BOEM consulted directly with DoD regarding the potential effect of issuing commercial wind energy leases in the potential Massachusetts offshore lease area. BOEM confirmed that the U.S. Army Corps of Engineers had not established any "danger zones" (water areas used for hazardous operations that may be closed to the public on a permanent or intermittent basis) or "restricted areas" (water areas where public access is limited or restricted to provide security for

Government property or to protect the public from damage or injury from the Government's use of the area).[3] The consultations with DoD also revealed that there were no military training routes or restricted airspaces directly overhead.[4] In response to public comments and agency consultation, BOEM further reduced the potential Massachusetts offshore lease area, now identified as the Wind Energy Area ("WEA").

38. After completing an Environmental Assessment in May 2012 and a Revised Environmental Assessment in June 2014, BOEM published a proposed sale notice and sought public comments on proposed lease sales in the Wind Energy Area. 79 Fed. Reg. 34,771 (June 18, 2014). After reviewing the public comments, BOEM published a final sales notice announcing that it would auction four commercial wind energy leases in the Wind Energy Area on January 29, 2015. 79 Fed. Reg. 70,545 (Nov. 26, 2014).

39. Vineyard Wind, then called Offshore MW LLC, won Lease OCS-A 0501 ("Lease Area") through a competitive leasing process.

40. The Commonwealth of Massachusetts has a high demand for electricity in the colder winter months. Its natural gas infrastructure nears maximum capacity when the weather is coldest, leading to significant electricity price fluctuations.

41. Massachusetts is seeking to increase its electricity supply while simultaneously seeking to meet a legislative mandate of net-zero greenhouse gas emissions by 2050. The development of offshore wind electricity generation is a key part of Massachusetts' strategy to meet those goals.

42. Vineyard Wind developed the Project in response to Massachusetts' renewable energy requirements. Under Section 83C of An Act to Advance Clean Energy, 2018 Mass. Legis.

---

[3] OCSLA Compliance Memo at 17
[4] *Id.*

Serv. Ch. 227, Massachusetts sought to procure up to 1,600 megawatts of commercial-scale offshore wind energy. Pursuant to 220 Code of Massachusetts Regulations § 23.04(5), Massachusetts distribution companies were required to solicit proposals to meet this requirement. Vineyard Wind secured power purchase agreements to supply 800 megawatts of electricity to three Massachusetts distribution companies under this process.

43. Prior to any construction activity, Vineyard Wind was required to submit a Site Assessment Plan to BOEM for its approval, followed by a COP, also requiring BOEM's approval.

44. Vineyard Wind submitted its Site Assessment Plan to BOEM on March 31, 2017, and BOEM approved it on May 10, 2018, subject to various terms and conditions.

45. On December 19, 2017, Vineyard Wind submitted its proposed COP. This described the major elements of the Project, such as the approximate number and size of WTGs necessary to generate 800 MW of electricity, potential layouts, the location of inter-array cabling, offshore electrical service platforms, offshore transmission cables to shore, onshore underground transmission cables, and an onshore substation.

46. BOEM's Office of Renewable Energy Programs performed a sufficiency review, technical review, and an environmental review of the COP to determine whether it complied with applicable requirements under OCSLA and BOEM's regulations.

47. BOEM's review included an extensive analysis under NEPA. That process began on March 30, 2018, when BOEM announced its intent to prepare the Environmental Impact Statement, described the proposed Project, and requested public comments on the scope of the environmental review that showed be performed. 83 Fed. Reg. 13,777 (Mar. 30, 2018).

48. During this process, BOEM consulted with all relevant federal agencies, including the DoD, the Coast Guard, the Army Corps of Engineers, and the Federal Aviation Administration, and

engaged in multiple rounds of review and public comment periods to analyze the Project's potential impacts. *See Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 2023 WL 6218159 (D. Mass. Sep. 25, 2023) (describing the extensive reviews by BOEM and other agencies).

49. BOEM completed the Final Environmental Impact Statement ("FEIS") and published a notice to that effect in the *Federal Register* on March 12, 2021. 86 Fed. Reg. 14,153 (Mar. 12, 2021). The Final EIS includes four volumes and totaled 2,422 pages. It is available on BOEM's website, https://www.boem.gov/renewable-energy/state-activities/vineyard-wind-1.

50. With respect to military and national security issues, the Project's FEIS confirms that the DoD (now DoW) reviewed Vineyard Wind's proposed project in 2018 and concluded that it "would have **minor** but acceptable impacts on [ ] operations." FEIS at 3-262. BOEM continued to coordinate with the DoD throughout the development and approval of the Project's COP to minimize conflicts with military and national security concerns. FEIS at 3-264.

51. The FEIS observed that military vessel traffic in the area is "relatively low," and that spacing the wind turbine generators "1 by 1 nautical miles apart" would reduce any risk that military vessels would collide with the Project's wind turbine generators or electrical services platform. FEIS at 3-262. Vineyard Wind agreed to 1 by 1 nm spacing, and BOEM added it as a condition of the COP approval. The Project's WTGs have been installed in accordance with that condition.

52. The FEIS also recognized that a portion of the wind development area falls within Warning Area W-105A, a Navy-managed block of airspace in the Narragansett Bay Complex extending from the surface to 50,000 feet (15,240 meters) above mean sea level (AMSL). W-105A is primarily used by the U.S. Air Force's 104th Fighter Wing, a unit of the Massachusetts Air

National Guard, for operations above 1,000 feet AMSL, though it may also be utilized by other military entities. FEIS at 3-251.

53. Although the Air Force initially raised concerns that the Project's WTGs could affect the 104th Fighter Wing's training activities in Warning Area W-105A, the Air Force agreed its concerns would be assuaged if the Project's structures "can withstand daily sonic overpressures from supersonic operations, and potentially falling debris from chaff and flare, and if the [Air Force] would not be held liable for damage to property or personnel." FEIS at 3-264. BOEM also incorporated these conditions into its approval of the COP and Vineyard Wind additionally volunteered to employ a Marine Coordinator for the life of the Project to serve as a liaison with military and national security interests to reduce potential conflicts. FEIS at 3-265. To date, no military representative has communicated with Vineyard Wind's Marine Coordinator regarding potential conflicts with the Project's ongoing operations or construction.

54. The FEIS also reported that the DoD's Military Aviation and Installation Assurance Siting Clearinghouse reviewed the updated COP in 2020 and determined that the proposed Project would adversely impact the North American Aerospace Defense Command's (NORAD's) air defense mission by interfering with the Falmouth Airport Surveillance Radar-8 (ASR-8) and Nantucket ASR-9 radar systems. FEIS at 3-268. The Clearinghouse explained that such interference would cause "increased false targets, reduced radar sensitivity, decreased probability of detection and radar tracking anomalies" in the vicinity of the Project, but that these impacts could be mitigated to an acceptable level by Radar Adverse Impact Management (RAM) measures and overlapping radar coverage. *Id*. To address these concerns, BOEM required that the Project's COP include conditions providing for notification to NORAD of

RAM scheduling, funding of RAM execution, and curtailment for national security or defense purposes, if necessary. *Id*.

### The Joint Record of Decision and Approvals of Vineyard Wind's COP and Other Permits and Authorizations

55. On May 10, 2021, BOEM and coordinating agencies issued a joint Record of Decision for the FEIS addressing BOEM's action to approve Vineyard Wind's COP under OCSLA Section 8(p).

56. The joint Record of Decision approved a combination of alternatives considered in the FEIS as it was deemed the environmentally preferred action alternative ("Preferred Alternative") despite not being the alternative that Vineyard Wind proposed. The approved Project, consistent with U.S. Coast Guard recommendations, required the WTGs to be arranged in an east-to-west and north-to-south orientation with a minimum spacing of one nautical mile to allow for safe vessel transit through the Project area.

