**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

VINEYARD WIND 1 LLC,

         *Plaintiff,*

v.

THE UNITED STATES DEPARTMENT
OF THE INTERIOR, et al.,

         *Defendants,*

Civil Action No.  1:26-cv-10156

Hon.

## <u>DECLARATION OF KLAUS SKOUST MOELLER</u>

I, Klaus Skoust Moeller, declare under penalty of perjury as follows:

1.      I am the Chief Executive Officer of Vineyard Wind 1 LLC ("Vineyard Wind"). In this capacity, I oversee all aspects of company operations, including construction, commissioning, and commercial operations of the Vineyard Wind 1 offshore wind project (the "Project"). My statements in this declaration are based on my personal knowledge or on my experience or my consultation with others, or are known to me in my capacity as CEO of Vineyard Wind. These statements are true to the best of my knowledge, information, and belief as of the date of this declaration.

2.      Vineyard Wind is a limited liability company organized under Delaware law, with its principal place of business in New Bedford, Massachusetts. Vineyard Wind's only business is to own, construct, and operate the Project.

3.      From January 2019 until February 2022, when I became Chief Executive Officer, I served as Project Director for Vineyard Wind. In that role, I was responsible for overseeing and managing the planning, procurement, and construction of the Project. I am therefore personally

1

familiar with the technical, engineering, manufacturing, logistical, operational, and financial aspects of the Project.

**Summary**

4.      As explained below, if the December 22, 2025 Director's Order (the "Order") issued by the Bureau of Ocean Energy Management ("BOEM") remains in place and is not promptly enjoined, Vineyard Wind will suffer immediate and irreparable harm, threatening the entire Project and Vineyard Wind's ability to survive. At this point, even a few days of further delay could materially jeopardize the Project.

5.      Vineyard Wind's Project is not speculative or in early stages of development/construction. The Project began producing power more than one year ago, and when BOEM issued the Order, the Project's construction was approximately 95% complete, with 61 of its 62 wind turbine generators ("WTGs") already installed, and on track to finish the remaining work and achieve full commercial operation by the end of March 2026. The Project is operating and capable of generating about 572 megawatts ("MW") of electricity for the Massachusetts grid. Only a limited and discrete scope remains to complete installation activities, implement the remaining blade replacement work, and bring the remaining turbines online to provide the power that is critically needed in Massachusetts.

6.      The remaining installation activities are being performed under a tightly sequenced construction plan that depends on the availability of the highly specialized installation vessel *Sea Installer* and its crew. A second vessel, *Wind Pace*, was assigned to remove and install blades and, under the Project schedule, was expected to install blades on at least five additional WTGs before departing for its next project in Europe. Because BSEE has asserted the Order does not allow installation of new blades, however, *Wind Pace* has completed only its

blade-removal scope and is scheduled to depart to its next job without installing additional blades.

7.    Once *Wind Pace* departs, Project completion will depend entirely on *Sea Installer*, which is itself scheduled to depart on March 31, 2026, and there is no practicable prospect of securing and mobilizing a replacement vessel on any predictable timeline. To preserve a feasible path to completion before *Sea Installer* departs, this vessel must resume blade-installation no later than **January 30, 2026**.

8.    Winter offshore operations are frequently constrained by weather, particularly during the harsh and unpredictable months of January and February. For that reason, the Project depends on *Sea Installer* being able to work whenever weather conditions permit safe operations. Yet because BSEE, citing the Order, has declined to authorize blade installation even under the applicable safety exemption, *Sea Installer* has been forced to stand by—squandering scarce weather windows and workable days that cannot be recaptured. *Sea Installer* has already been idle during some of the best winter weather conditions to date in 2026.

9.    Accordingly, time is the constraining factor; each day of delay caused by the Order materially threatens Vineyard Wind's ability to complete the Project before *Sea Installer* departs. The Order eliminates the window needed to complete work before March 31, so the Project cannot be completed even if it is lifted later. Vessel availability for construction and commissioning is exceptionally difficult to secure. With only a very few number of vessels worldwide capable of installing Vineyard Wind's turbines, securing such a vessel typically requires booking years in advance. The remaining work requires around 60 days of such installation vessel. If works don't resume by January 30, 2026, the project will likely not be completed before Vineyard Wind loses access to that vessel, with no ability to finish the project

in the foreseeable future. This will leave partially completed turbine assets stranded in the Atlantic Ocean in an unsafe condition.

