IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINEYARD WIND 1 LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT<br><br>OF THE INTERIOR, et al.,<br><br>*Defendants*, | Civil Action No.   1:26-cv-10156<br><br>Hon. |

**DECLARATION OF STEVEN SIMKINS**

I, Steven Simkins, declare under penalty of perjury as follows:

**Background and Qualifications**

1.     Since July 2024, I have been the Wind Turbine Team Lead for Vineyard Wind 1, LLC ("Vineyard Wind"). In that capacity, I coordinate and lead the technical response to issues regarding the installation, operation and safety of wind turbines and blades, manage cross-functional safety and engineering workstreams, and interface with the Bureau of Safety and Environmental Enforcement ("BSEE") and other regulators on turbine and blade issues.

2.     Before my current role, from November 2023 through July 2024, I served as Wind Turbine Commissioning Manager for the Vineyard Wind 1 Project (Project), where I was

1

responsible for bringing newly installed turbines online in a safe and expeditious manner to comply with the Project timeline. I managed a six-person offshore team working 24-hour rotations to support turbine commissioning and the delivery of fully operational turbines to the Project's Operations & Maintenance team.

3. Earlier in my career at Vineyard Wind, I was the WTG Technical Team Lead (February 2022–November 2023) and Mechanical Lead (March 2021–February 2022) on the Vineyard Wind 1 Project. As Technical Team Lead, I oversaw the preparation and submission of the Facility Design Report/Fabrication Installation Report ("FDR/FIR") which was required to be submitted to and approved by BOEM before construction could begin. In that role I also managed a team of three engineers responsible for main component type testing, implementing Project-specific turbine design changes, and ensuring compliance with the Turbine Supply Agreement (TSA) with the manufacturer, GE Vernova. In my prior role as the Mechanical Lead, I was responsible for the mechanical aspects of the TSA schedule and negotiated directly with the turbine supplier, culminating in execution of the contract.

4. Prior to Vineyard Wind, from January 2019 to March 2021, I served as a Wind Turbine Generator Technical Team Lead at Ørsted U.S. Offshore Wind. At Ørsted, I oversaw budget, project scope, and engineering specialists to execute turbine supply agreements for the Ocean Wind and Skipjack offshore wind farms—together comprising more than 100 turbines. I worked with the turbine manufacturer, GE Vernova, to meet local content requirements and integrate the debut of the Haliade-X turbine into U.S. codes and standards, and I collaborated with my engineering team to respond to BOEM inquiries during the federal permitting phase of those projects.

5.      From June 2018 to January 2019, I was a Project Engineer at Deepwater Wind (later acquired by Ørsted U.S. Offshore Wind), where I collaborated across disciplines to develop key project details and prepared a comprehensive Project Envelope tailored for the BOEM permitting process. In that role, I gained experience across all major project packages, including foundations, electrical, turbines, permitting, and the development phase.

6.      I hold a B.S. in Mechanical Engineering with a minor in Economics from the University of Colorado Boulder.

7.      In my roles at Vineyard Wind 1, I have overseen turbine package engineering and evaluation, commissioning, blade quality controls, and the ongoing removal and replacement of certain blade sets as required by BSEE and the terms and conditions of our approved Construction and Operations Plan (COP). I regularly review the design basis and certification materials for the turbine towers and foundations and coordinate with the Project's independent verification agent and GE Vernova on turbine integrity and safety. The statements below are based on my personal knowledge and experience and on information I have reviewed in the ordinary course of my responsibilities.

8.      I am familiar with the current construction and commissioning status of the Project and the logistics for ongoing installation and operation of turbines and blades, including the removal and replacement of certain blades pursuant to BSEE's instruction.

## Project Status

9.      As of the date of this declaration, Vineyard Wind has installed 61 of the Project's 62 wind turbine generators (WTGs).  Forty-four of the 61 installed WTGs are operational and capable of producing over 572 megawatts (MWs) of power. Ten WTGs are hammerheads (towers and nacelle, no blades). Complying with BSEE's requirements, all blades which were

produced from GE Vernova's Gaspé, Québec manufacturing facility, and which were installed offshore, have been removed. The balance of the Project's 62 WTGs—a single location—is at earlier stages of construction, where only a foundation and transition piece has been installed and a turbine are not yet erected.

