IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINEYARD WIND 1 LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT<br><br>OF THE INTERIOR, et al.,<br><br>*Defendants*, | Civil Action No.   1:26-cv-10156<br><br>Hon. |

**DECLARATION OF HOWARD DAVID BELOTE**

I, Howard David Belote, declare under penalty of perjury as follows:

**Declarant's Background, Experience, and Personal Knowledge**

1.  I have been retained by and am providing this declaration on behalf of Vineyard Wind 1, LLC ("Vineyard Wind") with regard to the Vineyard Wind 1 offshore wind project (the "Project") due to my unique familiarity with the mission compatibility evaluation process used by the Department of Defense ("DoD")[1] to determine the risks posed by wind projects to national security. I make this declaration based on my personal knowledge and subject matter

---

[1] On September 5, 2025, the president signed Executive Order 14347, entitled *Restoring the United States Department of War*, which states that "[t]he Department of Defense and the Office of the Secretary of Defense may be referred to as the Department of War and the Office of the Secretary of War, respectively, in the contexts described in" that order. Given that this executive order sets forth additional "secondary" names for the Department of Defense (DoD) and Secretary of Defense and many of the events described in this declaration pre-date this order, references to the Department of Defense and Secretary of Defense herein include the Department of War (DoW) and Secretary of War, respectively.

1

expertise and in support of Vineyard Wind's motion for a preliminary injunction and to assist in the Court's consideration of any classified information received from BOEM *in camera* regarding purported new national security threats from the Project.

2. As set forth below, I created the process and served as the first executive director of DoD's Military Aviation and Installation Assurance Siting Clearinghouse ("Clearinghouse") 15 years ago and have remained engaged with the stakeholders in that process as a wind developer and consultant ever since. I am intimately familiar with that process and the subject matter experts who conduct those risk assessments. I have reviewed the suspension Order issued to Vineyard Wind by the Acting Director of the Bureau of Ocean Energy Management ("BOEM") Matthew Giacona, the public statements of Secretary of the Interior Doug Burgum, communications between Vineyard Wind and BOEM. I conclude that the well-defined, 15-year-old Clearinghouse process has not been followed, and those subject matter experts have likely not been consulted, in the November 2025 analysis cited by Mr. Giacona or in BOEM's determination to send the Order to Vineyard Wind or similar orders to developers of other offshore wind projects in active construction.

3. I received a Bachelor of Arts in Government and Foreign Affairs from the University of Virginia in 1985, a Master of Airpower Art and Science from Air University's School of Advanced Airpower Studies (now Air and Space Studies) in 1999, and a Master of Science in National Security Strategy from the National War College in 2004. I served for 24 years and 7 months in the United States Air Force, retiring as an Air Force colonel. I am a former F-16 pilot who served as installation commander of Nellis Air Force Base, by many measures the largest fighter base in the country, and the 2.9-million-acre Nevada Test and Training Range. During my career, I served as Director of Staff for the 52nd Fighter Wing; Commander of the 32nd Air Operations Squadron, 3d Air Support Operations Group, and 99th Air Base Wing; and

as the Joint Staff Chief of Combating Weapons of Mass Destruction, the Pentagon's principal adviser to the Chairman, Joint Chiefs of Staff on global strategic planning issues related to weapons of mass destruction.

4.  From January to May 2003, I commanded the 52-person Air Component Coordination Element in Tel Aviv, Israel, providing senior Israeli Air Force and Joint Staff leaders real-time information about air, missile, and drone threats during the initial phases of Operation Iraqi Freedom.  From September 2004 to February 2005, I commanded the 3rd Expeditionary Air Support Operations Group in Baghdad and concurrently served as the Deputy Joint Fires and Effects Coordinator for Multi-National Corps-Iraq, responsible for providing air cover and close air support across the entire theater of operations—specifically supporting the Second Battle of Fallujah and providing air cover for more than 5800 polling locations during Iraq's first set of elections.  In these combat roles, I developed and exercised a deep understanding of airborne threat detection, assessment, engagement, and neutralization, earning Bronze Stars in each deployment.

5.  After my service in the United States Air Force, I was appointed as the first Executive Director of the DoD's Military Aviation and Installation Assurance Siting Clearinghouse, serving from July 2010 to June 2012.

6.  As the Executive Director, I established the Clearinghouse as the DoD's centralized office to coordinate the Department's evaluation of energy and transmission projects for potential impacts on homeland defense and military testing and training, with the specific evaluations done by the military services and bases that could potentially be affected by the development. The Clearinghouse's mission also included identifying and implementing mitigation strategies that would allow for energy development while safeguarding critical military operations and assets.

