**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| VINEYARD WIND 1 LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.:  1:26-cv-10156 |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF THE | ) | **Leave to file granted on January 16, 2026** |
| INTERIOR, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**VINEYARD WIND 1, LLC'S MEMORANDUM IN SUPPORT OF A MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

*Counsel for Vineyard Wind 1 LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.    HISTORY OF THE VINEYARD WIND PROJECT ................................................. 3

II.   THE CHANGE IN ADMINISTRATIONS ............................................................... 6

III.  THE ORDER .............................................................................................................. 7

IV.   VINEYARD WIND'S COMMUNICATIONS WITH BOEM AND BSEE REGARDING THE ORDER'S IMPACT ON THE PROJECT ......................................................... 8

LEGAL STANDARD.......................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

I.    VINEYARD WIND IS LIKELY TO PREVAIL ON THE MERITS OF ITS CHALLENGES TO THE ORDER................................................................................ 12

    A.    The Order Is Unlawfully Depriving Vineyard Wind Of The Right To Construct The Project In Accordance With The Approved COP......................................... 12

    B.    The Order Is Arbitrary And Capricious ............................................................. 14

    C.    The Order Violates the Due Process Clause of the Fifth Amendment ................. 19

    D.    BOEM Failed to Comply with Required APA Procedures in Issuing the Order.. 21

II.   THE ORDER IS IRREPARABLY HARMING VINEYARD WIND ............................ 22

III.  THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR AN INJUNCTION AGAINST THE ORDER................................................................................................ 24

IV.   NO SECURITY SHOULD BE REQUIRED.................................................................. 27

CONCLUSION..................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air N. Am. v. Dep't of Transp.*,
937 F.2d 1427 (9th Cir. 1991) ...................................................................................22

*Anchustegui v. Dep't of Agric.*,
257 F.3d 1124 (9th Cir. 2001) ...................................................................................22

*Blackwell Coll. of Bus. v. Att'y Gen.*,
454 F.2d 928 (D.C. Cir. 1971) ...................................................................................22

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)...................................................................................................19

*Connecticut v. Doehr*,
501 U.S. 1 (1991).......................................................................................................19

*Crowley v. Local No. 82*,
679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) .........26

*D. Ginsberg & Sons v. Popkin*,
285 U.S. 204 (1932)...................................................................................................14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)...................................................................................................18

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020).......................................................................................................17

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273 (1st Cir. 1996)....................................................................................15

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)...................................................................................................16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)...................................................................................................16

*FDA v. Wages & White Lion Invs., LLC*,
145 S. Ct. 898 (2025).....................................................................................15, 16, 17

*Garcia-Rubiera v. Fortuno*,
665 F.3d 261 (1st Cir. 2011)................................................................................19, 20

*Harry C. Crooker & Sons, Inc. v. Occupation Safety & Health Rev. Comm'n*,
    537 F.3d 79 (1st Cir. 2008) ..................................................................................13

*Hodel v. Va. Surface Min. & Reclamation Ass'n*,
    452 U.S. 264 (1981) ..............................................................................................22

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 257 (D.D.C. 2018) .....................................................................15

*Louhghalam v. Trump*,
    230 F. Supp. 3d 26 (D. Mass. 2017) ....................................................................11

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................19, 21

*Me. Forest Prods. Council v. Cormier*,
    51 F.4th 1 (1st Cir. 2022) .....................................................................................11

*Melone v. Coit*,
    No. 1:21-cv-11171-IT, 2023 WL 5002764 (D. Mass. Aug. 4, 2023), *aff'd*, 100
    F.4th 21 (1st Cir. 2024) ..........................................................................................5

*Michigan v. EPA*,
    576 U.S. 743 (2015) ..............................................................................................12

*Mont v. United States*,
    587 U.S. 514 (2019) ..............................................................................................13

*NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt.*,
    927 F.3d 1 (1st Cir. 2019) .....................................................................................22

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
    675 F. Supp. 3d 28 (D. Mass. 2023), *aff'd*, 100 F.4th 1 (1st Cir. 2024), *cert.
    denied*, 145 S. Ct. 1050 (2025) ..............................................................................5

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
    595 U.S. 109 (2022) ..............................................................................................14

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................11

*O'Neill v. Baker*,
    210 F.3d 41 (1st Cir. 2000) ..............................................................................20, 21

*Ohio v. EPA*,
    144 S. Ct. 2040 (2024) ..........................................................................................14

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ...................................................................................19, 20, 21

*Revolution Wind, LLC v. Burgum*,
   No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026).................................................3, 12, 22, 25

*S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.*,
   775 F.3d 82 (1st Cir. 2014) .........................................................................................................20

*Santillan v. Gonzales*.
   388 F. Supp. 2d 1065 (N.D. Cal. 2005) .....................................................................................15

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
   123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025) ...........................................4

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
   No. 1:22-cv-11091-IT, 2023 WL 621859 (D. Mass. Sept. 25, 2023)........................................3

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
   No. 1:22-cv-11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023), *aff'd*,
   123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025) ...........................................5

*Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*,
   626 F. Supp. 3d 468 (D. Mass. 2022) ........................................................................................26

*Tri Cnty. Indus., Inc. v. District of Columbia*,
   104 F.3d 455 (D.C. Cir. 1997) ...................................................................................................20

*Union Oil Co. of Cal. v. Morton*,
   512 F.2d 743 (9th Cir. 1975) ......................................................................................................19

**Statutes**

5 U.S.C. § 558....................................................................................................................21, 22

5 U.S.C. § 706............................................................................................................................14

43 U.S.C. § 1337....................................................................................................................4, 13

43 U.S.C. § 1341..................................................................................................................13, 14

43 U.S.C. § 1349........................................................................................................................22

**Other Authorities**

28 C.F.R. § 17.17.......................................................................................................................16

30 C.F.R. § 585.200.........................................................................................................12, 17, 21

30 C.F.R. § 585.417 ........................................................................................................13, 15

90 Fed. Reg. 8433 (Jan. 29, 2025) ................................................................................26

90 Fed. Reg. 8363 (Jan. 29, 2025) ..................................................................................6

11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) ...............................................................26

Secretary of the Interior, Order No. 3437 (July 29, 2025),
    https://www.doi.gov/document-library/secretary-order/so-3437-ending-
    preferential-treatment-unreliable-foreign ...................................................................6

Press Release, Governor Maura Healey, *Governor Healey Responds to Trump
    Administration Stop Work Order for Vineyard Wind* (Dec. 22, 2025),
    https://www.mass.gov/news/governor-healey-responds-to-trump-
    administration-stop-work-order-for-vineyard-wind ..................................................25

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012) ..............................................................................................................13