57. The joint Record of Decision included, as an attachment, a memorandum (the "OCSLA Compliance Memo") describing BOEM's sufficiency, technical, and environmental review of the COP and explaining why the Preferred Alternative satisfies the requirements of OCSLA subsection 8(p) and BOEM's implementing regulations. BOEM issued its final approval of the COP on July 15, 2021, as modified in January 2025. In approving the COP, BOEM imposed 115-pages of terms and conditions, including all mitigation and monitoring measures identified in the FEIS and several other technical, navigational, and safety conditions imposed by BOEM.

58. The OCSLA Compliance Memo described BOEM's consultation and coordination with other agencies, including DoD and the Coast Guard, and explained why the COP complies with each of the factors listed in subsection 8(p)(4) of OCSLA.

59. With respect to protection of national security interests of the United States, 43 U.S.C.

§ 1337(p)(4)(F), "BOEM has consulted with DoD for the purposes of assessing national security considerations in its decision-making processes" at "each stage of the regulatory process" involving Vineyard Wind's lease and Project.[5]  Before BOEM even published a Request for Interest in December 2010 to gauge the level of commercial interest in wind development offshore Massachusetts, BOEM organized a task force and consulted with DoD, NMFS and the Commonwealth of Massachusetts.[6] BOEM engaged in further consultations with DoD during the NEPA review of the potential effect of issuing commercial wind energy leases in the Massachusetts Wind Energy Area (WEA).[7] BOEM confirmed that the U.S. Army Corps of Engineers had not established any "danger zones" (water areas used for hazardous operations that may be closed to the public on a permanent or intermittent basis) or "restricted areas" (water areas where public access is limited or restricted to provide security for Government property or to protect the public from damage or injury from the Government's use of the area).[8] The consultations with DoD also revealed that there were no military training routes or restricted airspaces directly overhead.[9]

60. While BOEM was reviewing Vineyard Wind's COP, it again "coordinated with DoD to develop measures to safeguard against potential liabilities and impacts on DoD activities." [10] The Military Aviation and Installation Assurance Siting Clearinghouse coordinated the review of the COP within DoD, including with the US Air Force, NORAD, and the Department of the Navy.[11] The Air Force, NORAD and Department of the Navy raised the concerns that are described in the FEIS, and developed conditions for BOEM to impose on the COP to address

---

[5] OCSLA Compliance Memo at 17.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

their concerns.[12] BOEM imposed those conditions on Vineyard Wind's COP "[t]o protect the security interests of the United States."[13]

### Conditions of Approval of Vineyard Wind 1's COP

61. BOEM approved Vineyard Wind's COP on July 15, 2021. The approval was subject to numerous conditions, set out across 80 pages and grouped into seven categories, one of which covered national security.

62. The national security conditions included requirements that:

    a. Vineyard Wind confirm the Project's structures can withstand daily sonic overpressures and potential falling debris from chaff and flare released by U.S. Air Force operations. (Condition 4.1);

    b. Vineyard Wind agree to hold the United States harmless for any injury or damage to people or property caused by the United States or its agents, contractors, officers, or employees in connection with activities conducted by the United States Fleet Forces (USFF) N46. (Condition 4.2);

    c. To mitigate the impacts on NORAD's operations involving the Falmouth ASR-8 and the Nantucket ASR-9 radar systems, Vineyard Wind must enter into a mitigation agreement with the DoD (now DoW) and the Air Force to implement conditions concerning:

        i. Vineyard Wind's notification of NORAD for RAM scheduling that is required for Falmouth ASR-8; and

        ii. Vineyard Wind's payment of $80,000 to NORAD toward the execution of the RAM. (Condition 4.3);

---

[12] *Id.*
[13] *Id* at 18.

d. To mitigate potential impacts on the Department of the Navy's (Navy) operations, Vineyard Wind must coordinate with the DoD/Navy on any proposal to utilize distributed acoustic sensing (DAS) technology as part of the Project or associated transmission cables. (Condition 4.4);

e. Before entering any designated defense operating area, warning area, or water test area to conduct survey activities under the approved COP, Vineyard Wind enter into an agreement with the appropriate command headquarters to coordinate electromagnetic emissions associated with those activities. (Condition 4.5)

**Vineyard Wind Mitigation Agreement With DoD and U.S. Air Force**

63. In April 2022, Vineyard Wind entered into an agreement ("Mitigation Agreement") with the DoD and the Department of the Air Force "to ensure Project Owner may construct and operate the Project without adversely impacting DoD military operations and readiness." Mitigation Agreement, Section 3.A.

64. The agreement is designed to de-conflict the Project's wind turbine generators with NORAD's Airport Surveillance Radar in Falmouth, Massachusetts (ASR-8) and states that its terms "allow the mutual goals of the parties to be met, including the protection of the ASR-8, which promotes national security, and protection of the National Airspace System, while supporting military readiness." Mitigation Agreement, Section 1.B.

65. Under the agreement, Vineyard Wind agreed to limit the number and size of the WTGs.

66. Vineyard Wind also agreed to pay the DoD $80,000 to offset any costs undertaken to study or mitigate impacts from the Project or other projects, and to immediately curtail operations on a temporary basis for national security or defense purposes when requested by NORAD pursuant to a communications protocol specified in the agreement. Mitigation Agreement, Section 4.C. Curtailment "may not be requested except for a national security or defense purpose" and must

be "temporary in nature and extend only so long as is absolutely necessary to meet the discrete, temporary and stated national security or defense purpose." *Id.*

67. The DoD agreed that it had no objection to the Project, and, with limited exceptions not applicable here, would "not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project," provided that Vineyard Wind remained in compliance with the agreement. Mitigation Agreement, Section 3.E.4.

68. NORAD has not requested that Vineyard Wind curtail operations for a national security or national defense purpose.

**The Defendant Agencies' Defense of the Project's Authorizations and Permits in Litigation**

69. Four separate plaintiffs challenged Vineyard Wind's permits and authorizations for the Project. *See Nantucket Residents*, 675 F. Supp. 3d at 28, *aff'd*, 100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025); *Seafreeze Shoreside*, 2023 WL 6691015, *aff'd*, 123 F.4th 1 (1st Cir. 2024); *cert. denied*, 145 S. Ct. 2680 (2025); *Melone*, 2023 WL 5002764, *aff'd*, 100 F.4th 21 (1st Cir. 2024). Collectively, these lawsuits challenged BOEM's issuance of Lease OCS-A 0501, BOEM's approval of Vineyard Wind's Site Assessment Plan, BOEM's approval of Vineyard Wind's COP, the Final Environmental Impact Statement and joint Record of Decision, the Corps' Clean Water Act Section 404 permit, NMFS' 2021 Biological Opinion, and NMFS' Incidental Harassment Authorization. No party challenged the Corps' Section 10 permit issued to Vineyard Wind pursuant to the Rivers and Harbors Act.