10.     The Order also creates severe financial and public-interest harms. Vineyard Wind's financing arrangements and other commercial commitments depend on the Project meeting operational and revenue milestones; any delay threatens defaults that could trigger accelerated repayment obligations and jeopardize the Project's viability. Further, prohibiting completion impairs the public interest by preventing Vineyard Wind from delivering the full contracted clean energy capacity under its power purchase agreements ("PPAs") and from providing the expected additional generation to the ISO–New England grid. The suspension also disrupts hundreds of jobs and associated economic activity and delays expected tax and community benefits. Finally, stopping work mid-completion through winter conditions increases operational and safety risks by leaving partially completed equipment and systems idle offshore, requiring demobilization and later remobilization, and increasing hazards for offshore workers and mariners.

11.     These harms are unnecessary. Vineyard Wind has complied with, and continues to comply with, its permits and approvals, including the existing Mitigation Agreement with the Department of Defense ("DoD"), now the Department of War ("DoW"). The Project has already undergone extensive federal review and mitigation planning addressing national security and radar-related concerns. To my knowledge, since the Mitigation Agreement was executed, neither BOEM nor DoW has contacted Vineyard Wind to raise any national security concern regarding the Project before issuance of the December 22 Order. The Project has also been operating as a power plant for more than a year with no reported national security or radar-related issues.

12.     Despite repeated outreach from Vineyard Wind, BOEM, acting on behalf of the DoW, has declined to share any information regarding the Order's asserted national-security concerns beyond general references to radar degradation. As a result, Vineyard Wind has been unable to engage in meaningful mitigation discussions, and those discussions have been delayed. That delay increases the urgency of lifting the Order in the interim.

### Project Overview

13.     The Project is located approximately 14 miles offshore of Massachusetts on the Outer Continental Shelf ("OCS") in Lease Area OCS-A 0501, which Vineyard Wind secured from BOEM in 2015 (the "BOEM Lease"). The project is almost complete and the remaining offshore work is limited to installing 10 blade sets and installing one additional WTG.

14.     The Project is comprised of 62 WTGs, 61 of which have been installed, each with a monopile foundation, transition piece, tower, nacelle and blades, and each capable of generating 13.6 MW of power. The WTGs are connected to inter-array cables in strings that transmit power to an offshore electrical service platform ("ESP"). The ESP gathers the power generated by the WTGs and transforms it to a higher voltage for transmission to shore through two 220 kV offshore export cables that make landfall in Barnstable, Massachusetts. From there, onshore cables transmit the power to an onshore substation where it is stepped down before being interconnected to the grid. The Project has been producing power since January 2024.

15.     Vineyard Wind obtained all necessary property rights for the Project, including (i) a federal lease and easement on the OCS where the wind turbines and export cables are located, (ii) a 35-year lease (with two 25-year extensions and a purchase option) of an 8.1-acre site in Barnstable, Massachusetts where a substation interconnects the Project to the bulk power grid, and (iii) property easements within Barnstable where the onshore cables are installed. The

BOEM Lease grants Vineyard Wind the exclusive right and privilege to submit to BOEM a Construction and Operations Plan ("COP") and to conduct activities described in its approved COP subject to the terms and conditions of the lease and the regulations.

**Project Approvals**

16.     In May 2021, BOEM approved the COP, which took almost four years to obtain at a cost of over $300 million. BOEM's COP Approval Letter is dated July 15, 2021 and is attached as Exhibit 1. In approving the COP, BOEM found that if the Project is constructed and operated in accordance with the COP's terms and conditions, it will comply with the Outer Continental Shelf Lands Act ("OCSLA"), including the provisions requiring protection of the environment, safety, prevention of interference with reasonable uses of the outer-continental shelf and, most relevant here, protection of the national security interests of the United States.

17.     On January 17, 2025, BOEM approved a revised COP that governs Vineyard Wind's blade removal and replacement program. This Revised COP approval, including the associated Terms and Conditions for blade removal and replacement, is attached as Exhibit 2. Under those terms and conditions, Vineyard Wind was required to remove blades manufactured at GE's Gaspé, Québec facility and replace them with blades manufactured at GE Vernova's Cherbourg, France facility. Vineyard Wind has completed the required blade removals; the remaining scope of this program is to install replacement blades on 10 WTGs. The COP addendum also requires a third-party Certified Verification Agent ("CVA") to review the replacement blades and provide inspection information to the Bureau of Safety and Environmental Enforcement ("BSEE") for BSEE's review to confirm that the replacement blades meet applicable specifications. Before the Order, Vineyard Wind worked cooperatively

and effectively with BSEE and the CVA, and that process enabled blade installation to proceed safely and efficiently.