10. In my current role, I manage all blade-related project submissions to BSEE in accordance with the applicable COP terms and conditions. To date, the Project has submitted, and BSEE has reviewed, 52 Return to Installation ("RTI") packages, which authorize blade installation, and 44 Return to Service ("RTS") packages, which authorize turbines to be returned to operation following blade work. On average, BSEE completes its review of RTI submissions in approximately two days and completes its review of RTS submissions within the same day. BSEE's review times have decreased since the earliest submissions as the Project has improved the content and consistency of its packages and has consistently provided comprehensive submissions. Over time, BSEE has asked fewer follow-up questions per submittal and typically closes reviews without questions addressed to Vineyard Wind.

11. At present, Vineyard Wind is awaiting BSEE review of seven RTI, four Turbine Readiness Reports ("TRR"), and four RTS packages. Some of these packages have been with BSEE for review since December 23, 2025, where prior to the Order, they typically would have been reviewed in a matter of days.

12. BOEM's Stop Work Order has given rise to a range of complex safety, operational, and logistical challenges, as described below.

### Impacts from Not Installing Blades on Hammerheads

13. The risks and impacts associated with hammerheads offshore are as follows; lightning strike, climate control in the Nacelle, and structural fatigue. The wind turbine was

4

designed to be constructed completely and only be in a hammerhead state, without blades, for a brief amount of time during installation. Prior to the Suspension Order, the project was actively mitigating each risk by installing blades on the hammerhead locations and since this work has been restricted, the assets in this configuration are exposed to an unplanned longer term period.

14. The Lightning Protection System was designed assuming the blades would be present. There are lightning receptors or conductors specifically placed along the blades acting as the first layer of defense against a strike. From there, the blades are each individually grounded into the hub and onto the tower. Without the blades in place, the turbine does not benefit from such protection. This leaves the location and path of a lightning strike more unpredictable. In the event of a strike, there is a risk of the electrically powered and charged components in the hub igniting. Any electrical fire has the potential to propagate into the nacelle and cause a larger fire event.

15. Beyond lightning, the hammerheads are currently battling a climate control problem. The hub, which is what the three blades are installed onto, is currently fit with tarpaulin covers over each blade flange/hole. These tarpaulin covers were designed to be temporary protection against water ingress until the blades were properly mounted. During the winter months high winds, freezing rain, and other adverse conditions frequently penetrate these hub covers and lead to water, ice, and humidity entering the nacelle. Components inside the nacelle are generally rated to IP55, this includes the electrical equipment, cabinets, mechanical motors, etc. According to the IP rating and GE Vernova's Preservation Manual, the internal components of the nacelle cannot sustain a prolonged period of water or high humidity exposure. Not only will this lead to prolonged offshore work replacing damaged equipment but it also puts the safety of the workers at risk. Electrical cabinets that have experienced some level of corrosion become

less safe and increase the risk of an arc flash event. Exhibit 1 is a verification letter from the Project's Certified Verification Agent ("CVA"), DNV, confirming that (i) continued suspension of blade installation will lead to "impacts to health, safety, and the environment" as described above, and (ii) complete commissioning of critical safety systems would "ensure the turbine to be in its most controllable state."

16. Fixed offshore structures experience both wind and wave forces constantly which "excite" the structure to sway back and forth. In order to counteract this movement, the turbine is designed with two forms of damping, rolling mass dampers in the nacelle, and the wind loading from blades. The two rolling mass dampers are on independent rails in the "x" and "y" direction, counteracting the movement in the tower. Blade loading is most effective while the turbine is producing. During production, blades are feathered to capture the wind and, in doing so, take force from the wind. This force on the structure has a significant impact in damping movements in the structure. The movement in the tower is considered a fatigue impact and the design has accounted for a limited amount of such fatigue over the total life of the structure. With the Suspension Order in place, the project is unable to install blades on the hammerheads and mitigate this fatigue impact.