7.  As Executive Director, I was responsible for developing the governing regulations

for the Clearinghouse, published at 32 C.F.R. Part 211. Those regulations and the accompanying DoD Instruction 4180.02 created a structured process enabling collaboration among local officials, industry representatives, and military leaders to assess the mission compatibility of a wide range of projects.

8. Under my leadership, the Clearinghouse reviewed 657 Federal Aviation Administration ("FAA") and Bureau of Land Management ("BLM") project applications and secured DoD approvals for more than 96% of utility-scale project reviews. I also negotiated the first-ever Memorandum of Understanding between DoD and a wind developer, executed by the Acting Deputy Under Secretary of Defense (Installations and Environment). This agreement protected military flight paths and radar approaches essential to training operations, while simultaneously promoting large-scale economic development through renewable energy.

9. Concurrently with these project reviews, I worked with counterparts at the Department of Energy ("DOE"), the Department of Homeland Security ("DHS"), and the FAA to design and conduct the Interagency Field Test and Evaluation ("IFTE") around radars in Tyler, Minnesota; Abilene, Texas; and King Mountain, Texas. The IFTE conducted three field test campaigns between April 2012 and April 2013 to evaluate eight different radar mitigation technologies (software upgrades, infill radars, and replacement radars) and was formalized by interagency agreement in 2014 to become the Wind Turbine Radar Interference Mitigation ("WTRIM") Working Group. The WTRIM Working Group extended its charter in 2023 and submitted a report to Congress in 2024 that summarized its members' understanding of wind projects' impacts to radar capabilities and potential solutions, asserting that "the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts," and that "[r]eplacement radar and

infill radar solutions are the most viable technology mitigation solutions to enhance degraded radar performance in areas above wind turbines."[2]

10. During my tenure leading the Clearinghouse, offshore project reviews were mainly the purview of the Deputy Under Secretary of Defense (Readiness)("DUSD-R"), with the Clearinghouse in a supporting role. In this role, I assisted my direct counterparts in the Office of DUSD-R as they participated in BOEM-led State Task Forces in Virginia and North Carolina. These task forces ultimately led to lease sales and captured the nascent review processes, which I formalized when I drafted the original version of DoD Instruction ("DoDI") 4180.02. After my departure and the subsequent publication of DoDI 4180.02, all wind energy-related mission compatibility evaluations—terrestrial and offshore—became the responsibility of the Clearinghouse. The Clearinghouse's role as BOEM's single DoD point of contact for mission compatibility issues has been memorialized in a DoD-Department of the Interior ("DOI") interagency memorandum of understanding, most recently updated on October 29, 2024.[3]

11. After leaving the Clearinghouse in 2012, I served as the Vice President for Federal Business at Apex Clean Energy where I generated opportunities to develop wind and solar projects for Federal customers, including the DoD; created teams to bid on renewable generation and energy surety for Army, Navy, and Air Force installations; and represented Apex on the American Council on Renewable Energy's Leadership Council and its National Defense and Security Initiative, as well as the Association of Defense Communities' Defense Energy Council.

12. I then served as Senior Vice President of Cassidy & Associates where I created cost-effective solutions for industry, military communities, and governmental agencies. There, I

---

[2] Update on the Efforts of the Wind Turbine Radar Interference Mitigation Working Group, Report to Congress, February 2024, https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-004484%20-%20Report%20to%20Congress%20as%20of%20December%2014%202023%20%282%29.pdf at Pages ii and iii.

[3] See Exhibit 1, October 29, 2024 Memorandum of Agreement; see also https://www.boem.gov/newsroom/press-releases/boem-and-dod-sign-agreement-bolster-interagency-collaboration-offshore-wind.

created a strategic consulting practice at the intersection of aviation, national security, and clean renewable energy/sustainability.  In this practice, I represented major utilities and energy developers before staff and members of the U.S. Congress; the FAA; DoD, DOE, and DOI; and state, county, and municipal agencies and councils.

13. Currently, I am the Managing Partner & CEO of DARE Strategies LLC where I've helped wind and solar developers sell renewable power to the military and other federal entities, helped wind and solar developers permit projects compatible with military training and test activities, and advised on federal- and state-level energy policy in Washington DC and a number of state capitals.