*ISO New England Statement on Department of the Interior Offshore Wind
    Announcement*, ISO NEWSWIRE (Dec. 22, 2025),
    https://isonewswire.com/2025/12/22/iso-new-england-statement-on-
    department-of-the-interior-offshore-wind-announcement .......................................26

Lisa Friedman & Brad Plumer, *Trump Promises to End New Wind Farms*, N.Y.
    Times (Jan. 7, 2025), https://www.nytimes.com/2025/01/07/climate/trump-
    wind-turbines.html .....................................................................................................6

Oliver Milman, *Trump Pledges to Scrap Offshore Wind Projects on "Day One"
    of Presidency*, Guardian (May 13, 2024), https://www.theguardian.com/us-
    news/article/2024/may/13/trump-president-agenda-climate-policy-wind-power....................6

## INTRODUCTION

The Administrative Procedure Act ("APA") and the Outer Continental Shelf Lands Act ("OCSLA") do not permit the Bureau of Ocean Energy Management ("BOEM") to advance a new administration's policy goals by halting construction of a lawfully approved offshore wind energy project (the "Project") based on unspecified national security impacts that contradict prior findings of the Department of Defense (now War, collectively "DoW"). And when BOEM's unlawful action imposes irreparable harm on a lessee and poses an enterprise level threat to its project, an emergency injunction is warranted. Thus, Vineyard Wind 1 LLC respectfully requests that the Court issue a temporary restraining order and preliminary injunction enjoining BOEM's order halting construction or commissioning of the few remaining wind turbines for Vineyard Wind's $4.5 billion offshore wind energy project.

Vineyard Wind needs to be able to complete construction of its Project before it loses access to a critical construction vessel on March 31, 2026. If construction is not completed by that date, the partially completed wind turbines will be left in an unsafe condition and Vineyard Wind will incur a series of financial consequences that it likely could not survive. Vineyard Wind's Project is now 95% constructed and has been producing power for more than one year. It is currently capable of producing 572 megawatts ("MW") of electricity—approximately 75% of the 800 MW it will be able to produce when it is fully completed. BOEM approved the Project in May 2021 following a decade-long review process that included extensive consultation with the DoW that resulted in mitigation measures to avoid impairing the North American Aerospace Defense Command's ("NORAD") air defense mission and the Department of the Navy's naval operations. With those mitigation measures in place, BOEM found that the COP would protect the national security interests of the United States and DoW agreed not to object to the construction or operation of the Project.

On December 22, 2025, BOEM arbitrarily reversed course, issuing a Director's Order ("Order") mandating that Vineyard Wind "suspend all ongoing activities" for at least 90 days, citing unspecified "impacts to national security" that were supposedly discussed in classified materials from DoW six weeks earlier. The Order excepted activities "necessary for the current level of power generation" and those "necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment." That same day, BOEM issued similar orders to the four other offshore wind energy projects that, like Vineyard Wind, are currently in construction.

Over the next several weeks, Vineyard Wind repeatedly reached out to confer with BOEM, DoW, and the Bureau of Safety and Environmental Enforcement ("BSEE") to forge a path forward without litigation. But BOEM and DoW refused to discuss the supposedly new information about national security impacts or what Vineyard Wind might do to mitigate them. And BSEE failed to permit installation of blades on 10 already-constructed towers, thereby creating safety risks the Order supposedly was intended to prevent. Having exhausted all options with the agencies and facing a critical need to complete the Project before a critical construction vessel departs at the end of March, Vineyard Wind is now asking this Court to issue a temporary restraining order and preliminary injunction to allow Vineyard Wind to complete construction and operate the Project in accordance with the approved COP.

Vineyard Wind satisfies the criteria for a temporary restraining order and preliminary injunction. Vineyard Wind is likely to succeed on the merits because the Order is arbitrary and capricious and violates the APA, OCSLA, and due process. The Order does not explain what the Project is supposedly doing to impact national security, or how suspension could be necessary since the Project is complying with the mitigation measures DoW previously found would protect

national security. The Order was issued without notice and in violation of APA and OCSLA provisions governing when activity on a lease may be suspended. And the circumstances surrounding the Order, as well as statements of Secretary Burgum and the President, suggest that the national security rationale is a pretext for preventing the construction of offshore wind energy projects that the President simply dislikes.

The suspension also threatens immediate, irreparable harm by derailing a tightly sequenced construction plan, jeopardizing both the safety of the partially completed wind turbines and Vineyard Wind's ability to complete the Project and generate revenues needed to cover its expenses. Put simply, the Order poses an existential threat to the Project and the company. The balance of equities and the public interest favor enjoining the Order to protect jobs and ensure reliable, affordable power for the New England grid.

The Court should therefore issue a preliminary injunction enjoining BOEM from enforcing the unlawful Order, just as another court did in *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), ECF No. 63.

**BACKGROUND**

### I.    HISTORY OF THE VINEYARD WIND PROJECT

BOEM consulted with the DoW to assess potential national security impacts at every stage of the decade-long process that led to the issuance of Vineyard Wind's lease in 2015 and the approval of the Project's construction and operations plan ("COP") in 2021. *See* OCSLA Compliance Memo at 17, Ex. 3 to Decl. of Jack Pirozzolo; *see also Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 1:22-cv-11091-IT, 2023 WL 621859 (D. Mass. Sept. 25, 2023) (describing extensive multi-agency review of the Project). Before BOEM approved the COP, the DoW requested specific mitigation measures to

- Address [the Air Force's] liability concerns pertaining to the 104th Fighter Wing's

3

training operations within Warning Area 105 [(an area that has some overlap with the Project area)];

- Mitigate impacts on NORAD's air defense mission due to potential turbine interference with two radar systems (the Falmouth Air Surveillance Radar (ASR)-8 and the Nantucket ASR-9); and

- Mitigate potential impacts on the [Department of the Navy's] naval operations.

*Id.* at 18.

DoW described its radar-impact mitigation approach as involving overlapping radar coverage and Radar Adverse Impact Management ("RAM"). Declaration of Klaus Moeller ¶ 20. DoW stated that this would mitigate Project impacts to an acceptable level and requested (1) notification to NORAD prior to Project completion for RAM scheduling, (2) payment by Vineyard Wind of an $80,000 contribution toward RAM execution, and (3) curtailment of Project operations in the event of non-routine temporary emergency circumstances "absolutely necessary" for "stated" national security or defense purposes. *Id.* DoW further stated it would "work with BOEM on the specific text" to implement these requirements. *Id.*

To protect national security and ensure compliance with OCSLA, 43 U.S.C. § 1337(p)(4), BOEM imposed these DoW-requested measures as terms and conditions of its approval of the COP. *Id.; see also Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, 123 F.4th 1, 14 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025) (upholding COP approval as consistent with OCSLA).