70. In their court filings, the Agency Defendants repeatedly asserted that the challenged permits and authorizations for the Project complied with all applicable laws, the Project was safe, and that its construction and operation did not imperil national security or vessel transit. Among other things, and most relevant to the Order challenged here, the Agency Defendants told the

court that:

a. "Plaintiffs' claim that the Project could endanger national security lacks merit and is directly contradicted by the administrative record in this case … Indeed, the United States Department of Defense ('DoD') concluded otherwise … BOEM consulted with DoD at every stage of its decision-making process … and DoD ultimately concluded that any concerns with respect to the Project placement could be addressed through mitigation."[14]

b. "BOEM met its obligations under section 8(p)(4) of OCSLA as follows: National security: BOEM ensured the protection of national security interests by consulting with the Department of Defense ('DoD') and requiring Vineyard Wind to adopt measures requested by DoD in order to avoid interference with defense activities."[15]

c. BOEM "undertook a lengthy sufficiency review, technical review, and environmental review of the COP to determine whether it met the requirements of section 8(p) of" OCSLA.[16]

d. "BOEM's approval of the Construction and Operations Plan complied with OCSLA."[17]

e. "BOEM met its obligations under section 8(p)(4)" of OCSLA "through a lengthy approval process, which included gathering input from stakeholders, the preparation of an [Environmental Impact Statement], and detailed consultation with various federal agencies, including the U.S. Coast Guard, the Bureau of Safety and Environmental Enforcement, the Federal Aviation Administration, the National Oceanic and

---

[14] Fed. Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. at 19, *Seafreeze Shoreside, Inc. v. U. S. Dep't of Interior*, No. 1:22-CV-11091-IT (D. Mass. May 19, 2023), ECF No. 123 ("Fed. Defs.' Opp.").

[15] Fed. Defs.' Reply in Supp. of Summ. Judgment at 10–11, *Seafreeze Shoreside Inc. v. U.S. Dep't of Interior*, No. 1:22-CV-11091-IT (D. Mass. Mar. 7, 2023), ECF No. 93 ("Fed. Defs.' Reply").

[16] Fed. Defs.' Opp. at 2.

[17] Fed. Defs.' Mem. in Supp. of Cross-Mot. for Summ. Judgment at 35, *Seafreeze Shoreside Inc. v. U.S. Dep't of Interior*, No. 1:22-CV-11091-IT (D. Mass Dec. 20, 2022), ECF No. 73.

Atmospheric Administration … and the U.S. Department of Defense."[18]

    f.   "Through a 31-page memorandum, BOEM detailed its compliance with each of the section 8(p) factors."[19] And the Agency Defendants' "summary judgment briefing demonstrated that Federal Defendants fully met their obligations under OCSLA and NEPA."[20]

    g.   BOEM "selected an alternative based, in part, in the Coast Guard's recommendations regarding the spacing and orientation of turbines designed to reduce the impacts on marine navigation and fishing."[21]

    h.   The court should deny plaintiffs' motion for a preliminary injunction, in part, because "there is a strong public interest in the certainty and reliability of Federal Defendants' approvals. Where, as here, [the] developer has complied with agency rules and satisfied federal statutory requirements to the agencies' satisfaction, the developer should be able to rely on its permits, as it may need to make business and financial decisions in furtherance of completing the authorized activity. OCSLA recognizes this interest."[22]

    i.   The "determinations and analyses concerning the Vineyard Wind Project were rational and are fully supported by the respective administrative records."

71. The district court granted summary judgment to the Agency Defendants, and Vineyard Wind who participated as an intervenor-defendant, on all issues raised by all plaintiffs. The plaintiffs appealed to the U.S. Court of Appeals for the First Circuit. On appeal, the Agency Defendants successfully defended the Project's permits and authorizations. *See supra* ¶ 68.

---

[18] Fed. Defs.' Opp. at 5.
[19] Fed. Defs.' Reply at 9.
[20] Fed. Defs.' Opp. at 4.
[21] Fed. Defs.' Reply at 11–12.
[22] Fed. Defs.' Opp. at 18–19 (citing 43 U.S.C. § 1332(3) (Outer Continental Shelf "should be made available for expeditious and orderly development")).

**Status of Project Construction and Operations**

72. Onshore construction for the Project began in November 2021. Offshore construction began in March 2022. The Project is 95% complete and is currently capable of producing approximately 572 MW of electricity from 44 operational WTGs, with additional capacity originally scheduled to come online over the coming weeks as additional WTGs are made operational. To date, Vineyard Wind has installed 61 of 62 WTGs and completed the offshore and onshore electrical infrastructure necessary to deliver power to the New England grid. Remaining offshore work consists primarily of installing one WTG (including blades), installing sets of three blades ("blade sets") on 10 WTGs as part of the BOEM-approved blade replacement program, and bringing the remaining 18 WTGs online.

73. GE Vernova—a U.S. company based in Massachusetts responsible for the manufacture and installation of the Project's WTGs—is utilizing *Sea Installer* to complete the remaining offshore construction. This vessel is highly specialized and specifically designed for this work. Loss of access to this vessel would jeopardize completion of the Project.

74. *Sea Installer* is secured by contract for the term necessary to complete the Project on the current schedule, which, prior to the Order, anticipated completing the remaining offshore work before March 31, 2026. If Vineyard Wind does not complete the remaining offshore work before March 31, 2026, it will lose access to *Sea Installer*. This vessel is critical to the Project's completion because the Project's remaining offshore installation, blade installation, and start-up activities depend on using that vessel.

75. Vineyard Wind's completion plan depends on keeping *Sea Installer* continuously supplied with blade sets through a staged logistics plan, including shuttling blade sets offshore from New Bedford using two barges on a rotating basis. That sequencing, in turn, depends on BSEE continuing to review and issue routine non-objection determinations for the remaining blade

installation work. To date, Vineyard Wind has submitted 52 Return to Installation ("RTI") packages, which authorize blade installation, and 44 Return to Service ("RTS") packages, which authorize WTGs to be returned to operation following blade work, and BSEE has issued non-objections on all of those submissions. BSEE typically completes RTI reviews in approximately two days and RTS reviews within the same day.

76. The remaining offshore scope requires installation of eleven blade sets, ten of which still require BSEE review and a non-objection on the associated RTI packages before the blades can be installed. Vineyard Wind must also obtain BSEE non-objections on RTS packages to return WTGs to operation following blade work, including RTS packages for the 18 WTGs that are currently awaiting clearance to produce power. Completing the Project before *Sea Installer* departs is therefore contingent on BSEE timely completing and issuing non-objections on the remaining RTI and RTS packages. But BSEE staff have advised that, while the Order remains in effect, they cannot complete those reviews or issue the required non-objections—effectively preventing installation of the remaining blade sets. For example, Vineyard Wind is currently awaiting BSEE review of two RTI packages and one RTS package submitted on December 23, 2025, and another RTS package submitted on December 26, 2025; under ordinary circumstances, BSEE would have completed review and issued non-objections within two days or less, but those submissions have now been pending for days longer than the typical review period, with no assurance as to when non-objections will issue.

77. On December 31, 2025, BSEE's Director advised Vineyard Wind that it could complete blade removals but could not move forward with any new blade installation, because BSEE did not believe that was "a matter that impacts, health, safety and the environment," consistent with the Order.

78. The Order's minimum 90-day pause threatens to prevent timely blade-set review and push the remaining offshore work beyond *Sea Installer*'s fixed availability window, creating an open-ended delay that could extend completion by a year or more and jeopardize the Project's ability to reach commercial operation.

79. Because the Order both halts the work needed to complete the Project within *Sea Installer*'s limited window and prevents Vineyard Wind from obtaining the BSEE non-objections required to install blades and clear WTGs for power production, it threatens to foreclose Vineyard Wind's only feasible path to complete construction and commissioning—harm that cannot be undone by lifting the Order later.