18.     Vineyard Wind participated in extensive local, state, and federal regulatory proceedings to obtain the permits necessary to construct and operate the Project, including federal approvals issued after extensive review by BOEM, the Environmental Protection Agency, the U.S. Army Corps of Engineers, the National Marine Fisheries Service, the U.S. Coast Guard, and the Federal Aviation Administration. Vineyard Wind has complied with, and continues to comply with, all applicable federal, state, and local permits and approval conditions, including BSEE-required inspections and approvals at specified stages before key installation and operational milestones.

19.     In particular, Vineyard Wind has addressed and resolved all national security issues identified for the Project through the federal permitting and interagency review process and has implemented the mitigation measures and operational commitments required to protect U.S. defense interests. Consistent with that process, the DoD and the U.S. Department of the Air Force ("Air Force") conducted an extensive national security review and executed an agreement with Vineyard Wind under which they agreed not to object to the construction and operation of the Project so long as Vineyard Wind complies with the agreement's terms. Vineyard Wind has complied with, and continues to comply with, those requirements.

20.     DoD described its radar-impact mitigation approaches (overlapping radar coverage and Radar Adverse Impact Management ("RAM")) and stated that, for Vineyard Wind, these measures would mitigate impacts to an acceptable level, while requesting that BOEM include conditions requiring (1) notification to the North American Aerospace Defense Command's ("NORAD") prior to project completion for RAM scheduling, (2) an $80,000

contribution toward RAM execution, and (3) curtailment for national security or defense

purposes as described in the leasing agreement; DoD further stated it would "work with BOEM

on the specific text" to implement these mitigation requirements.

21.     Consistent with these negotiated approval conditions, after BOEM issued its Final

Terms and Conditions for the Project on July 15, 2021, Vineyard Wind provided a written

confirmation to the United States Air Force on July 30, 2021 (copied to BOEM and DoD's

Clearinghouse) confirming that the Project structures can withstand daily sonic overpressures

and potential falling debris from chaff and flares, as required by BOEM's approval conditions.

Vineyard Wind has implemented these and the other national-security-related approval

conditions throughout construction and into operations, and the Project has been operating as a

power plant since January 2024 without any reported radar-related issues or any identified non-

compliance with DoD- or Air Force-related conditions.

22.     In April 2022, after more than three years of consultation and interagency review

with the DoD and the Air Force beginning in 2018, Vineyard Wind entered into an agreement

(the "Mitigation Agreement") with the DoD and the Air Force to address national security,

National Airspace System protection, and military readiness concerns potentially associated with

the Project. A copy of the Mitigation Agreement and a 2023 addendum to it are attached as

Exhibit 3.

23.     The Mitigation Agreement's stated objective is to "mitigate any potential adverse

impacts and to minimize risks to national security while allowing the Vineyard Wind 1 Offshore

Wind Energy Project . . . to proceed with development." The Mitigation Agreement further states

that it is "structured to ensure [Vineyard Wind] may construct and operate the Project without

adversely impacting DoD military operations and readiness." Provisions of the Mitigation

Agreement include:

- limiting the Project to 62 turbines and one offshore substation;

- limiting Project structures to a maximum height of 837 feet above sea level;

- restricting construction to a specified geographic area;

- requiring Vineyard Wind to provide funding to offset the cost of measures undertaken by DoD to mitigate any adverse impacts or to conduct studies of potential measures to mitigate such impacts;

- requiring immediate curtailment of Project wind turbine operations for national security or defense purposes upon request by NORAD; and

- imposing requirements for the protection of national defense capabilities and military operations from compromise or exploitation, including risks that may arise from activities under foreign control operating in the vicinity of national defense capabilities and military operations.

24.     The Mitigation Agreement also requires Vineyard Wind to provide advance

notice to the DoD regarding any foreign entities or foreign persons proposed to work on the

Project, so the DoD can evaluate and address any potential security concerns. The terms of the

Mitigation Agreement thus ensure that Project operations do not conflict with the NORAD's

operation of the Falmouth, Massachusetts Airport Surveillance Radar ("ASR-8"), while

protecting the National Airspace System and supporting military readiness.

**Project Status**

25.     To date, Vineyard Wind has incurred over $4.5 billion to develop, permit,

engineer, fabricate components for, and construct the Project.