**Operational Considerations When Idling Turbines**

17. A power producing WTG cannot simply be switched off and left unattended. Even when not producing power, each WTG must remain energized because its control, safety, and monitoring systems are active components that continuously adjust and protect both the equipment and persons on or around it. These include the supervisory control and data acquisition ("SCADA") platform, yaw and pitch controls that orient the blades, nacelle and tower environmental controls, fire detection systems, and required navigational/aviation aids

such as the Aircraft Detection Lighting System ("ADLS"). When WTGs are generating power, these systems are self-powered by the WTG; once placed in idle, they must draw from the grid, with integrated battery back-up systems and onboard generators available only as a short-term contingency. Across the full Project, this results in a grid draw of approximately 5.3 MW whenever all WTGs are idled. In effect, idling then converts the Project's WTGs from a source of power to a load on the grid, imposing a continuous energy demand to maintain safe and compliant operation.

18. For WTGs that are fully constructed (i.e., transition piece, tower, nacelle, and blades installed) but still in the process of being commissioned and not yet sending power to the grid (sometimes referred to as "cold commissioning"), it is not an acceptable practice to halt work mid-process without first completing certain critical safety and functionality checks (e.g., verification of the fire detection system and other emergency systems, communications and control redundancies, and baseline functional tests). If those checks are not performed, the turbine is left with essential safety systems unverified, meaning that Vineyard Wind cannot confirm that fire detection, emergency shutdown, or communication links will operate as designed. In that state, the turbine cannot be relied upon to protect personnel, vessels, or the structure itself, and leaving it idle under those conditions would create unacceptable risks until commissioning is completed. The best way to avoid these risks are to allow the turbines to operate.

## Impacts of Idling to WTGs

19. WTG towers are not designed to remain idle for extended periods of time. As described previously, the tower design of the asset assumes the asset is operating and benefitted from the wind load felt by the blades.

20. The towers and foundations are engineered for a 25-year design life with only limited allowances for idle periods, every day spent idling uses up part of that allowance. Although this does not create an immediate risk of failure, it means that the equipment will reach the end of the design life sooner than expected. The practical result is earlier and more frequent replacement of major components such as tower sections, foundations or transition pieces, and potentially the need for life-extension retrofits or premature repowering. These interventions are extremely costly offshore, requiring the return of specialized heavy-lift vessels and adding unplanned expense. In short, prolonged idling undermines the structural integrity and long-term economics of the Project.

21. At the location where only the foundation and transition piece are installed (no tower, nacelle, or blades), high-voltage inter-array cables are terminated at the structure pending turbine installation. Those cables cannot be left unconnected or dormant indefinitely without additional protection and re-testing. Prolonged exposure of these connections to the marine environment allows for corrosion, water ingress, and insulation degradation, any of which can compromise the integrity of the cable system. Once those limits are exceeded, specialized electrical testing and full recommissioning by the cable installation contractor are required before the strings can be safely energized. That process is complex and costly, and it creates delays because specialized vessels and crews must be re-mobilized. In short, interrupting installation at this stage does not simply pause the Project; it actively undermines prior work, shortens the useful life of expensive components, and makes restarting significantly more difficult and risky.

22. Idled turbines also present seasonal hazards. In winter conditions, turbines that remain idle for extended periods can accumulate ice on their blades. When temperatures rise or wind speeds change, that ice can loosen and fall from height, which creates a potential hazard for

personnel working on the turbines and for vessels operating nearby. During this past winter's operations, when certain turbines were idled, we observed ice buildup and subsequent shedding from turbine blades. On one occasion, a crew transfer vessel approaching a turbine aborted personnel transfer in response to falling ice. Allowing the blades to rotate with the wind prevents ice accumulation and protects vessels and workers from harm.

### Impacts of Idling Turbines to the Grid

23. The Project is currently capable of supplying more than 572 MW of power to the grid and is on track to reach 800 MW within the next two months. This makes the Project a significant generator in the ISO-New England system and one relied on by the regional grid operator. Given the complexity of the local grid, removing this output would increase operational strain and heighten the risk of service disruptions for residential customers. In addition to supplying power, the Project's specialized components at the onshore substation—such as synchronous condensers—provide voltage support and help balance power flows through the Point of Interconnection with the grid.

### Impacts of Order on BSEE Review of Blade Packages

24. Following issuance of the Order, I contacted BSEE on December 23, 2025, to advise that two RTI submissions and two RTS submissions had been uploaded in TIMSWeb (BSEE's online portal for receiving and tracking such regulatory submissions) and were ready for review. BSEE confirmed receipt, but indicated that it could not provide a timeline or assurance that the reviews would be completed unless and until it received guidance from agency leadership regarding its authority under the Order.