14. During my career I have successfully negotiated 37 Memoranda of Understanding between DoD and wind developers, facilitating the permitting of 45 projects comprising 13.7 GW of wind power while protecting critical military capabilities, including the two largest single-phase wind projects (i.e., built and brought online as one cohesive project) in the U.S.: Apex's 525-MW Aviator project in Texas and Pattern Energy's 1050-MW Western Spirit project in New Mexico.

15. In the offshore wind space, I represented Trident Wind for more than 4 years in negotiations with DoD, BOEM, the Navy, and the Air Force that led to the Morro Bay lease sale off California.  I was retained by the American Clean Power Association ("ACP") as an advisor to its vice president for offshore wind, and on their behalf in March 2021 briefed newly installed BOEM Director Amanda Lefton on the Morro Bay negotiations and the mitigations necessary to protect Navy, Air Force, and Space Force operations in the vicinity.  In 2022, I researched and drafted the "DOD [*sic*] Activities" section of ACP's response to "BOEM-2022-0023, Call for Information and Nominations for Commercial Leasing for Wind Power Development on the

6

Central Atlantic Outer Continental Shelf."[4] I was subsequently engaged by Duke Energy to help manage their communications with the Clearinghouse and ensure compliance with all national security provisions relating to their Carolina Long Bay project.

16. Based on my professional experience, I am intimately familiar with the Clearinghouse review process. I can testify to the rigor of this process and to the thorough review to which Vineyard Wind's Project was subjected. Conversely, I can testify to the apparent lack of rigor to which BOEM's Order and its referenced DoD Assessment were subjected before suspending the Project's activities.

### The DoD Clearinghouse Process

17. The DoD Clearinghouse process ensures that national security considerations are addressed at every stage of offshore wind planning, permitting, and development. DoD conducts a thorough evaluation of the potential impact that any given offshore wind project may have on military operations, activities, and technologies, and communicates any concerns identified to BOEM and other stakeholders. To the extent that such concerns are unable to be resolved, DoD retains the prerogative to object to any offshore wind project that may adversely affect its missions, a prerogative that in practice operates as an effective veto. To my knowledge, BOEM has never overridden a DoD objection to moving forward with a specific offshore wind project; quite simply, this process makes sure that a project would not be approved in the first place if it posed an unacceptable threat to national security. Rather, with proper planning and mitigation measures, BOEM, DoD, and other agencies have repeatedly determined that offshore wind developments and national security-related functions can successfully coexist.

18. The Clearinghouse acts as a single point of contact for federal agencies, State and local governments, and developers to facilitate DoD reviews of proposed energy and

---

[4] *See* Exhibit 2, Re: BOEM-2022-0023, Call for Information and Nominations for Commercial Leasing for Wind Power Development on the Central Atlantic Outer Continental Shelf.

transmission projects to ensure they do not impinge on national security interests. In the offshore wind energy context, DoD is consulted during each of the area identification, leasing, and permitting stages of project development. The actual evaluations of proposed areas for development and specific project reviews are undertaken by the potentially affected military services, their major commands, or individual bases. The Clearinghouse facilitates the internal coordination among the Services, the Joint Staff, and the Office of the Secretary of Defense, and presents the DoD position to the developer, local communities, and federal agencies.

19. First, through the Clearinghouse process, DoD actively participates in BOEM's identification of areas on the Outer Continental Shelf that may be suitable for wind energy development by providing BOEM with mission compatibility assessments of proposed wind energy areas (WEA), including informing BOEM if certain proposed WEAs are not military mission-compatible or if site-specific stipulations are required to overcome compatibility challenges. If DoD determines that wind energy development would be incompatible with ongoing or planned mission operations in the area, BOEM has typically modified or excluded those areas from the WEA and, therefore, from consideration for future leasing.

20. Once suitable areas for wind development have been identified, BOEM continues to consult with DoD during the leasing process. Before BOEM offers lease areas, DoD reviews the final lease sale areas for mission compatibility and may request removal of specific lease blocks if they present unresolved operational risks. Alternatively, DoD may request lease stipulations to ensure that any site-characterization activities performed on the lease before development begins do not unacceptably degrade military testing, training, and operations. The stipulations in the Project lease track those that BOEM inserted at DoD's request during my time advising Trident Wind, ACP, and Duke's Carolina Long Bay project and that DoD has consistently considered to be sufficient to mitigate mission impacts. *See, e.g.* Lease OCS-A

0486, available at https://www.boem.gov/oil-gas-energy/executed-lease-ocs-0486 (detailing, in Addendum C, procedures to be employed in the event of an "evacuation or suspension of activities" and for "electromagnetic emissions").