In April 2022, Vineyard Wind entered into an agreement (the "Mitigation Agreement") with the DoW and the Air Force to implement these mitigation measures and address national security, National Airspace System protection, and military readiness concerns. Ex. 3 to Moeller Decl. The Mitigation Agreement is "structured to ensure [Vineyard Wind] may construct and operate the Project without adversely impacting DoD military operations and readiness." *Id.* at 3. Provisions of the Mitigation Agreement include:

- limiting the Project to 62 turbines and one offshore substation;

- limiting Project structures to a maximum height of 837 feet above sea level;

- restricting construction to a specified geographic area;

- requiring Vineyard Wind to pay $80,000 to offset the cost of measures undertaken by DoW to mitigate any adverse impacts on military operations and readiness;

- requiring immediate curtailment of Project wind turbine operations for non-routine temporary emergency circumstances "absolutely necessary" for "stated" national security or defense purposes; and

- imposing requirements to protect against risks that may arise from activities under foreign control operating in the vicinity of national defense capabilities and military operations.

*Id.* at 3, 5–8, 13–17.

In previous litigation in this Court and the First Circuit, BOEM (represented by the Department of Justice) defended its national security assessment, stating in this Court that "Plaintiffs' claim that the Project could endanger national security lacks merit and is directly contradicted by the administrative record in this case … Indeed, the United States Department of Defense ('DoD') concluded otherwise … BOEM consulted with DoD at every stage of its decision-making process … and DoD ultimately concluded that any concerns with respect to the Project could be addressed through mitigation." Complaint ¶ 68(a); *see also id.* ¶ 68(b) (BOEM's First Circuit brief said "BOEM ensured the protection of national security interests by consulting with the Department of Defense … and requiring Vineyard Wind to adopt measures requested by DoD in order to avoid interference with defense activities"). BOEM prevailed in those cases and the other similar cases.[1]

---

[1] In each case, this Court upheld the challenged approval and the First Circuit affirmed. *See Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 1:22-cv-11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) (consolidating similar action by Responsible Offshore Development Alliance), *aff'd*, 123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025); *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28 (D. Mass. 2023), *aff'd*, 100 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1050 (2025); *Melone v. Coit*, No. 1:21-cv-11171-IT, 2023 WL 5002764 (D. Mass. Aug. 4, 2023), *aff'd*, 100 F.4th 21 (1st Cir. 2024). The Supreme Court denied

## II.    THE CHANGE IN ADMINISTRATIONS

After the COP was approved, neither BOEM nor Vineyard Wind changed the Project's design or location. Offshore wind nevertheless became a political target during the 2024 presidential campaign, with then-candidate Trump pledging to end offshore wind energy projects "on day one."[2] Following his election, the President reiterated that he would "have a policy where no windmills are being built."[3] Then, on his first day in office, President Trump issued a memorandum temporarily withdrawing all unleased areas of the OCS from offshore wind leasing and directing "a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases, [and] identifying any legal bases for such removal." Presidential Memorandum of January 20, 2025, 90 Fed. Reg. 8363, § 1 (Jan. 29, 2025). Thereafter, the President issued several executive orders targeting offshore wind energy projects, which led the Secretary of the Interior to issue an order directing his subordinates to consult with other agencies and provide a report concerning (among other things) "[i]mpacts that the development of offshore wind projects that have received a COP from the Department may have on military readiness."[4] All the while, President Trump continued to echo his steadfast policy against wind energy for reasons other than national security. The President asserted that he would "not allow a windmill to be built in the United States" because, among other things, wind mills are "killing the beauty of our scenery, our valleys, our beautiful plains," are "driving [whales] *loco*," and are "the worst form of energy, the most expensive form of energy." Complaint ¶ 89.

---

certiorari petitions from the Nantucket Residents, Seafreeze, and Responsible Offshore Development Alliance.

[2] Oliver Milman, *Trump Pledges to Scrap Offshore Wind Projects on "Day One" of Presidency*, Guardian (May 13, 2024),    https://www.theguardian.com/us-news/article/2024/may/13/trump-president-agenda-climate-policy-wind-power  (The President claimed that wind turbines "destroy everything, they're horrible, the most expensive energy there is," and "[t]hey ruin the environment, they kill the birds, they kill the whales.")

[3] Lisa Friedman & Brad Plumer, *Trump Promises to End New Wind Farms*, N.Y. Times (Jan. 7, 2025), https://www.nytimes.com/2025/01/07/climate/trump-wind-turbines.html.

[4] Secretary of the Interior, Order No. 3437 (July 29, 2025), https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign.

### III.    THE ORDER

On December 22, 2025, BOEM's director issued the Order directing Vineyard Wind "to suspend all … activities related to the Vineyard Wind 1 Project on the Outer Continental Shelf for the next 90 days for reasons of national security." Order at 1, Ex. 1 to Complaint. However, the Order allowed Vineyard Wind to "perform any activities that are necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment over the next 90 days and during any subsequent extensions," and to "continue any activities from those wind turbines that are necessary for the current level of power generation." *Id.*

The Order provides no details on potential security impacts. It states that in November 2025, DoW "completed an additional assessment regarding the national security implications of offshore wind projects" and provided Department of the Interior leadership with "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." *Id.* Based on its "initial review of this classified information," BOEM determined that the impacts "can only be feasibly averted by suspension of on-lease activities." *Id.* "In coordination with DoW," BOEM will determine whether the impacts can be mitigated, and it invites Vineyard Wind "to meet and confer about that possibility." *Id.* "BOEM will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled." *Id.*

Following issuance of the Order, Secretary Doug Burgum posted to X a series of comments that repeated the Administration's sentiments that offshore wind is a "bad deal" and a "scam" but did not mention national security. Complaint ¶ 98. And at a recent meeting with oil executives, the President repeated that his "goal is to not let any windmill be built" for reasons unrelated to any alleged impact on national security.  Complaint ¶ 89.

### IV.    VINEYARD WIND'S COMMUNICATIONS WITH BOEM AND BSEE REGARDING THE ORDER'S IMPACT ON THE PROJECT

The Project is comprised of 62 wind turbine generators ("WTGs"), each with a monopile foundation, transition piece, tower, nacelle, and blades, and each capable of generating 13.6 MW of power. When BOEM issued the Order, the Project was approximately 95% complete and on track to finish the remaining work and reach full commercial operations by the end of March, 2026. Moeller Decl. ¶ 5. The remaining work consists primarily of installing one full WTG (including blades), installing sets of three blades ("blade sets") on 10 WTGs as part of the BOEM-approved blade replacement program, and bringing online the remaining 18 WTGs (including the one WTG that remains to be installed). *Id.* ¶ 27. The remaining construction work is being done by a specialized vessel (*Sea Installer*), which is scheduled to depart on March 31, 2026 pursuant to an existing contract. *Id.* ¶ 29. Even if a potential substitute vessel could be identified, it would require contracting and extensive Project-specific mobilization, so resuming and finishing the remaining offshore work would take an additional year or more, if completion would remain feasible at all. *Id.* ¶ 35.