80. The Project has not installed sufficient nameplate capacity to meet the requirements of the six Power Purchase Agreements ("PPAs") it entered with Massachusetts electrical utilities. If the Project is not completed before Vineyard Wind loses access to the specialized construction vessel, Vineyard Wind will not be able to meet its obligations under the PPAs and could be exposed to a declaration of default. Such a default could result in forfeiture of the credit posted (approximately $48 million) and give the electrical utilities a unilateral right to terminate PPAs, leaving the Project with uncertainty about its income, and depriving the people of Massachusetts of a long-term, below-market source of clean and affordable energy.

**BOEM's Issuance of the Unlawful Order**

*81.* When campaigning for his second term in office, President Trump consistently promised to "make sure that [offshore wind] ends on day one" and "to write it out on an executive order." Jennifer Dlouhy, *Trump Vows 'Day One' Executive Order Targeting Offshore Wind*, Bloomberg (May 12, 2024) (covering a New Jersey campaign rally); *see also* Susan Phillips, *How a Trump Victory Could Stall Offshore Wind Expansion*, WHYY (Oct. 29, 2024), https://whyy.org/articles/offshore-wind-industry-trump-presidency (same). President Trump

did not back down after his successful election, reiterating his commitment to end offshore wind, stating he would "try and have a policy where no windmills are being build." Lisa Friedman & Brad Plumer, *Trump Promises to End New Wind Farms*, N.Y. Times (Jan. 7, 2025), https://www.nytimes.com/2025/01/07/climate/trump-wind-turbines.html.

82. Consistent with his repeated campaign promises to try to end wind via executive order, President Trump issued a Memorandum on the first day of his second term in office, withdrawing all unleased areas of the Outer Continental Shelf from offshore wind leasing, effective January 21, 2025, pending "a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, identifying any legal bases for such removal." Presidential Memorandum of January 20, 2025, *Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*, 90 Fed. Reg. 8,363, § 1 (Jan. 29, 2025).

83. The Memorandum stated that the withdrawal is not intended to "affect[ ] rights under existing leases in the withdrawn areas." *Id.* Instead, "[w]ith respect to existing leases," the Memorandum directed "the Secretary of the Interior, in consultation with the Attorney General as needed" to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, [and] identifying any legal bases for such removal." *Id.*

84. The Memorandum also prohibited federal agencies from issuing "new or renewed approvals, rights of ways, permits, leases, or loans for onshore or offshore wind projects pending the completion of … assessment and review of Federal wind leasing and permitting practices." *Id.* at 8,363–64, § 2(a). The Memorandum directed the Secretary of the Interior to lead the

assessment and review in consultation with the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, the Secretary of Energy, and the Administrator of the Environmental Protection Agency. *Id.* The Memorandum further directed the relevant agencies to consider "the economic costs associated with the intermittent generation of electricity and the effect of subsidies on the viability of the wind industry. *Id.*

85. The actions described in the Memorandum are purportedly justified by "various alleged legal deficiencies underlying the Federal Government's leasing and permitting of onshore and offshore wind projects, the consequences of which may lead to grave harm" and in light of "potential inadequacies" in offshore wind NEPA reviews. *Id.* at 8,363–64. These purported harms included unspecified "negative impacts on navigational safety interests, transportation interests, national security interests, commercial interests, and marine mammals." *Id.* at 8,363.

86. The Memorandum did not mention Vineyard Wind's Project. Nor did the Memorandum explain what "alleged legal deficiencies" or "potential inadequacies" might exist in the approvals of Vineyard Wind's project or any other offshore wind energy project.

87. On July 29, 2025, DOI issued Secretary Order ("SO") No. 3437, *Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision Making*, directed the Assistant Secretary – Land and Minerals Management to provide a report describes and provides recommendations regarding, as relevant here, "[i]mpacts that the development of offshore wind projects that have received a COP from the Department may have on military readiness." SO 3437 § 5(b)(1)(D).

88. On September 10, 2025, Secretary Burgum confirmed at an energy conference in Milan that five offshore wind projects were under review, stating that "under this administration there is

not a future" for offshore wind and "the fact that subsidies have been either cut back or limited

means that it's likely that there won't be future offshore wind build in America." Ari Natter,

*US Reviewing Five Offshore Wind Farms Under Construction*, Bloomberg L.P. & Energy

Connects                               (Sep.                               10,                               2025),

https://www.energyconnects.com/news/renewables/2025/september/us-reviewing-five-

offshore-wind-farms-under-construction.

89.    At the same time, President Trump continued to echo his steadfast policy against wind energy

for reasons other than national security. The President has asserted that "[w]indmills should

not be allowed" and that he would "not allow a windmill to be built in the United States"

because they were "killing the beauty of our scenery, our valleys, our beautiful plains," because

they were "driving [whales] *loco*," because they were "a shame" to see "over the horizon"

when playing golf at Turnberry, and because they are "the worst form of energy, the most

expensive form of energy." Forbes Breaking News, *Trump Goes On Sudden Tirade Against*

*Windmills During Meeting With EU President Ursula Von Der Leyen*, at 0:06–0:21, YouTube

(July 27, 2025), https://www.youtube.com/watch?v=1Asznj3uWKA. After the U.S. District

Court for the District of Columbia granted a preliminary injunction against the arbitrary and

capricious stop-work order against another New England offshore wind project, the White

House boldly reassured the public that it would not give up: "President Trump was elected

with a resounding mandate to end Joe Biden's war on American energy and restore our

country's energy dominance — which includes prioritizing the most effective and reliable tools

to power our country. *This will not be the final say on the matter*." Kelsey Tamborrino, *Judge*

*Allows Work to Restart on New England Wind Project that Trump Halted*, Politico (Sep. 22,

2025),        https://www.politico.com/news/2025/09/22/judege-offshore-wind-project-restarts-

00575150 (emphasis added); *see also* PBS NewsHour, *WATCH: Trump Calls Wind Turbines 'So Pathetic and So Bad' as He Goes After Renewable Energy*, at 0:01–0:33, YouTube (Sept. 23, 2025), https://www.youtube.com/watch?v=6wkHCSbSwkw (quoting President Trump as saying "[w]e're getting rid of the falsely named renewables, by the way. They're a joke. They don't work. They're too expensive.").

90. Despite these legal setbacks, and without any advance warning, BOEM issued the Order to Vineyard Wind on December 22, 2025, two days before the newly-announced three-day federal holiday. The Order directs Vineyard Wind "to suspend all ongoing activities related to the Vineyard Wind 1 Project on the Outer Continental Shelf for the next 90 days for reasons of national security." However, Vineyard Wind "may perform any activities that are necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment over the next 90 days and during any subsequent extensions" and, "given that this project is partially generating power, [Vineyard Wind] may continue any activities from those wind turbines that are necessary for the current level of power generation."

91. The Order states that in November 2025, DoW "completed an additional assessment regarding the national security implications of offshore wind projects," that Department of the Interior leadership received "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects," and that the "impacts are heightened by the projects' sensitive location on the East Coast and the potential to cause serious, immediate, and irreparable harm to our great nation."

92. The Order further says that "Based on BOEM's initial review of this classified information, the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities. In coordination with DoW, BOEM will determine whether the national security

threats relating to this project can be mitigated and invites [Vineyard Wind] to meet and confer about that possibility."

93. BOEM issued similar orders on December 22, 2025 to four other offshore wind energy projects.

94. The Order does not identify what the national security impacts are. The Department of Interior issued a public statement that the "national security risks inherent to large-scale offshore wind projects" involve potential radar interference—a risk that was disclosed, discussed, and mitigated throughout the Project's review and approval process with the Government, including DoD. Press Release, U.S. Dep't of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

95. The Order does not identify how long it will remain in effect beyond the initial 90-day suspension period but does suggest the possibility of cancellation: "Given the construction status of [the Project], BOEM will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled." *Id.*

96. The Order does not allege that Vineyard Wind violated any federal law, any order from BOEM or BSEE, a term of Vineyard Wind's lease, a term or condition of the Project's COP, or any other permit or authorization.