26.     When BOEM issued the Order, the Project was approximately 95% complete and

already operating as a power plant capable of delivering approximately 572 MW of power to the

New England grid. Construction completed to date includes installation of all 62 monopile

foundations and transition pieces, all inter-array cables, the ESP, the offshore export cables, the onshore cables, the onshore substation, and 61 installed WTGs. Forty-four WTGs are currently cleared for power production by BSEE (giving the Project a total capacity of 572 MW) and, absent the Order, additional capacity was expected to come online over the next few weeks as additional WTGs are brought online.

27.    The remaining offshore work consists primarily of: (i) installing one additional WTG (including blades); (ii) installing sets of three blades ("blade sets") on 10 WTGs as part of the BOEM-approved blade replacement program, which continues the blade removal campaign completed in accordance with revised COP terms and conditions; and (iii) bringing online the remaining 18 WTGs (including the one WTG that remains to be installed). All remaining construction work is being performed pursuant to BOEM-approved COP modifications and in compliance with the applicable terms and conditions intended to ensure blade integrity throughout manufacturing, transportation, installation, and start-up and operational testing. Those requirements include inspections at defined stages, independent certification before installation and operational start-up, and BSEE review at specified points in the process.

28.    The work was being performed by the WTG manufacturer and installer, GE Vernova, a U.S. company based in Massachusetts, using two highly specialized vessels designed for offshore WTG installation and blade work (including removal and replacement)—*Wind Pace* and *Sea Installer*. However, because the Order does not allow construction to proceed, the *Wind Pace* is scheduled to depart for another project.

29.    Because the *Wind Pace* is scheduled to depart, the Project's remaining offshore work—including the final WTG installation, remaining blade installation, and the start-up

activities required to bring the remaining WTGs online—must be completed using *Sea Installer*, which is currently scheduled to demobilize and depart for its next project on March 31, 2026.

30.     Because Vineyard Wind will lose access to *Wind Pace*, the remaining replacement blades must be moved from Canada to the Port of New Bedford using a different vessel. New Bedford will then serve as the staging port for shuttling blade sets offshore for installation by *Sea Installer*.

31.     For each blade set, the process is: (i) the barge departs New Bedford after loadout and readiness steps (including obtaining the necessary permission from the U.S. Army Corps of Engineers to cross the hurricane barrier); (ii) the barge transits to the Project area; (iii) the barge transfers the blade components to *Sea Installer* at an offshore mooring buoy ; and (iv) *Sea Installer* elevates to installation height and installs the blade set.

32.     Vineyard Wind anticipates using two barges so that while one barge is delivering blades offshore, the other can be loaded out in New Bedford. This method is designed to keep *Sea Installer* continuously supplied with blades so that it can complete the remaining installation work before *Sea Installer*'s scheduled March 31, 2026 departure.

33.     Each day of delay attributable to the Order may not simply add a day at the end of the schedule; it can translate into days or weeks of downstream delay by disrupting vessel sequencing, missing limited weather windows, and forcing re-planning of logistics and review activities.

### The Order Irreparably Harms Vineyard Wind

34.     The Order imposes a minimum 90-day stop-work period, but the harm to Vineyard Wind is not confined to a 90-day schedule slip. Before BOEM issued the Order, the remaining offshore work was on track to be completed before March 31, 2026, when *Sea*

*Installer* is scheduled to demobilize and depart. The work stoppage required by the Order now threatens to prevent Vineyard Wind from completing the remaining offshore work before *Sea Installer*'s scheduled departure, jeopardizing the Project's planned path to completion.

35.     Vineyard Wind has reviewed the global availability of vessels capable of performing this specialized offshore installation and blade work and has been unable to identify a substitute vessel that could be mobilized in time to preserve the March 31, 2026 completion window. Even if a potential substitute could be identified, it would require contracting and extensive Project-specific mobilization—including procurement and installation of specialized equipment and sea-fastening—work that is time-intensive and would impose substantial additional cost. In Vineyard Wind's prior experience, when it lost access to a specialized installation vessel due to the vessel's contractual commitments elsewhere, it took more than six months to identify and mobilize a replacement. As a result, if the Project is not completed before *Sea Installer*'s departure, Vineyard Wind expects that resuming and finishing the remaining offshore work would take an additional year or more, if completion remains feasible at all.

36.     Prior to the Order, Vineyard Wind's remaining offshore work depended on a routine, predictable cadence of BSEE review and timely determinations for blade work.