25. Consistent with that point, on December 29, 2025, BSEE representative Jonathan Fraser contacted me primarily to obtain offshore status updates, including vessel movements and

recent progress. During that call, he confirmed that the RTI/RTS submissions were under engineering review, but stated that BSEE would not reach conclusions on those submissions until it received additional guidance regarding the Order.

26. On December 29 and 31, 2025, I also spoke with BSEE representative Jansen Butler regarding the status of BSEE's engineering review. Mr. Butler confirmed the packages had been assigned to engineers and that the review was progressing, with only a limited clarification pending with the Certified Verification Agent ("CVA") DNV, and no issues that would ordinarily prevent completion. He also indicated that BSEE could not formally issue a confirmation under the circumstances, and later advised that the matter would be elevated to the "front office."

27. On December 31, 2025, I provided Mr. Fraser and other BSEE personnel a written update regarding ongoing activities Vineyard Wind understood were necessary "to prevent impacts to health, safety, and the environment" under the Order. That update included a table describing the relevant activity scopes, the health, safety, and environmental rationale for each activity, and the vessels employed, including installing inspected blades on hammerhead turbines and completing commissioning activities for critical systems. *See* Exhibit 2.

28. On January 5, 2026, Mr. Fraser contacted me via text regarding a meeting to discuss the technical basis for why installing blades is a safety measure. I responded that Vineyard Wind was available to meet immediately and proposed meeting later that afternoon, offering to have supporting materials ready by approximately 4:00 p.m. Mr. Fraser responded that he was not available. When I asked about the next opportunity to meet, he stated that he had another pressing issue and needed to log off for the day. He advised Vineyard Wind to provide the report when it was available, and that BSEE would "go from there."

29. On January 6, 2026, I emailed Mr. Fraser and the BSEE team that Vineyard Wind would submit the requested Technical Information Report supporting blade installation on hammerheads that day, and that Vineyard Wind had completed a verification process with the CVA concerning the technical information, with the CVA to submit its confirmation to BSEE as well. I also offered a meeting and written responses to any questions during BSEE's review. *See* Exhibit 3.

30. Later on January 6, 2026, I transmitted the technical information report to Mr. Fraser and the BSEE team by email and again offered a meeting or prompt written responses to questions while BSEE reviewed the materials. *See* Exhibit 4. On January 7, 2026, I provided BSEE a written weekly overview summarizing offshore construction status and identifying review priorities for pending RTI, RTS, and TRR submissions, including target installation dates. *See* Exhibit 5.

31. On January 8, 2026, BSEE performed an inspection of the offshore work site to evaluate current conditions and to assess Vineyard Wind's ongoing critical safety related works. In the course of the visit, the BSEE team was able to see first-hand assets in hammerhead and even commenting on the hub covers and related water ingress.

32. On January 9, 2026, in response to Mr. Fraser's request for lightning-related documentation, I provided two of the requested documents by email and explained that GE Vernova would transmit the third directly due to IP restrictions. I also provided supplemental information regarding the frequency of lightning events at the Project site based on StormGeo Offshore Weather Service data. *See* Exhibit 6.

33. On January 10, 2026, after I texted Mr. Fraser to follow up on his offshore visit and whether he had feedback on the lightning materials, I spoke with him by phone. During that

11

call, he confirmed receipt of the requested lightning documents but indicated that BSEE's review had not yet begun. Although I highlighted the urgency of this issue, Mr. Fraser indicated that his team was still becoming familiar with the relevant lightning-protection issues and hub components, and that he would need a high level of confidence in the technical basis before recommending to BSEE leadership that blade installation should proceed as a safety mitigation, which he indicated would not be immediate.

34. On January 13, 2026, I emailed Mr. Fraser asking if BSEE had any further questions regarding the documents we had provided and stressing the urgency of situation for Vineyard Wind. *See* Exhibit 7. Mr. Fraser responded that BSEE has no additional questions at this time. *See* Exhibit 8.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___January 15___, 2026.


_____/s/ Steven Simkins_____
Steven Simkins
Wind Turbine Team Lead, Vineyard Wind 1, LLC

12

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 15, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                               */s/* Jack W. Pirozzolo
                                               Jack W. Pirozzolo