21. At the permitting and COP development stage, the Clearinghouse coordinates the DoD review of energy project applications and determines whether a project would have an adverse impact on military operations and readiness. If potential adverse impacts are identified, the Clearinghouse works with the project sponsor and DoD components to identify feasible and affordable actions that can be taken by the Department, the developer of such energy project, or others to mitigate any adverse impact on military operations and readiness. When agreement is reached, the measures are formalized in a mitigation agreement, incorporated into BOEM's Conditions of Approval for the COP, and binding on the project sponsor.

22. If the Secretary of Defense concludes that a project, even after mitigation, poses an unacceptable risk to national security, DoD would request that BOEM not issue a lease or approve a COP. When DoD has requested that certain areas be removed from leasing offers and has asked for site-specific stipulations, BOEM has agreed to those requests. When DoD has identified a mission impact from a project, the challenge becomes the primary task of the Mitigation Response Team ("MRT," the formal relationship of DoD, military service, and developers' subject matter experts).

23. Given the rigorous and time-consuming process for researching, selecting, and conditioning offshore wind operations, any appreciable national security risks these projects may pose would have already been flagged and addressed before construction work began. Having reviewed a timeline of Vineyard Wind's MRT and the executed mitigation agreement,[5] I can

---

[5] *See* Exhibit 3, Agreement Among the Department Of Defense, the Department of the Air Force, and Vineyard Wind 1 LLC, Addressing the Vineyard Wind 1 Offshore Wind Energy Project near Martha's Vineyard, Massachusetts.

confidently state these risks were thoroughly evaluated for the Project.

### Knowledge of Potential Radar Interactions with Wind Turbines

24. Within the Clearinghouse's mission compatibility evaluation process, the lead agency for radar issues is the North American Aerospace Defense Command's Domain Awareness Branch, abbreviated NORAD/J32R, whose radar/air defense analysts work with the Air Force's 84th Radar Evaluation Squadron ("84 RADES") to determine precisely how many wind turbines will be within line-of-sight of and interfere with radars used by NORAD for homeland surveillance and defense.

25. Wind turbine interference, one of many types of unwanted radar energy or "clutter," is a long-studied and well-understood issue. In their analyses, NORAD and 84 RADES determine how interference from the spinning blade will impact a radar's ability to detect and display targets, and consider suitable mitigation options, such as overlapping coverage from adjacent radars that form NORAD's overall radar picture. NORAD then assesses the concordant risk to nearby population centers, military facilities, and DoD operations not only from the specific impact of a single wind project, but also the cumulative effect of all turbines within the radar's field of view.

26. Following that risk assessment, NORAD determines which mitigation technologies and strategies will ensure mission accomplishment. The most common technological fix, Radar Adverse-impact Mitigation ("RAM"), requires voluntary contributions of $80,000 per radar. This provides funding for experts to optimize the radar settings to reduce the effects of the wind turbine interference and maximize the radar's ability to detect and display targets.

27. Significantly, all NORAD-drafted mitigation agreements also include emergency curtailment provisions and communications protocols that direct immediate stoppage of the project's turbines for a national security or defense purpose, defined as an "emergency

circumstance in which the President of the United States, the Secretary of Defense, or a combatant commander under 10 U.S.C. Section 164 directs a change to the mission of NORAD in support of emergency circumstances," and specifically including NORAD air defense events within the definition. The Clearinghouse website[6] lists 102 radar mitigation agreements with emergency curtailment (most including the aforementioned definition); the Project's draft mitigation agreement, as well as all offshore projects whose mitigation agreements are publicly searchable on BOEM's website, contains the emergency curtailment provision.

28. The curtailment provisions, in the broader context of DoD's suite of reinforcing and redundant security measures and capabilities, provide a final safeguard to remove any radar-related risks from operating turbines. And curtailment protocols independently undermine BOEM's contention that newly developed adversary capabilities change DoD's longstanding risk calculus on offshore wind and justify the stop-work order and 90-day review period. Even if there was any basis for BOEM's determination that new adversary capabilities could specifically exploit turbine interference (in the relatively miniscule volume of airspace above the Eastern OCS, *see* para. 32, below), curtailment measures negate any theoretical vulnerability: once the turbines have stopped operating, any interference from the moving blades ceases. And while the turbine towers themselves reflect some radar energy, moving target filters in the radar processor will remove the interference from these stationary objects. This combination creates a "clean" radar picture for the radar operator, regardless of a potential adversary's technology or tactics.