Seeking to find a path forward without litigation, Vineyard Wind's CEO emailed Director Giacona on December 23, 2025, acknowledging receipt of the Order and requesting a meeting at the earliest opportunity to discuss a path forward. *Id.* ¶ 46. Director Giacona and other officials from BOEM and the Department of the Interior met with Vineyard Wind on December 30, but refused to identify the supposed national-security threat posed by the Project beyond generalized references to potential radar degradation. *Id.* The officials did not explain why that could be a risk to national security in light of Mitigation Agreement and the DoW-approved mitigation measures. Nor were they willing to discuss any mitigation measures Vineyard Wind could implement to address the alleged concern, saying those were issues Vineyard Wind needed to address with DoW.

*Id.* However, on December 31, the Department of the Interior advised Vineyard Wind that DoW will not provide any information about the nature of the alleged national security impacts or possible mitigation measures while litigation was pending. *Id.* ¶ 49. Vineyard Wind responded that it had not filed a lawsuit and had personnel with the requisite security clearance, Project expertise, and experience to address any national security concerns, but BOEM has ignored this response. *Id.*

Also seeking to find a path forward without litigation, Vineyard Wind explained to BOEM and BSEE that it needs to complete construction of partially installed turbines to ensure the safety—something that is permitted by the Order. *Id.* ¶ 46. This construction work principally involved (1) removing blades from partially constructed turbines because the blades were produced at the factory that produced the defective blade that failed in July 2024 and replacing them with blades produced at a different factory and installing one nacelle (as reviewed by BSEE), (2) then performing commissioning activities to test and prepare critical control and safety systems to ensure that the turbines are in the safest condition. On December 31, 2025, BSEE advised that Vineyard Wind could complete blade removals but could not move forward with any new blade installation because BSEE did not believe that was "a matter that impacts, health, safety and the environment." *Id.* ¶ 47; Ex. 6 to Moeller Decl.[5]

Vineyard Wind sought reconsideration and promptly provided BSEE additional explanation and documentation on January 5 and January 6, 2026, demonstrating that timely installation of blades on 10 hammerhead (tower and nacelle) WTGs is necessary to avoid potential safety risks. Simkins Decl. ¶ 28–29. WTGs are designed mechanically and electrically as an integrated system. It is widely accepted among engineering experts that once tower installation is

---

[5] Vineyard Wind also completed the installation of one tower that was being installed when the Order was issued and could not safely be left uninstalled.

started, the safest course of action is to complete installation of all components and put the turbine in in operational-ready mode, which requires completing the commissioning of all critical systems so the turbine can be controlled remotely and its critical safety systems can are tested and functional. Moeller Decl. ¶ 43. The idea of having partially constructed turbines for an extended period was never contemplated by either the certified design or Vineyard Wind's Facility Design Report ("FDR") that was stamped by a Professional Engineer, verified by the Certificated Verification Agent ("CVA"), and reviewed by BSEE. BSEE previously was concerned about this issue and repeatedly emphasized that Vineyard Wind should remove the faulty blades on these towers and replace them with new blades as soon as possible to ensure full control of the turbine and testing of all critical systems. *Id*. The faulty blades have been removed, and not installing replacement blades creates significant increased health, safety and environmental risks. *Id*.

The turbines are fitted with a lightning protection system which utilizes the lightning receptors in the blades to correctly attract and ground any lightning strikes. Vineyard Wind has provided BSEE with technical materials addressing these lightning-protection risks (including the January 6 technical submission and follow-up lightning-protection documentation), and BSEE confirmed receipt. Without installed blades, this system is not operating as designed, increasing the risk of damage—and potential environmental impacts—in the event of a lightning strike. *Id.* ¶ 45.

Installation of blades is also needed to ensure that water and/or excess humidity does not intrude into the nacelle and damage critical safety systems. The nacelle has holes where the blades are installed. The holes are covered, but the covers are not designed to be protective for long periods of time nor are they designed to protect against harsh winter weather conditions. *Id.* ¶ 44. If the covers become detached from the nacelle, there can be significant water ingress into the hub

leading to flooding within the nacelle and subsequent damage to blade bearings, hydraulic equipment, safety equipment and electrical equipment, including electrical cabinets, motors, batteries, and various other electrical and electronic components. *Id*. Such an occurrence is a violation of the Contractor's Preservation Plan, which explicitly prohibits the accumulation of water or moisture for a prolonged period (>2 days) in any area inside the turbine. *Id.* Should this occur, critical safety systems could be compromised. *See id.* ¶ 43; Ex. 6 to Moeller Decl. (discussing safety systems that could be impacted).

On January 8, 2026, BSEE performed an inspection of the offshore work site to evaluate current conditions. Simkins Decl. ¶ 31. On January 10, 2026, Vineyard Wind contacted BSEE staff to discuss additional information Vineyard Wind had provided about the safety risks posed by a lightning strike on a turbine without blades. *Id.* ¶ 33. On January 14, 2026, Vineyard Wind was advised that BSEE would not reconsider its December 31 decision that blade installation is not permitted by the Order.

## LEGAL STANDARD

The Court may issue a temporary restraining order or preliminary injunction if "the moving parties show that the balance of four factors tips in their favor: a likelihood of success on the merits; whether and to what extent the movants will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022) (cleaned up); *see also, e.g.*, *Louhghalam v. Trump*, 230 F. Supp. 3d 26, 32 (D. Mass. 2017). The third and fourth criteria "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

**I.    VINEYARD WIND IS LIKELY TO PREVAIL ON THE MERITS OF ITS CHALLENGES TO THE ORDER**

It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citation omitted). Vineyard Wind is likely to succeed on the merits, because the Order violates OCSLA, the APA, and the Fifth Amendment of the Constitution. *Cf.* Order at 2, *Revolution Wind*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), ECF No. 63 ("Revolution Wind has demonstrated likelihood of success on the merits" or similar claims against the Order BOEM issued to stop construction of its project).