97. The Order does not acknowledge that BOEM approved Vineyard Wind's COP after consulting with the DoW and finding that the conditions imposed in the COP ensure that the Project will be carried out in a manner that protects national security. The Order also does not acknowledge that Vineyard Wind and DoW previously agreed to a mitigation agreement to ensure the

Project does not unreasonably interfere with DoW's national security interests.

98. Following issuance of the December 22 Orders, Secretary Doug Burgum posted to X a series of comments that repeated the administration's sentiments that offshore wind was "BAD," but did not mention national security. *See, e.g.*, Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM) ("Offshore wind is an Expensive BAD Deal. It's forcing Americans to pay billions for less power while better options are ignored. Offshore wind isn't just a bad deal, it's a scam and YOU are paying for it!"). Even when asked directly about the December 22 Orders, Secretary Burgum only briefly mentioned the Orders' reference to a "classified report" regarding ground-based radar before expending most of his air time criticizing offshore wind for any reason but national security (fisheries' opposition, costs, benefit to foreign supply chains and economies) and endorsing natural gas as the  solution to energy demands in the northeast region. Fox News, *Trump Admin Halts All Offshore Wind Farm Construction*, at 1:14–6:43, YouTube (Dec. 23, 2025), https://www.youtube.com/watch?v=zaGVeJSdy30. Meanwhile, the White House repeated its earlier sentiments that "President Trump has been clear: wind energy is the scam of the century" and that "Americans have been forced to pay billions more for the least reliable source of energy," before adding a nod to national security: "The Trump administration has paused the construction of all large-scale offshore wind projects because our number one priority is to put America first and protect the national security of the American people." Peggy Spellman Huey, *Wind Farm Halt an 'Egregious Attack' on Clean Energy, Landing Like 'Lump of Dirty Coal' for Holidays: Hochul*, Patch (Dec. 25, 2025) https://patch.com/new-york/shirley-mastic/wind-farm-halt-egregious-attack-clean-energy-landing-lump-dirty-coal.

99. In response to the Order's invitation to "meet and confer," Vineyard Wind's CEO emailed

Director Giacona on December 23 to acknowledge receipt of the Order and request a meeting at the earliest opportunity to discuss the Order and a path forward, including immediate mitigation measures. Director Giacona and other officials from BOEM and the Department of the Interior agreed to and attended a meeting with Vineyard Wind on December 30. But the Department of Interior officials refused to identify any national-security threat posed by the Project or to discuss any mitigation measures Vineyard Wind could implement to address it. They said Vineyard Wind needed to talk to DoW about those issues.

### Forcing Vineyard Wind to Cease Construction Activities and Operations Will Cause it Significant Harm.

100.    Requiring Vineyard Wind to stop work on the Project at this late stage, even for a short period, will irreparably harm Vineyard Wind. It would preclude completion of the Project which, in turn, would cause cascading financial losses in the billions of dollars. Vineyard Wind could not recover from such losses.

101.    Vineyard Wind has invested substantially in the Project. To date, Vineyard Wind has incurred $4.5 billion in developing, permitting, engineering, fabrication, and construction costs. This includes expending more than $300 million over four years to obtain approval of its COP.

102.    Under the terms of its lease with BOEM, Vineyard Wind pays rent and operating fees annually. Over the life of the Project, Vineyard Wind will pay over $60 million in rent and operating fees. To date, it has paid around $3 million and will pay around $2 million per year when the Project is fully operational.

103.    Vineyard Wind incurs daily costs of approximately $2.0 million, including direct and indirect costs associated with the vessels, GE Vernova, lost revenue, interest (including $9 million in monthly interest), Project personnel, organizational management, logistical set up,

insurance policies, etc. Even if the vessels stop work for a short period of time, Vineyard Wind must continue paying the vessel rates. A 90-day stop of the Project will cost Vineyard Wind approximately $180 million, which is unplanned and for which there is no source of financing to pay.

104.    More importantly, it is critical that the specialized installation vessel be able to work to install WTGs and blades to achieve Project completion before March 31, 2026. The Project schedule does not contain a sufficient buffer to withstand the 90-day suspension mandated by the Order.

105.    The Order will cause additional harm beyond the construction logistics and related costs. Although the Order permits the Project to continue its current level of power generation, that level is insufficient to prevent the catastrophic financial consequences of the Order. If the Project is not timely completed by March 31, 2026 (the contractual maturity date under the credit agreement), and with no vessels secured to complete the Project in the foreseeable future, then its lenders will have the ability to declare an event of default, accelerate repayment of the construction loan, and foreclose on the Project. Such an event would threaten the financial viability of the entire Project and, consequently, Vineyard Wind's ability to survive.

106.    Vineyard Wind would also not be able to deliver the power capacity agreed to with the Massachusetts distribution companies and ISO-New England (ISO-NE) grid operator, risking New England grid reliability and directly harming citizens like those depending on the Project for a job or nearby ratepayers not accounting for unexpected increased electricity costs.

107.    The Project directly supports approximately 3,700 good paying jobs, including union and nonunion positions, with ongoing construction being the most labor-intensive. The vast majority of these workers are residents of Massachusetts. At this stage of construction,

approximately 750 U.S. workers are employed on the Project. If all work on the Project is stopped, these workers will be laid off with no clear employment opportunities for similar work. In addition, there are 32 U.S. flagged vessels currently engaged on the Project, all of which would have to cease work and lose significant income. To date, the Vineyard Wind has generated approximately $1.9 billion in Massachusetts-based economic output. More than 80 southeastern Massachusetts companies have secured work from Vineyard Wind, the majority of which are based in New Bedford. *Id*. Vineyard Wind has also secured supply contracts with vendors in over 29 states expending approximately $1.7 billion with U.S. based suppliers. Vineyard Wind has indirectly generated jobs through its supply chain expenditures which similarly would be lost.

108.    When fully operational, the Project will generate much-needed clean electricity for more than 400,000 homes and businesses in Massachusetts and enhance the reliability of New England's transmission system. As the Massachusetts Department of Public Utilities found when approving Vineyard Wind's power purchase agreements, the Project will provide enhanced reliability to the New England region and contribute to the reduction of winter electricity price spikes. The Project will provide $3.7 billion in energy-related cost savings over its life and will reduce carbon emissions in an amount equivalent to taking 325,000 cars off of the road annually. These public benefits will be lost if the Project is not completed.

109.    These public benefits cannot be overstated. Massachusetts is obligated by law to meet certain renewable energy production mandates and greenhouse gas emissions reductions. Vineyard Wind plays a crucial role in meeting these obligations, with the Vineyard Wind Project contracts providing energy and renewable energy credits at a price materially below the projected cost of buying them in the market over the 20-year term of the contract. *See*

Mahony Decl. ¶ 42, *New York v. Trump*, No. 25-CV-11221 (D. Mass. May 14, 2025), ECF No. 71-11.

110.    If the Project cannot be completed and fully operational, it will exacerbate broader issues plaguing Massachusetts's regional electricity grid operator, ISO-NE, and increase risks to reliability. New England grid resiliency is critical, particularly as the region is increasingly vulnerable to seasonal weather spikes and sever weather-related events, such as winter storms. Seasonal spikes in demand currently require costly imports of expensive natural gas from outside the region. In the next ten years alone, ISO-NE expects summer peak demand to increase nine percent and winter demand to increase 30 percent. *See id.* ¶ 43.