37.     The remaining offshore scope requires installation of eleven blade sets, ten of which still require BSEE review of the associated Return to Installation ("RTI") packages before the blades can be installed. In addition, BSEE must review the Return to Service ("RTS") packages for the 18 WTGs that are currently awaiting clearance to produce power, four of which have been submitted. Completing the Project before *Sea Installer* departs is therefore contingent on BSEE timely completing and issuing non-objections on the remaining RTI and RTS packages. But BSEE staff have advised that, while the Order remains in effect, BSEE cannot

assure it has authority to complete those reviews or issue the required non-objections absent leadership guidance—effectively preventing installation of the remaining blade sets regardless of vessel and blade availability.

38.    As a result, the Order threatens to prevent timely blade-set review and push the remaining offshore work beyond *Sea Installer*'s fixed availability window. Once that window closes, the resulting delay becomes open-ended, and could extend completion by years, jeopardizing the Project's ability to achieve commercial operation. The construction has no meaningful tolerance for delays of this magnitude. Because the Order both halts the work needed to complete the Project within *Sea Installer*'s limited window and prevents Vineyard Wind from finalizing the BSEE reviews required to install blades and clear WTGs for power production, it threatens to foreclose Vineyard Wind's only feasible path to complete construction and commissioning—harm that cannot be undone by lifting the Order later.

**The Suspension Order Will Cause Significant Harm to Third Parties and the Public**

39.    The Project has directly supported approximately 3,700 good-paying jobs, including union and non-union positions, and the ongoing construction phase is the most labor intensive. At this stage, approximately 750 U.S. workers are employed in constructing the Project, the vast majority of these workers are residents of Massachusetts. If all construction work on the Project is stopped, most of these workers will be laid off with no clear employment opportunities for similar work. In addition prior to the Order, there were approximately 32 U.S.-flagged vessels engaged on the Project employing 276 U.S. mariners all of which would have to cease work and lose significant income.

40.    To date, Vineyard Wind has generated approximately $1.9 billion in Massachusetts-based economic output. More than 80 southeastern Massachusetts companies

have secured work from Vineyard Wind, the majority of which are based in New Bedford. Vineyard Wind has also secured supply chain contracts with vendors in over 29 states, expending almost $1.7 billion with U.S. based suppliers. Vineyard Wind has indirectly generated jobs through its supply chain expenditures which similarly would be lost.

41.     The Project is already capable of generating 572 MW of power to serve Massachusetts residences and is enhancing the reliability of New England's transmission system. Prior to the issuance of the Order, the remaining power was scheduled to come online by the end of March, bringing the project to 800 MW, enough to serve 400,000 Massachusetts residences and further enhance grid reliability. As the Massachusetts Department of Public Utilities found when approving the PPAs, the Project will provide enhanced reliability to the New England region and contribute to reducing winter electricity price spikes, and the PPAs are a cost-effective mechanism for procuring reliable renewable energy on a long-term basis and are in the public interest. The Project is expected to provide $3.7 billion in energy-related cost savings over its life and it will reduce carbon emissions equivalent to taking about 325,000 cars off the road each year. These benefits will be lost if the Project is not completed.

42.     Finally, under the terms of the BOEM Lease, Vineyard Wind pays rent and operating fees annually, which over the life of the Project will amount to more than $60 million. To date, it has paid around $3 million and will pay around $2 million per year when the Project is fully operational. These benefits will also be lost if the Project is not completed.

**Potential Additional Harms From a Pause in Construction**

43.     Wind turbines are designed mechanically and electrically as an integrated system, and accepted engineering practice is clear that once tower installation has started, the safest course is to complete installation of all components, including blades, and place the turbine in

operational-ready mode, which requires bringing critical systems online so the turbine can be controlled remotely and its safety systems are tested and functional. The idea of having partially constructed turbines for an extended period was never contemplated by either the certified design or Vineyard Wind's Facility Design Report ("FDR"), which was stamped by a Professional Engineer, verified by the CVA, and reviewed by BSEE. BSEE previously emphasized to Vineyard Wind the need to both remove and replace blades as soon as possible to ensure full control of the turbine and testing of critical systems. The faulty blades have been removed, and Vineyard Wind has obtained concurrence from the CVA that not installing replacement blades on the remaining partially erected "hammerhead" WTGs (tower and nacelle) creates significant increased health, safety, and environmental risks.