### Vineyard Wind's National Security Mitigation Measures and BOEM and DoD's Departure from Process

29. The 2022 mitigation agreement (as amended in 2023) between Vineyard Wind and DoD (and the Air Force) demonstrates that Vineyard Wind agreed to every mitigation

---

[6] *See* https://www.dodclearinghouse.osd.mil/Project-Review/-Formal-Review/Mitigation-Agreements/ (last visited Jan. 13, 2026).

measure requested by DoD. The 102 existing mitigation agreements and the February 2024 WTRIM Working Group Report to Congress show that the affected radars can operate at or near their designed capabilities to detect adversary threats. There is no indication that DoD's subject matter experts on the ground have departed from this consensus. Indeed, it does not appear that any new concerns were communicated to Vineyard Wind through regular channels—inside or outside the government—before the stop-work order on December 22. BOEM leadership's decision to issue the Order without working through these on-the-ground experts represents a significant departure from the 15-year-old Clearinghouse process in which DoD's lead stakeholders activate the MRT to identify potential risks to the mission and work with wind developers to mitigate those risks.

30.　　Similarly, DoD's normal process in addressing potential risks entails sharing unclassified characterizations of the challenge or areas of concern with MRT members. DoD has demonstrated that it can do so without divulging classified requirements, capabilities, or means and methods. Yet DoD has refused to do so here, without explanation.

31.　　Further supporting that the established process was not followed for the assessment forming the basis of Mr. Giacona's Order is the government's inconsistent actions on other, related fronts on which I heard no such exigent concerns regarding radar and wind projects. The national-security concern referenced in the Order involves the interaction between wind turbines and surveillance and air-defense radar—an issue that is not unique to offshore wind. Terrestrial wind farms can create the same types of radar effects (including clutter and masking) that are cited with respect to offshore projects, and if a new threat assessment reflects an urgent, materially heightened risk of adversaries exploiting such effects (for example, by routing unmanned aircraft through turbine fields), that heightened risk would apply at least as readily to onshore wind projects as well. Yet, between December 15 and 16, 2025, I received approvals

from NORAD/J32R for the standard RAM and curtailment mitigation provisions on five separate terrestrial wind projects. Those approvals indicate that NORAD's experts are either unaware of the November threat assessment—which is unlikely, given their mission—or they continue to believe the RAM and curtailment provisions adequately mitigate the risk to its terrestrial mission.

32.   NORAD's continuity on the terrestrial project side cannot reasonably be explained by the Administration's apparent theory that offshore wind projects present a unique vulnerability. In fact, RAM and curtailment are at least equally effective to protect the East Coast than the interior U.S. From my command experience overseeing air operations for U.S. European Command and Multi-national Corps-Iraq, terrestrial wind turbines present a greater tactical challenge for homeland surveillance and defense than the relative handful of offshore turbines halted by Mr. Giacona's order. The Project's approximately 75,614 acres represent only approximately 0.028% of the 269,000,000 acres on the Atlantic Outer Continental Shelf. Our Nation's defense and intelligence capabilities are multi-layered and would, for example, allow combatant commanders to deploy F-35s from Burlington ANGB or F-16s from Atlantic City ANGB to surveil the areas behind the small amount of sea- and airspace where offshore turbines are or will be located.

33.   From the foregoing circumstances, I conclude that Director Giacona has not followed the process as established in Title 10 nor the DoD/BOEM MOU that is designed to identify challenges and collaborate on solutions. His stop-work order is premature because it did not fully avail itself of a well-understood, fully vetted Clearinghouse mission compatibility evaluation, and it lacks any possible rational basis in national security.

34.   Further, BOEM's order is overbroad in stopping construction activities that have minimal to no effect on NORAD's surveillance mission. DoD's coastal defense capabilities are not impaired while vessels like *Wind Pace* or *Sea Installer* install tower components and turbine

blades.  And several other Project offshore components (e.g., offshore substations, subsea cables) do not significantly impair radar surveillance.  Resumption of the Project construction, as over the past two years, in parallel with DoD's, NORAD's, and the Navy's longstanding and effective collaboration with Vineyard Wind the Clearinghouse process, presents negligible overall national security risk (and none with respect to radar interference).

35.  Recognizing the difficulty in translating these esoteric concepts of radar theory and coastal defense in a written declaration, I am available upon request to assist the Court with live testimony, including *in camera* review of information provided by BOEM.  I possess an active SECRET clearance and can provide context up to that level of classification.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 13, 2026

_____
Howard David Belote

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 15, 2026, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                                                                     */s/* Jack W. Pirozzolo
                                                                                                        Jack W. Pirozzolo