**A.    The Order Is Unlawfully Depriving Vineyard Wind Of The Right To Construct The Project In Accordance With The Approved COP**

The Order is unlawfully depriving Vineyard Wind of its right to construct and operate the Project pursuant to the COP that BOEM approved and that this Court and the First Circuit upheld as consistent with OCSLA. Both OCSLA and Vineyard Wind's lease confer "the exclusive right and privilege, subject to the terms and conditions of [the] lease and applicable regulations," to construct and operate the Project in accordance with the "COP that has been approved by the Lessor [BOEM]." Lease § 2(a); *see also* 30 C.F.R. § 585.200(a) (lessee has the "right, subject to obtaining necessary approvals," and complying with the regulations, to "install and operate facilities"). And while OCSLA and the lease authorize BOEM to suspend activities on the lease in limited circumstances, they do not authorize the suspension ordered here.

The lease says that the BOEM "reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of section 12 of the Act and applicable regulations." Lease § 3(c), Ex. 2 to Pirozzolo Decl. But the Order does not invoke the national security provisions of section 12 of the Act, since neither provision authorizes the Order's

suspension of Project activities. Section 12(c) states that leases "shall contain" a provision authorizing BOEM, "upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President," to "suspend operations under any lease; and all such leases shall contain … provisions … of just compensation to the lessee whose operations are thus suspended." 43 U.S.C. § 1341(c). But there is no declared war or national emergency. Section 12(d) states that the "United States reserves" the "right to designate, by and through the Secretary of Defense, with the approval of the President," areas of the OCS "needed for national defense." *Id.* § 1341(d). But the Secretary of Defense/War has not declared Vineyard Wind's lease as "needed for national defense."

Instead, the Order invokes 30 C.F.R. § 585.417(b), which purportedly authorizes BOEM to issue a suspension order "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. That regulation was issued pursuant to the Secretary of the Interior's authority to "provide for the . . . suspension" of offshore wind leases. 43 U.S.C. § 1337(p)(5). That authority, however, is not unbounded. Rather, the *general* description of the Secretary's regulatory authority referenced in § 1337(p)(5) must be read in harmony with—and is necessarily constrained by—the *specific* conditions Congress established for national-security-based suspension in 43 U.S.C. § 1341. *See Mont v. United States*, 587 U.S. 514, 524 (2019) (statutory provision should be read in "consideration of the entire text, in view of its structure" and "logical relation of its many parts"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012) ("Statutes *in pari materia* are to be interpreted together, as though they were one law.").

"It is a conventional canon of legal interpretation that specific provisions trump more general ones." *Harry C. Crooker & Sons, Inc. v. Occupation Safety & Health Rev. Comm'n*, 537

F.3d 79, 84–85 (1st Cir. 2008). Accordingly, § 1337(p)(5) allows the Secretary to provide for suspension on national-security grounds only insofar as they comport with the framework in § 1341. Reading the statute otherwise would render § 1341's intricate interagency procedures governing suspensions on national-security grounds meaningless. Such a construction would violate "the cardinal rule that, if possible, effect shall be given to every clause and part [of] a statute." *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204 (1932); *see also* Scalia & Garner, *supra*, at 174 (court should avoid interpretation that causes a provision "to duplicate another provision or to have no consequence").

BOEM therefore can neither claim for itself the authority to determine when suspension is needed for national security and defense, nor usurp regulatory power beyond its congressionally authorized bounds. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109 (2022) (agencies "possess only the authority that Congress has provided."). But BOEM did just that in issuing the Order based on its own determination that some unspecified harm to national security "can only be feasibly averted by suspension of on-lease activities." Order at 1. And BOEM did so without adhering to the procedures and limitations in the lease, which require the "appropriate military agency" to make "[e]very effort" to "provide as much advance notice as possible of the need to suspend operations," and specify that suspensions "for national security reasons will generally not exceed seventy-two (72) hours." Lease Addendum C, §§ 3.2.2, 3.2.3; *see also id.* § 3.2.2 ("Advance notice will normally be given before requiring a suspension…."). The Order is thus "in excess of" BOEM's authority and should be held "unlawful" and "set aside." 5 U.S.C. § 706(2)(C).

### B.   The Order Is Arbitrary And Capricious

The Order is also unlawful and should be set aside because it is "arbitrary and capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024). It is also

arbitrary and capricious for an agency to change its position without providing a "reasoned explanation for the change" and considering the "serious reliance interests" engendered by the agency's prior decision. *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (cleaned up). The Order is arbitrary and capricious on both of those grounds.

**First**, the Order does not provide a reasonable explanation of why BOEM is taking the extraordinary action of suspending activities taken under an approved COP. It cites 30 C.F.R. § 585.417(b), but does not explain why a suspension of all construction activity and commissioning of wind turbine generators for the Project is "**necessary** for reasons of national security or defense." (emphasis added). The Order nowhere identifies what BOEM thinks the "national security threats relating to this project" are. Order at 1. It does not identify what the Project is doing to cause those unidentified threats. And it does not explain why those unidentified threats have "the potential to cause serious, immediate, and irreparable harm to our great nation." *Id.* BOEM has thus failed to provide "a rational connection between the facts found and the choices made." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1289 (1st Cir. 1996) (citation omitted).

This failure cannot be excused on the ground that BOEM claims to be relying on national security grounds. An agency cannot simply say "trust us, we had good national security reasons for what we did." *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). While some information about "the rapid evolution of relevant adversary technologies" may well be classified, that does not excuse the wholesale failure to provide any information about the nature of the harm these technologies supposedly pose when deployed in or near Vineyard Wind's Project or why Vineyard Wind could not take measures to mitigate those supposed harms. *See Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1078 (N.D. Cal. 2005) (action was arbitrary and capricious where agency did not show "any actual connection" between its action and "threats to national

security" and failed to "consider alternative mechanisms for addressing national security objectives"). The Order does not explain why that information is classified. And if BOEM seeks to rely on classified information in this Court, it must provide a declassified summary or at least provide the information to the Court *in camera* and provide access to Vineyard Wind's counsel with appropriate conditions to safeguard its secrecy. *See* 28 C.F.R. § 17.17(a).

**Second,** the Order is also arbitrary and capricious because it violates the "change-in-position doctrine." *Wages & White Lion Invs.*, 145 S. Ct. at 917. That doctrine states that it is arbitrary and capricious for agencies to change their positions unless they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* (cleaned up).  BOEM violated that doctrine here.