111.    Vineyard Wind's Project—in conjunction with other offshore wind energy projects contracted by the Commonwealth of Massachusetts—not only reduces the burden of these high seasonal electricity costs to customers, but also helps increase regional grid reliability and retain billions of dollars that would otherwise flow out of the region. *See id.* ¶¶ 43–44; *see also* ISO New Eng., *ISO New England Statement on Department of the Interior Offshore Wind Announcement*, ISO Newswire (Dec. 22, 2025), https://isonewswire.com/2025/12/22/iso-new-england-statement-on-department-of-the-interior-offshore-wind-announcement.

112.    Prior to the Order, ISO-NE anticipated having "sufficient resources" to meet consumer demand this winter due, in part, to contributions from the Project. Press Release, ISO New Eng., *New England Expected to Have Sufficient Electricity Supplies this Winter* (Nov. 17, 2025), https://www.iso-ne.com/static-assets/documents/100029/20251117-pr-winter-outlook.pdf. Without offshore wind, ISO-NE's expected available supply capacity will decrease. *Id.* Stifling the Project at this stage will immediately alter ISO-NE's analyses regarding near-term and future electricity needs for a reliable system, increasing risk not only

to reliability but also affecting more broadly New England's economy and industrial growth.
*Id.*

113.    And Massachusetts ratepayers are some of those most harmed by the Order. As the
Commonwealth explained, the Order to Vineyard Wind means the loss of new power
generation that could power over 200,000 homes and businesses *this winter*—a time when the
NE grid is most constrained—and ratepayers could lose out on savings of at least $13 million
in direct wholesale energy market costs. Press Release, Commonwealth of Mass. Governor
Maura Healey & Lt. Governor Kim Driscoll, Governor Healey Responds to Trump
Administration Stop Work Order for Vineyard Wind, Commonwealth of Massachusetts (Dec.
22, 2025), https://www.mass.gov/news/governor-healey-responds-to-trump-administration-
stop-work-order-for-vineyard-wind. Commonwealth Governor Healey explains in no unclear
terms that the Order is causing Massachusetts to "los[e] out on crucial additional power that
was poised to lower costs and emissions in the region this winter." *Id.* And without offshore
wind projects like Vineyard Wind, New England "faces increased blackout risks, higher costs,
and greater reliance on expensive backup plans during winter." Turn Forward, *Report
Highlights Strong Performance amid Elevated Grid Stress* (Dec. 4, 2025)
https://turnforward.org/impacts-of-offshore-wind-on-reliability-and-affordability-iso-ne-
nyiso (citing Charles River Assocs., *Impacts of Offshore Wind on Reliability and Affordability
in ISO-NE and NYISO* (Dec. 2, 2025)).

114.    Beyond these immediate impacts, this type of arbitrary action by the Government is
significant because of its impact on the markets—injecting further uncertainty into the markets
will make it "harder for states and private companies to secure financing for public works
projects if investors know they can be stopped at any time despite having gone through all the

necessary local and federal approval processes." Press Release, Commonwealth of Mass. Governor Maura Healey & Lt. Governor Kim Driscoll, Joint Statement on Offshore Wind from Governor Maura Healey, Governor Kathy Hochul, Governor Ned Lamont, Governor Dan McKee, (Dec. 23, 2025), https://www.mass.gov/news/joint-statement-on-offshore-wind-from-governor-maura-healey-governor-kathy-hochul-governor-ned-lamont-governor-dan-mckee.

115.    Finally, the Order's prevention of timely installation of blades creates and exacerbates potential safety risks. During the December 30, 2025 meeting, BOEM asked Vineyard Wind to submit a description of the construction activities Vineyard Wind believed were necessary to prevent impacts to health, safety, or the environment, as permitted by the Order. Vineyard Wind responded that same day by email, explaining that it intended to (i) complete construction of partially installed turbines by removing, replacing and/or installing blades and installing one nacelle to ensure that the turbines are in the safest condition in the interim and (ii) perform start up activities that test and prepare critical control and safety systems. On December 31, 2025, BSEE responded that Vineyard Wind could complete blade removals but could not move forward with any new blade installation, because BSEE did not believe that was "a matter that impacts, health, safety and the environment." Vineyard Wind requested a meeting to discuss this issue and was asked by BSEE ton instead provide a written report. Vineyard Wind provided additional documentation to BSEE on 6, 2026, to demonstrate the work necessary to avoid potential safety risks, particularly those related to water damage and lightning strikes. Although Vineyard Wind has continued to engage BSEE to timely resolve this issue, BSEE has been unwilling to meet. On January 14, 2026, BSEE advised Vineyard Wind that it would not modify its December 31 position to not allow blade installation as safety work under the Order.

116.    This decision is at odds with accepted engineering practice and the reality that the safest condition for a turbine is to be in full operational mode, which requires completing start-up testing of all essential systems to ensure the turbine can be controlled remotely and that all critical safety systems are functional.

117.    Blade installation is also necessary to ensure neither water nor excess humidity enters the nacelle through the blade mount openings and interfaces and damages critical safety systems. Although the openings are covered, the covers are not designed to withstand long-term exposure to harsh winter weather conditions, including sustained high winds, rain, and snow. Damaged or degraded covers may become marine debris and, if detached from the nacelle, may allow significant water ingress into the hub, which could flood the nacelle's interior and cause subsequent damage to blade bearings, hydraulic equipment, safety equipment, and electrical equipment such as cabinets, motors, batteries, and other electronic components. Such damage would violate the Contractor's Preservation Plan, which prohibits water/moisture for a prolonged period (>2 days) in any area inside the turbine.

118.    Completion of the turbines is also needed to prevent risk of lightning strikes. The turbines are fitted with a lightning protection system that utilizes lightning receptors or conductors placed along the blades to provide preferred interception points for lightning strikes and safely conduct the resulting current to ground. Without installed blades, this system is not operating as designed, increasing the risk of damage or electrical fire in the event of a lightning strike.

119.    The tower of a WTG without blades may also experience increased stress from tower sway, which is materially reduced when the blades are installed, consistent with design load assumptions set forth in the BSEE-approved Facility Design Report. The failure to install blades on turbines that have been idle and/or without blades for long periods of time

compromises the turbine's structural integrity, a risk that is only exacerbated by the potential inability to install blades after the departure of *Sea Installer* in March if the Order remains in effect through its initial 90-day period and installation cannot resume before the vessel demobilizes.

120.    BSEE's December 30, 2025 conclusion that blade installation does is not necessary to ensure safety is at odds with BSEE's earlier communications and actions. Following a blade failure in July 2024, BSEE revised the COP to require the removal and replacement of certain blades, repeatedly stressing that the work should be done as soon as possible to ensure full control of the turbine and to enable testing and verification of key control and safety systems.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of OCSLA and the APA
(Against All Defendants)

121.    Vineyard Wind repeats and re-alleges the allegations in the paragraphs above as if fully set forth herein.

122.    Vineyard Wind's lease confers "the exclusive right and privilege, subject to the terms and conditions of [the] lease and applicable regulations," to construct and operate the Project in accordance with the "COP that has been approved by [BOEM]." Lease, § 2(a); *see also* 30 C.F.R. § 585.200(a) (lessee has the "right, subject to obtaining the necessary approvals," and complying with the regulations, to "install and operate facilities").

123.    Vineyard Wind's lease further provides that BOEM "reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of section 12 of [OCSLA] and applicable regulations provided that compensation must be paid to the Lessee as provided by [section 12(c) and (d).]" Lease, § 3(c).

124.    Section 12(c) states that issued leases "shall contain" a provision authorizing BOEM, "upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President," to "suspend operations under any lease; and all such leases shall contain … provisions … of just compensation to the lessee whose operations are thus suspended." 43 U.S.C. § 1341(c).