44.    Installation of blades is needed to ensure that water and/or excess humidity does not intrude into the nacelle and damage critical safety systems. The nacelle has openings where the blades are installed. The openings are covered, but the covers are not designed to be protective for long periods of time nor to protect against harsh winter weather conditions; in high winds, a cover can detach. If a cover becomes detached, there can be significant water ingress into the hub leading to flooding within the nacelle and damage to blade bearings, hydraulic equipment, safety equipment, and electrical and electronic components, including electrical cabinets, the yaw backup system, the Mark VI controller, redundant power sources, and turbine sensors. Such an occurrence violates the Contractor's Preservation Plan, which prohibits the accumulation of water or moisture for a prolonged period (greater than two days) in any area inside the turbine, and could compromise critical safety systems, including the electrical safety chain and fire detection system.

45.    In addition, the turbines are fitted with a lightning protection system that utilizes lightning receptors in the blades to provide preferred interception points for lightning strikes and safely conduct the resulting current to ground. Without installed blades, this system is not operating as designed, increasing the risk of damage, fire, and potential environmental impacts in the event of a lightning strike.

## Communications with BOEM and BSEE Since the Order

46.    On December 23, 2025, I emailed Director Giacona and Kenneth Stevens, Principal Deputy Director of BSEE, acknowledging receipt of the Order and requesting a meeting at the earliest opportunity to discuss the Order and a path forward. *See* Exhibit 4. On December 30, I and other representatives of Vineyard Wind met with Director Giacona and other officials from BOEM and the Department of the Interior to discuss the Order. During that meeting, BOEM declined to identify a specific national-security threat underlying the Order beyond generalized references to potential radar degradation, and it would not discuss any mitigation measures Vineyard Wind could implement to address the concerns referenced in the Order. BOEM asked Vineyard Wind to submit a description of any construction activities Vineyard Wind believed were "necessary to respond to . . . [or] prevent impacts to health, safety, or the environment," as permitted by the Order. BOEM also stated that the underlying national-security concerns and any potential mitigation measures were matters Vineyard Wind would need to address with DoW, and BOEM would not discuss them. I responded that same day by email, explaining that Vineyard Wind intended to perform operations on partially installed turbines, including removing, replacing, and/or installing blades, so that those turbines are left in the safest condition. *See* Exhibit 5. My email also stated that, following blade installation, each WTG will need to be brought online to ensure critical control and safety systems are operational

and that Vineyard Wind intended to complete the described safety related work at every practical opportunity, including during the upcoming weather windows.

47.     On December 31, 2025, BSEE informed Vineyard Wind that, although Vineyard Wind could complete blade removals, BSEE would not allow installation of replacement blades on WTGs. *See* Exhibit 6. In response, on January 5, 2026, I emailed Kenneth Stevens, Principal Deputy Director of BSEE (copying Director Giacona), explaining the health, safety, and environmental risks of leaving WTGs in a partially installed condition without blades and requesting confirmation that blade installation necessary to stabilize and secure partially installed WTGs falls within the Order's health-and-safety exception. A true and correct copy of that email is attached as Exhibit 7 and summarized in paragraphs 43–45 above.

48.     Vineyard Wind sought to meet promptly with BSEE to explain the technical basis for why installing blades is necessary to address immediate safety risks during the construction pause. BSEE did not make itself available for a prompt meeting and instead directed Vineyard Wind to submit its supporting materials in writing. Vineyard Wind submitted technical information to BSEE on January 6, 2026 and supplemented those materials at BSEE's request. Nevertheless, BSEE has not allowed Vineyard Wind to resume blade installation activities. On January 14, 2026, I was advised that BSEE would not modify its December 31 decision to not allow blade installation.

49.     In our December 30 meeting, BOEM stated it would provide a DoW point of contact regarding access to the November 2025 assessment of "new classified information" regarding the national security implications of offshore wind projects (the "classified report"). However, on December 31, BOEM advised Vineyard Wind that DoW would not provide any information regarding the Order while litigation was pending. On January 1, 2026, I emailed

Director Giacona and Mr. Stevens advising that Vineyard Wind had not yet pursued litigation that would prevent DoW from providing information, requesting a meeting to discuss the classified report, and providing the names of Vineyard Wind representatives with security clearances. *See* Exhibit 8. BOEM has not responded.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *15* January 2026.

_____
Klaus Skoust Moeller

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/* Jack W. Pirozzolo
Jack W. Pirozzolo