The Order's suggestion that the Project poses some unspecified threat to national security contradicts BOEM's finding, made after years of extensive review and consultation with DoW, that the COP and mitigation measures BOEM imposed will ensure the protection of the national security interests of the United States. Yet the Order fails to acknowledge BOEM's prior finding. Compounding the arbitrariness, the Order provides no *reasoned* explanation for disregarding the facts and circumstances that serve as the basis for BOEM's approval of the COP. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) ("a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior" decision). The Order references supposedly new and classified information, but it nowhere explains why that information undermines BOEM's prior conclusions or renders the existing mitigation measures inadequate. That "unexplained inconsistency" with BOEM's prior finding renders the Order arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016); *see also* Hearing Tr. at 42,  *Revolution Wind*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), ECF No. 65

(developer likely to succeed on challenge to similar order where BOEM did not explain "how these national security concerns differed from the same ones that the developers … specifically committed to mitigating in their 2024 agreement with the Department of the Defense or the ones which the project was extensively screened out for as part of its multi-year, multi-agency approval").

**Third**, the Order wholly fails to acknowledge that BOEM's approval of the COP, and repeated defense of that approval in subsequent litigation, "engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted). The change-in-position doctrine is "administrative law's answer" to the concern that "an agency should not mislead regulated entities" by telling them "one thing" and then turning around and doing "something different." *Wages & White Lion Invs.*, 145 S. Ct. at 917. BOEM did not have to hold an auction and sell leases for wind energy development. But once BOEM did so, it was entirely reasonable for Vineyard Wind to spend money developing its project on the lease it acquired for that very purpose. That reliance became stronger when BOEM approved the COP, since the lease and regulations expressly authorize Vineyard Wind to "conduct activities" that are "described in a . . .  COP that has been approved by [BOEM]." Lease § 2(a); *see also* 30 C.F.R. § 585.200(a). And the reliance became stronger still when the COP was challenged  in this Court, BOEM defended the COP, and the COP was upheld in the First Circuit and the Supreme Court denied certiorari. Indeed, BOEM previously recognized Vineyard Wind's reliance interest.

In opposing a motion to enjoin the Project's construction, BOEM said "there is a strong public interest in the certainty and reliability of Federal Defendants' approvals. Where, as here, the developer has complied with agency rules and satisfied federal statutory requirements to the agencies' satisfaction, the developer should be able to rely on its permits, as it may need to make

business and financial decisions in furtherance of completing the authorized activity. OCSLA recognizes th[is] interest."[6] As the attached declarations explain, Vineyard Wind made extensive business and financial decisions in furtherance of completing its Project, having incurred over $4.5 billion to date to develop, permit, engineer, fabricate components for, and construct the Project. Moeller Decl. ¶ 25; Hortiguela Decl. ¶ 5. The Order's failure to acknowledge Vineyard Wind's reliance interest, much less to explain why that isn't entitled to significant weight, is the height of arbitrary and capricious action.

**Finally**, Secretary Burgum and the President have made numerous public statements expressing opposition to offshore wind energy, and a desire to stop construction of wind energy projects, for reasons entirely unrelated to national security. *See* Complaint ¶¶ 5, 89, 98 (collecting statements). What is more, it appears that BOEM and DoW did not follow the established process for resolving national security concerns related to offshore wind energy project. *See* Declaration of Howard David Belote ¶ 2 (the "15-year-old Clearinghouse process has not been followed, and those subject matter experts have likely not been consulted, in the November 2025 analysis cited by Mr. Giacona or in BOEM's determination to send the Order to Vineyard Wind or similar orders to developers of other offshore wind projects in active construction"). These facts, when combined the agencies' refusal to discuss the issue with Vineyard Wind and try to work out a solution, suggest that the Order is arbitrary and capricious because the national security rationale is a pretext for stopping a project the President disliked for other reasons. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (agency action is arbitrary and capricious where the stated explanation "is incongruent with what the records reveals about the agency's priorities"); *see also* Hearing Tr. at 42, *Revolution Wind*, No. 1:25-cv-02999-RCL (court has "concern" that "the stated national

---

[6] Agency Def.' Opp. to Prelim. Inj. at 18–19, No. 1:22-cv-11091-IT (D. Mass. May 19, 2023), ECF No. 123 (citing 43 U.S.C. § 1332(3) (Outer Continental Shelf "should be made available for expeditious and orderly development").

security reason may have been pretextual").

### C. The Order Violates the Due Process Clause of the Fifth Amendment

The Order also violates the Fifth Amendment, which bars the government from depriving a person of property absent "constitutionally adequate process." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 270 (1st Cir. 2011). BOEM deprived Vineyard Wind of due process by suspending operations on its lease without prior notice, without disclosure of the grounds for its action, and without any meaningful pre- or post-deprivation opportunity to be heard.

Vineyard Wind has a protected property interest in its lease, which grants Vineyard Wind "the exclusive right and privilege" to construct and operate a wind energy project in accordance with the approved COP. Lease § 2(a); *see Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975) (OCSLA lease "convey[s] a property interest enforceable against the Government"). By suspending construction and commissioning of wind turbines for at least 90 days (and potentially indefinitely), the Order deprives Vineyard Wind of that right. *See Connecticut v. Doehr*, 501 U.S. 1, 12 (1991) ("[E]ven temporary or partial impairments to property rights . . . merit due process protection."). And it does so without providing Vineyard Wind with any "meaningful" opportunity to contest the suspension. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Ordinarily, due process requires "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (collecting cases). That didn't happen. BOEM issued the Order with no notice or opportunity to "rebut [its] factual premises." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). In evaluating whether such proceedings comport with due process, courts balance (1) "the private interest" implicated; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value . . . of additional or substitute procedural safeguards"; and (3) "the Government's interest" in the chosen procedure.

*Id.* at 335. Here, each factor undercuts the adequacy of BOEM's unilateral proceedings.

**First**, Vineyard Wind's private interest is exceptionally strong: the Order's suspension of construction poses an existential threat to the nearly completed, multibillion-dollar Project. *See infra* at 22–24; *cf. Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997) (property interest in "entitlement to continue construction without unfair interference" is "substantial" where "any interruption of construction is likely to be very costly").

**Second**, BOEM's issuance of the Order without affording Vineyard Wind any opportunity to contest—or even *know*—the grounds for the suspension heightens the risk of erroneous deprivation. Due process requires, at a minimum, "the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action." *Ralls Corp.*, 758 F.3d at 318. Yet BOEM acted unilaterally without procedural safeguards "to minimize substantively unfair or mistaken deprivations of property." *Garcia-Rubiera,* 665 F.3d at 275 (quotation omitted).