125.    Section 12(d) reserves the United States's "right to designate, by and through the Secretary of Defense, with the approval of the President," areas of the OCS "needed for national defense, and so long as such designation remains in effect, no exploration or operations may be conducted on any part of the surface of such area except with the concurrence of the Secretary of Defense," and lease payments "likewise shall be suspended," the "lease shall be extended" by the length of the suspension, and "the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution." *Id.* § 1341(d).

126.    Neither section 12(c) nor 12(d) authorize BOEM to suspend construction of the Project and neither section is applicable here as (1) there is no declared war or national emergency and (2) the Secretary of Defense has not declared Vineyard Wind's lease "needed for national defense."

127.    The Order cites to BOEM's regulations at 30 C.F.R. § 585.417(b), which BOEM asserts authorizes it to issue a suspension order "[w]hen the suspension is necessary for reasons of national security or defense." *Id.* § 585.417. That regulation must be read in conjunction with OCSLA Section 12, which gives the DoW (not BOEM) the authority to determine when a suspension of the lessee's operations is necessary for reasons of national security or defense. BOEM cannot claim for itself the authority to determine what is needed for national security and defense.

128.    BOEM also issued the Order without adhering to additional procedures and limitations in the lease requiring the "appropriate military agency" to make "every effort" to "provide as much advance notice as possible of the need to suspend operations," reiterate that "[a]dvance notice will normally be given before requiring a suspension," and specify that suspensions "for national security reasons will generally not exceed seventy-two (72) hours." Lease Addendum C, § 3.2.2.

129.    This willful failure to apply the procedures and circumstances set forth in OCSLA section 12 or the Lease unlawfully deprives Vineyard Wind of its rights under the Lease to construct the remaining five percent of its Project in accordance with the approved COP.

130.    In issuing the Order, BOEM acted contrary to the terms of its lease and COP, which is a violation of 43 U.S.C. § 1349(a).

131.    Additionally, because BOEM's issuance of the Order is arbitrary, capricious, and in violation of law, it violated the APA, 5 U.S.C. § 706.

## COUNT II

### Violation of the APA
(Against All Defendants)

132.    Vineyard Wind repeats and re-alleges the allegations in the paragraphs above as if fully set forth herein.

133.    Under the Administrative Procedure Act, a "reviewing court shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review of a final agency action is based on an administrative record and applicable law. *Id.* § 706.

134.    An agency must produce an administrative record showing that its decision is rational and supported with factual evidence. The agency must examine the relevant data and articulate a

satisfactory explanation for its action including a rational connection between the facts found and the choice made. An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

135.    When a federal agency changes its policy or reverses a prior decision, it must provide a reasoned explanation for that change, including an explanation of why its prior factual findings are no longer valid. This is particularly true where prior agency decisions have engendered serious reliance interests and have been upheld in hotly contested litigation.

136.    The Order is a final agency action subject to judicial review under the Administrative Procedure Act. 5 U.S.C. § 704. A final agency action is an action that (1) marks the consummation of the agency's decision making process and is not a tentative decision, and (2) is one by which rights or obligations have been determined or from which legal consequences flow. The Order is both of these things.

137.    The Order is not a tentative decision. It directs Vineyard Wind to halt "all ongoing activities related to the Vineyard Wind 1 Project" for 90 days (and perhaps longer), except for activities "necessary for the current level of power generation" and those "necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment." In so doing, the Order purports to alter Vineyard Wind's legal right to conduct activities under its approved COP.

138.    The Order makes no factual or legal findings that Vineyard Wind's specific activities violate the terms of its approved construction and operation plan, its lease, or any applicable

statute, regulation, or permit or authorization.

139.    The Order does not provide a reasonable explanation of why BOEM is taking the extraordinary action of suspending activities taken under an approved COP. It cites 30 C.F.R. § 585.417(b), but does not explain why a suspension of all construction activity and commissioning of wind turbine generators for the Project is "necessary for reasons of national security or defense."

140.    The Order nowhere identifies what BOEM thinks are the "national security threats relating to this project." Ex. 1 at 1. It does not identify what the Project is doing to cause those unidentified threats. It does not explain why those unidentified threats have "the potential to cause serious, immediate, and irreparable harm to our great nation." *Id.* And it does not explain why the unspecified harm "can only be feasibly averted by suspension of on-lease activities." *Id*

141.    The Order is also arbitrary and capricious because it violates the "change-in-position doctrine." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025). That doctrine states that it is arbitrary and capricious for agencies to change their positions unless they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* (quotation omitted).

142.    The Order does not acknowledge BOEM's prior findings that BOEM's approval of the COP will result in protection of national security and compliance with the other factors in 43 U.S.C. § 1337(p)(4) and part 585 of the regulations in title 30 of the Code of Federal Regulations—findings that were based on a voluminous administrative record, that BOEM defended when those findings were challenged in multiple lawsuits, and that were upheld by this Court and the First Circuit.

143.    The Order provides no *reasoned* explanation for disregarding the facts and circumstances that serve as the basis for BOEM's approval of the COP. The Order references new and supposedly classified information from the DoW. But it nowhere explains why that information undermines BOEM's prior conclusions or renders the existing mitigation measures inadequate.

144.    The Order failed to account for Vineyard Wind's serious and justifiable reliance interests on the permits, authorizations, and the Mitigation Agreement with the DoD (now War) allowing it to construct and operate the Project. Vineyard Wind relied upon these validly issued permits, authorizations, and Mitigation Agreement in investing $4 billion in the Project. Given that the Agency Defendants defended their approval of the Project when it was challenged in litigation, and their approval was upheld by both the U.S. District Court and the First Circuit, Vineyard Wind's reliance was both reasonable and well understood by the Agency Defendants.

145.    Finally, despite the Order's stated reasoning, President Trump met with oil executives at the White House on January 9, 2026, to boast of his outspoken opposition to wind energy, noting specifically that he is "not much of a windmill person," that his administration has "not approved one windmill since [taking] office and [he's] going to keep it that way," and that "I've told my people we will not approve windmills." The White House, *President Trump Participates in a Meeting with Oil and Gas Executives*, at 59:51–59:57, 1:00:53–1:01:04, YouTube (Jan. 9, 2026), https://www.youtube.com/watch?v=iaE8lw8_x30&t=3590s. Not *once* did President Trump cite national security concerns, instead focusing on other factors. *Id.* at 1:00:04 –1:00:10 ("They lose money. They destroy your landscape. They kill your birds. They're all made in China.").

146.    For the reasons stated in the preceding paragraphs, the Order is pretextual and was issued

in bad faith.

147.    Agency Defendants' failure to provide a reasoned explanation or evidence supporting the Order, explain its change in position, grapple with the contradictory administrative record supporting the lease and COP, or consider Vineyard Wind's reasonable reliance interests in its permits and authorizations for the Project is arbitrary, capricious, and otherwise not in accordance with law in violation of 5 U.S.C. § 706.

## COUNT III

### Violation of APA
(Against All Defendants)

148.    Vineyard Wind repeats and re-alleges the allegations in the paragraphs above as if fully set forth herein.

149.    Under the Administrative Procedure Act, a "reviewing court shall … hold unlawful and set aside agency action" conducted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Judicial review of a final agency action is based on an administrative record and applicable law. *Id.* § 706.

150.    APA Section 558 prohibits an agency from issuing a "withdrawal, suspension, revocation, or annulment of a license" without first providing "notice" and an "opportunity to demonstrate or achieve compliance with all lawful requirements," except in cases of willfulness or where public health, interest, or safety requires otherwise. *Id.* § 558(c). A "license" is defined as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8).