**Third**, BOEM cannot justify dispensing with pre-deprivation process. The government may forgo advance notice and a hearing only where "the necessity of quick action by the State" makes such procedures impracticable. *O'Neill v. Baker*, 210 F.3d 41, 47 n.6 (1st Cir. 2000). But the Order itself defeats any claim of exigency: BOEM received DoW's assessment in November, but waited until December 22 to issue the Order. *See* Order at 1. Given that "emergency situations require an *immediate* response," *S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.*, 775 F.3d 82, 86 (1st Cir. 2014) (emphasis added), BOEM's delay is incompatible with any claim that advance process was infeasible. And BOEM cannot manufacture exigency by simply reciting the words "national security." *See Ralls Corp.*, 758 F.3d at 318–19 (pre-deprivation "procedural protections are required by the Due Process Clause . . . notwithstanding the Government's compelling interest in national security[.]") (internal quotation marks omitted)). Because BOEM

20

could have given Vineyard Wind at least "some pretermination opportunity to respond" prior to the Order, the third *Mathews* factor also weighs decisively in Vineyard Wind's favor. *O'Neill*, 210 F.3d at 47–48.

**Finally**, BOEM has not given Vineyard Wind any meaningful opportunity to respond since the suspension took effect. Although the Order invites Vineyard Wind to "coordinate with [BOEM] to determine whether the national security threats posed by this project can be adequately mitigated," Order at 1, that offer has proven illusory. Aside from saying that the issue has something to do with radar degradation, BOEM has declined to provide any specifics about the national-security impacts underlying the Order or discuss any mitigation measures Vineyard Wind could implement to mitigate them. Moeller Decl. ¶ 40. Even when the government relies on classified information, due process still requires disclosure of the "unclassified support therefor" and a "genuine . . . opportunity to rebut the unclassified supporting evidence." *Ralls Corp.*, 758 F.3d at 318 (internal quotation marks omitted). Since BOEM has refused to provide either, its hollow post-deprivation assurances similarly deprive Vineyard Wind of the "fundamental requirement of due process . . . to be heard at meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks omitted).

### D.  BOEM Failed to Comply with Required APA Procedures in Issuing the Order

BOEM's failure to afford Vineyard Wind pre-suspension process likewise violates the procedural requirements of the APA. Section 558 provides that the suspension of a "license" is lawful only if the agency first gives written notice of the "facts or conduct" justifying the action and an "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c). A "license" includes "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8). Vineyard Wind's lease and COP approval are "licenses" because they grant permission to

construct and operate the Project in the leased area. *See* Lease § 2(a); 30 C.F.R. § 585.200(a); *see also Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1437 (9th Cir. 1991) (courts read "the APA's definition of 'license' … broadly, in accordance with its terms" that include "'permits'" or "'other form of permission'"). And while Section 558's procedural safeguards do not apply "in cases of willfulness or those in which public health, interest, or safety requires otherwise," 5 U.S.C. § 558(c), BOEM cannot invoke these exceptions because it made no finding—and offered no evidence—that the exceptions applied here. *See Blackwell Coll. of Bus. v. Att'y Gen.*, 454 F.2d 928, 934 (D.C. Cir. 1971); *Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001). Indeed, BOEM's delay in issuing the Order belies any claim that exigent circumstances prevented BOEM from providing notice and an opportunity for Vineyard Wind to demonstrate and achieve compliance with lawful requirements here. *See supra* at 20;  *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 301 (1981) ("[I]mmediate cessation orders respond[ ] to situations in which swift action is necessary to protect the public health and safety."). The Order was unlawfully issued "without observance of [the] procedure required" by Section 558.[7]

## II.    THE ORDER IS IRREPARABLY HARMING VINEYARD WIND

Where, as here, "the potential economic loss is so great as to threaten the existence of the movant's business," a preliminary injunction is warranted. *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt.*, 927 F.3d 1, 5 (1st Cir. 2019) (citation omitted). BOEM's Order threatens to prevent completion of construction, which could produce catastrophic financial consequences that Vineyard Wind may not be able to withstand. *Cf.* Order at 2, *Revolution Wind*, No. 1:25-cv-02999-RCL (order preventing timely completion of Revolution Wind's project causes irreparable harm).

---

[7] Nothing in OCSLA displaces the protections otherwise afforded by the APA when BOEM suspends leases issued under that statute. *See* 43 U.S.C. § 1349(a)(6) (expressly preserving rights available under "any other Act").

**First**, the direction to halt construction has been causing Vineyard Wind to incur daily costs of approximately $2.3 million, including contractor costs, labor costs, interest payments, and loss of revenue. Hortiguela Decl. ¶ 8.

**Second**, the Order threatens Vineyard Wind's ability to complete construction of the Project. Vineyard Wind's ability to complete the remaining work hinges on a tightly sequenced offshore work plan and the continued availability of *Sea Installer*, which is available through March 31, 2026. Moeller Decl. ¶ 6. Vineyard Wind has no practicable prospect of securing a replacement vessel on any predictable timeframe. *Id.* ¶ 7. Accordingly, if *Sea Installer* departs before completion, the Project would be left without the specialized vessel required to finish construction, even if the Order is lifted later. *Id.* And given the amount of construction work that remains, the Order needs to be lifted by January 30, 2026 so *Sea Installer* has time to complete construction before it departs on March 31. *Id.* ¶ 9.

**Third**, the Project has not installed enough nameplate capacity to meet the requirements of its Power Purchase Agreements ("PPAs") with Massachusetts utilities. Hortiguela Decl. ¶ 12. If the Project is not completed before Vineyard Wind loses access to *Sea Installer*, Vineyard Wind will not be able to generate enough power to meet its obligations under the PPAs and could be exposed to a potential declaration of default. Such a default could result in forfeiture of the credit posted (approximately $48 million) and give the electrical utilities a unilateral right to terminate the PPAs, leaving the Project with no certainty about its power purchasers and income. *Id.*

**Fourth**, BSEE has advised Vineyard Wind that it will not permit installation of replacement blades, and its staff have not given Vineyard Wind any assurances that they will continue to timely review information Vineyard Wind submits to BSEE to permit blades to be installed and turbines to be placed in operation pursuant to the terms and conditions of the COP.

*Id.* ¶¶ 31–34; *see also* Declaration of Stevens Simkins ¶ 20. The Order therefore prevents Vineyard Wind from obtaining the reviews needed to install the remaining blade sets and place the turbines in operation, regardless of whether there is a vessel available to do the installation work. This is particularly problematic because continued installation of replacement blades should fall with the Order's exception for work to address potential health, safety or environmental impacts. *See supra* at 9–11.

**Finally**, and most significantly, the Order poses an existential threat to the Project and Vineyard Wind. Hortiguela Decl. ¶ 7; Moeller Decl. ¶ 4. Although the Order permits the Project to continue its current level of power generation, that level is insufficient to prevent the catastrophic financial consequences of the Order. Hortiguela Decl. ¶ 11. If the Project is not timely completed by March 31, 2026 (the contractual maturity date under the credit agreement), and with no vessels secured to complete the Project in the foreseeable future, then the lenders will have the ability to declare an event of default, accelerate repayment of the construction loan, and foreclose on the Project. *Id.* Such an event would threaten the financial viability of the entire Project and, consequently, Vineyard Wind's ability to survive. *Id.* To avoid that irreparable harm, Vineyard Wind must be permitted to resume construction by January 30 to allow time for construction to be completed before the *Sea Installer* departs on March 31, 2026.