151.    Vineyard Wind's Lease and COP each constitute a "license" under the APA because each is a "form of permission" to develop wind energy on the outer continental shelf. And BOEM provided Vineyard Wind with neither notice nor an opportunity to demonstrate or achieve

compliance with lawful requirements prior to issuing the Order. Because neither of the limited exceptions to this requirement—willfulness or public health, interest, or safety—applies here, BOEM's Order violates the APA.

**COUNT IV**

**Violation of OCSLA**
(Against All Defendants)

152.    Vineyard Wind repeats and re-alleges the allegations in the paragraphs above as if fully set forth herein.

153.    OCSLA authorizes "any person having a valid legal interest which is or may be adversely affected" to commence a civil action to compel compliance with OCSLA against "any person, including the United States, and any other government instrumentality or agency" for any alleged violation of OCSLA, any regulation promulgated under OCSLA, or the terms of any leases or permit issued under OCSLA. 43 U.S.C. § 1349(a)(1).

154.    In many situations, a plaintiff must provide "notice of the alleged violation, in writing under oath, to the Secretary and any other appropriate Federal official, to the State in which the violation allegedly occurred or is occurring, and to any alleged violator." *Id.* § 1349(a)(2)(A). But there is an exception to the "60-Day Notice" requirement under Section 1349(a)(2)(A): "An action may be brought under this subsection immediately after notification of the alleged violation in any case in which the alleged violation … would immediately affect a legal interest of the plaintiff." *Id.* § 1349(a)(3).

155.    The Order issued by BOEM on December 22, 2025, immediately affects a legal interest of Vineyard Wind by ordering Vineyard Wind to halt all activity related to the Vineyard Wind Project on the outer continental shelf—depriving Vineyard Wind of its rights under its lease and approved COP and causing massive financial harm that threatens the existence of the

Project. Vineyard Wind gave the Secretary and the Acting Director of BOEM notice of their alleged violations of OCSLA, the OCSLA regulations, and the terms of Vineyard Wind's lease by sending them a copy of this Complaint shortly before the Complaint was filed with this Court.

156.    Vineyard Wind provided the notification described in Section 1349(a)(2)(A) by sending Defendants and the Commonwealth of Massachusetts a copy of this Complaint prior to when it filed this action.

157.    Section 2(a) of Vineyard Wind's lease gave the company "the exclusive right," subject to the terms and conditions of the lease and applicable regulations, to conduct those activities that are described in its approved COP. *See also* 30 C.F.R. § 585.200(a)(1) ("A lease issued under this part grants the lessee the right, subject to obtaining the necessary approvals … and complying with all the provisions of this part, to occupy, and install and operate facilities on, a designated portion of the OCS for the purpose of conducting … Commercial activities").

158.    As described above, the OCSLA statute and regulations permit BOEM or BSEE to suspend activities on a lease only in limited circumstances. The Order cites only its alleged regulatory authority pursuant to 30 C.F.R. § 585.417(b). But the Order does not provide the evidence and factual findings necessary to justify an order to suspend activity.

159.    The Order does not claim, much less show, that the Secretary of Defense has determined that operations must be suspended because the lease area is needed for national security or defense, or because of a state of war or national emergency. *See* 43 U.S.C. § 1341(c)–(d); 30 C.F.R. § 585.417(b).

160.    Because BOEM is bound to comply with its own regulations, and the Order does not comply with the requirements under OCSLA's implementing regulations for a notice of a

cessation order, the Order violates OCSLA.

161.    The Order immediately affects a legal interest of Vineyard Wind. 43 U.S.C. § 1349(a)(3).

162.    Further, by disrupting the construction and operation of Vineyard Wind's lawfully authorized and permitted Project, and by imperiling the Project through the indefinite and unlawful Order, Agency Defendants violated Congress' directive, as expressed in OCSLA, that the Outer Continental Shelf be used for "expeditious and orderly development." *Id.* § 1332(3).

**COUNT V**

**Deprivation of Property without Adequate Due Process, U.S. Constitution, Amendment V**
(Against All Defendants)

163.    Vineyard Wind repeats and re-alleges the allegations in the paragraphs above as if fully set forth herein.

164.    The Fifth Amendment to the United States Constitution prohibits one from being "deprived of life, liberty, or property, without due process of law."

165.    Vineyard Wind lawfully holds Lease OCS 0501-A. The legality of its issuance was challenged in litigation, defended by the Agency Defendants in litigation, and upheld by the U.S. District Court of the District of Massachusetts.

166.    Defendant BOEM lawfully approved Vineyard Wind's COP, entitling Vineyard Wind to construct and operate the Project.

167.    Vineyard Wind has a property interest in its lease as the lease grants Vineyard Wind exclusive rights to construct and operate the Project provided that it obtains all other required permits and authorizations.

168.    Vineyard Wind has obtained all permits and authorizations required to construct and operate the project.

169.   The Order violates due process because it arbitrarily deprives Vineyard Wind of its right to construct and operate the Project pursuant to the approved COP without prior notice, without notice of the factual basis for the Order, and without providing Vineyard Wind with an opportunity to contest the basis for the Order before, or after, the Order took effect.

170.   For the reasons described above, immediate compliance with the Order will cause Vineyard Wind significant financial harm and threaten the long-term outlook for the Project. This is particularly true given the Order's open ended review of "potential mitigation measures" and BOEM's perceived unilateral ability to indefinitely extend the suspension or outright cancel the Project. Ex. 1 at 1. The Order fails to sufficiently identify its interest in immediately halting Vineyard Wind's construction activities and operations without notice and an opportunity for a hearing.

171.   Thus, in issuing the Order BOEM violated the Fifth Amendment to the United States Constitution.

## COUNT VI

### Declaratory Judgment Act
(Against All Defendants)

172.   Vineyard Wind repeats and re-alleges the allegations in the paragraphs above as if fully set forth herein.

173.   Based on the violations of law set forth in Counts I through V above, Vineyard Wind is also entitled to a declaratory judgment finding BOEM's Order to be unlawful and unenforceable pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Declare that the Order is arbitrary and capricious in violation of the APA;

2.     Declare that the Order violates OCSLA;

3.     Declare that the Order is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right and otherwise not in accordance with law in violation of the APA;

4.     Declare that the Order violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution;

5.     Issue a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining, without bond, Defendants from implementing, enforcing or otherwise relying on the Order, including withholding any approvals, concurrences, or reviews requested by Vineyard Wind;

6.     Direct BSEE to resume review of, and issuance of non-objections to, submissions by Vineyard Wind to permit blades to be installed and turbines placed in operation pursuant to the terms and conditions of the COP;

7.     Alternatively declare that blade installation and preservation work falls within the Order's safety exception;

8.     Award Vineyard Wind damages in an amount to be determined; and

9.     Grant all other relief as the Court may deem just and proper, including, but not limited to, attorney's fees and costs.

Date:  January 15, 2026

Respectfully submitted,

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

Peter C. Whitfield (*pro hac vice* pending)
Richard W. Smith (*pro hac vice* pending)
Kathleen Mueller (*pro hac vice* pending)
Matthew Brewer (*pro hac vice* pending)
SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, DC 20005
(202) 736-8000
pwhitfield@sidley.com
rwsmith@sidley.com
kmueller@sidley.com
mbrewer@sidley.com

Brooklyn Hildebrandt (*pro hac vice* pending)
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
(213) 896-6007
bhildebrandt@sidley.com

*Counsel for Vineyard Wind 1 LLC*