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR AN INJUNCTION AGAINST THE ORDER

The balance of harms and public interest also favor an injunction. Vineyard Wind takes protection of national security seriously. It agreed to the mitigation measures imposed in the COP and entered the Mitigation Agreement with DoW, whose stated objective "is to mitigate any potential adverse impacts and to minimize risks to national security while allowing the Vineyard Wind 1 Offshore Wind Energy Project … to proceed with development." Mitigation Agreement

at 3. Vineyard Wind is abiding with that Mitigation Agreement and all mitigation measures in the BOEM-approved COP, but the Order is arbitrarily and capriciously preventing it from proceeding with the development of the Project. That not only causes irreparable harm to Vineyard Wind, but also causes economic harm to individuals and businesses and deprives Massachusetts utilities of a much needed source of clean power. *Cf.* Order at 2, *Revolution Wind*, No. 1:25-cv-02999-RCL (finding the "balance of the equities" favors enjoining the order stopping construction of Revolution Wind's project).

The Commonwealth of Massachusetts has made significant investments in infrastructure at the New Bedford Marine Commerce Terminal, in workforce development, and supply chain development so Vineyard Wind can construct the Project and provide clean, affordable energy for over 400,000 homes and businesses. Declaration of Bruce K. Carlisle ¶¶ 17–31. Approximately 750 US workers are employed on the Project, the vast majority of these workers are residents of Massachusetts. Moeller Decl. ¶ 39. If all construction work is stopped, most of these workers will be laid off with no clear opportunities for similar work. *Id.* In addition, there are 32 US flagged vessels, 276 US mariners, and 18 fishing vessels currently engaged on the Project, all of which would have to cease work and lose significant income. *Id.*

The Order is also harming Massachusetts electric utilities and consumers. In approving the PPAs, the Massachusetts Department of Public Utilities found that the 800 MW of clean power from the Project will help reduce winter electricity price spikes, provide $3.7 billion in energy-related cost savings over the life of the Project, and reduce carbon emissions equivalent to taking 325,000 cars off the road each year. *Id.* ¶ 41; *see also* Declaration of Elizabeth Mahony, ¶ 23 (PPAs are "projected to provide an average of 1.4 cents/kWh (in real 2017 dollars) of direct savings to ratepayers."). As Governor Healey and other Massachusetts officials explain, the Order is causing

Massachusetts to "los[e] out on crucial additional power that was poised to lower costs and emissions in the region this winter."[8] ISO-New England confirms that power from Vineyard Wind and Revolution Wind (another offshore wind energy project whose construction was suspended by BOEM on December 22, 2025) is "particularly important to system reliability in the winter when offshore wind output is highest and other forms of fuel supply are constrained."[9] "[C]anceling or delaying these projects will increase costs and risks to reliability" and "adversely affect New England's economy and industrial growth."[10] And it is not in the public interest to delay "largescale wind energy projects [that] can impact efforts to combat this [climate] crisis." *Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*, 626 F. Supp. 3d 468, 474 (D. Mass. 2022).

Finally, an injunction that allows the Project to complete construction would serve the public interest and enhance national security by helping to address the national energy emergency declared by the President. Executive Order 14156 of January 20, 2025, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 29, 2025). The declaration finds that our energy infrastructure is "far too inadequate to meet our Nation's needs" and contributes to "high energy prices." *Id.* Vineyard Wind's Project will bring additional electricity to the New England electrical grid, helping to address the energy scarcity and bring down electricity prices.

---

[8] Press Release, Governor Maura Healey, *Governor Healey Responds to Trump Administration Stop Work Order for Vineyard Wind* (Dec. 22, 2025), https://www.mass.gov/news/governor-healey-responds-to-trump-administration-stop-work-order-for-vineyard-wind; *see also* Mahony Decl. ¶ 44 ("Massachusetts ratepayers will pay at least $11 million more in direct wholesale energy market costs between January and March 2026 alone without the Vineyard Wind project operating at full capacity.").

[9] ISO-NE, *ISO New England Statement on Department of the Interior Offshore Wind Announcement*, ISO NEWSWIRE (Dec. 22, 2025), https://isonewswire.com/2025/12/22/iso-new-england-statement-on-department-of-the-interior-offshore-wind-announcement/.

[10] *Id.*

## IV.    NO SECURITY SHOULD BE REQUIRED

Vineyard Wind should not be required to post a bond because a preliminary injunction allowing Vineyard Wind to continue to operate in accordance with the terms and conditions of the COP "carries no risk of monetary loss to the defendant" agencies. 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.); *see also Crowley v. Local No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) (upholding district court's decision to not require a costly bond where "[n]o great burden will be placed on [defendants], even in the absence of security").

## CONCLUSION

For the foregoing reasons, Vineyard Wind respectfully requests that this Court issue a temporary restraining order and preliminary injunction enjoining the Order in its entirety, and to ensure implementation of the Order, BSEE should resume its practice of reviewing submissions by Vineyard Wind so blades may be installed and turbines may be placed in operation pursuant to the terms and conditions of the COP. Alternatively, Vineyard Wind requests the Court to declare that continued installation of blades on 10 partially erected turbines falls within the safety exception of the Order and that BSEE resume its review of Vineyard Wind's submissions so installation may occur in accordance with the COP. As explained above in pages 9–11, replacement of the faulty blades with new blades and placing the wind turbines in operational ready mode ensures that the turbines can be controlled remotely and have all critical safety systems well tested and functional. The CVA has advised Vineyard Wind that failure to complete this work creates significant increased, health, safety, and environmental risks. Thus, contrary to BSEE's unreasonable position, this activity falls squarely within the exceptions provided in the Order.

Date:  January 15, 2026

Respectfully submitted,

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

Peter C. Whitfield (*pro hac vice* pending)
Richard W. Smith (*pro hac vice* pending)
Kathleen Mueller (*pro hac vice* pending)
Matthew C. Brewer (*pro hac vice* pending)
SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, DC 20005
(202) 736-8000
pwhitfield@sidley.com
rwsmith@sidley.com
kmueller@sidley.com
mbrewer@sidley.com

Brooklyn Hildebrandt (*pro hac vice* pending)
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
(213) 896-6007
bhildebrandt@sidley.com

*Counsel for Vineyard Wind 1 LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of January 2026, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system and served on anticipated counsel for Defendants via electronic mail.

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo