# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

VINEYARD WIND 1 LLC,

 Plaintiff,

 v.

THE UNITED STATES DEPARTMENT OF
THE INTERIOR *et al.,*

Defendants.

Civil Action No. 1:26-CV-10156

**Leave to file granted on January 21, 2026**

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

    I.   Wind Energy Development on the Outer Continental Shelf ....................... 3

    II.   Factual and Procedural Background ........................................................... 4

STANDARD FOR OBTAINING PRELIMINARY INJUNCTIVE RELIEF ............................. 7

ARGUMENT ....................................................................................................... 8

    I.   The Government is Not Required to Justify Withholding Classified Information or Provide Unclassified Summaries for the Purpose of Litigation .................................................................................................. 8

    II.   Vineyard Wind Is Unlikely to Succeed on the Merits ............................. 10

        A.   BOEM Had Authority to Issue the Suspension Order ............................ 10

        B.   BOEM Reasonably Applied its Authority ................................................ 13

        C.   The Suspension Order is Consistent with APA and Constitutional Process Requirements ........................................................................... 17

    III.   The Balance of Harms Weighs Against an Injunction ............................. 18

        A.   Vineyard Wind Has Not Shown Irreparable Harm ................................. 19

        B.   National Security Concerns Can Outweigh a Plaintiff's Irreparable Harm When Balancing the Harms ......................................................... 22

CONCLUSION .................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. U.S. E.P.A.*,
  38 F.3d 43 (1st Cir. 1994) ................................................................................................. 21

*Airport Impact Relief, Inc. v. Wykle*,
  192 F.3d 197 (1st Cir. 1999) ............................................................................................. 13

*Baltimore Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) ............................................................................................................ 13

*Basengezi v. Smith*,
  No. CV 23-1249 (JEB), 2024 WL 1050340 (D.D.C. Mar. 11, 2024) ................................ 15

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) .......................................................................................................... 17

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ..................................................................................................... 14, 15

*Busic v. Transportation Sec. Admin.*,
  62 F.4th 547 (D.C. Cir. 2023) ........................................................................................ 1, 17

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004) ............................................................................................. 22

*Citizens Awareness Network v. U.S. NRC*,
  59 F.3d 284 (1st Cir. 1995) ............................................................................................... 13

*Coleman v. Kendall*,
  74 F.4th 610 (4th Cir. 2023) ............................................................................................. 12

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ............................................................................................ 3

*Dept. of the Navy v. Egan*,
  484 U.S. 518 (1988) ....................................................................................................... 8, 13

*Doe v. Noem*,
  152 F.4th 272 (1st Cir. 2025) ............................................................................................ 16

*Does 1-6 v. Mills*,
  16 F.4th 20 (1st Cir. 2021) .................................................................................................. 7

*Elhady v. Kable*,
  993 F.3d 208 (4th Cir. 2021) ....................................................................................... 23, 24

*Esso Standard Oil Co. v. Monroig-Zayas*,
  445 F.3d 13 (1st Cir. 2006) ................................................................................................. 7

*Fares v. Smith*,
  901 F.3d 315 (D.C. Cir. 2018).................................................................... 14, 15

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021).................................................................................. 13

*FDA v. Wages & White Lion Inv., LLC*,
  604 U.S. 542 (2025).................................................................................. 16

*Gilbert v. Homar*,
  520 U.S. 924 (1997).................................................................................. 18

*Goldman v. Weinberger*,
  475 U.S. 503 (1986).................................................................................. 23

*Haig v. Agee*,
  453 U.S. 280 (1981).................................................................................. 18

*Hodel v. Va. Surface Mining and Reclamation Ass'n*,
  452 U.S. 264 (1981).................................................................................. 18

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003)..................................................................... 9

*Jifry v. FAA*,
  370 F.3d 1174 (D.C. Cir. 2004...................................................................... 9

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007).................................................................................. 14

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989).................................................................................. 13

*Mathews v. Eldridge*,
  424 U.S. 319 (1976).................................................................................. 18

*McKinney v. Dist. of Columbia*,
  142 F.4th 784 (D.C. Cir. 2025).................................................................... 17

*Mckinney v. District of Columbia*,
  2025 WL 2551713 (D.C. Cir. Aug. 29, 2025) ................................................. 17

*Morrissey v. Brewer*,
  408 U.S. 471 (1972).................................................................................. 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)................................................................................... 13

*N.B. et al. v. District of Columbia*,
  244 F. Supp. 3d 176 (D.D.C. 2017).............................................................. 18

*Nat'l Council of Resistance of Iran v. Dep't of State*,
  251 F.3d 192 (D.C. Cir. 2001).................................................................... 9, 16

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................... 7

*Olivares v. Transp. Sec. Admin.*,
    819 F.3d 454 (D.C. Cir. 2016) ............................................................................. 15

*Puerto Rico Aqueduct & Sewer Auth. v. U.S. EPA*,
    35 F.3d 600 (1st Cir. 1994) .................................................................................. 21

*Puerto Rico Hosp. Supply, Inc. v. Boston Scientific Corp.*,
    426 F.3d 503 (1st Cir. 2005) ................................................................................ 19

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010) .................................................................................... 7

*River St. Donuts, LLC v. Napolitano*,
    558 F.3d 111 (1st Cir. 2009) ................................................................................ 16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) ............................................................................ 19, 20

*Rusaviainvest, OOO v. Yellen*,
    No. 18 CIV. 5676 (PGG), 2023 WL 6198256 n. 3 (S.D.N.Y. Sept. 21, 2023) ......... 9

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    605 U.S. 168 (2025) ............................................................................................. 13

*Snepp v. United States*,
    444 U.S. 507 (1980) ............................................................................................. 18

*Stagg, P.C. v. U.S. Dep't of State*,
    673 F. App'x 93 (2d. Cir. 2016) ........................................................................... 23

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
    560 F. Supp. 3d 81 (D.D.C. 2021) .................................................................. 23, 24

*Stritzinger v. U. S. Off. of the Gen. Servs. Admin.*,
    No. CV 3:15-2978-TLW-PJG, 2016 WL 3035087 n.4 (D.S.C. Jan. 29, 2016) ......... 12

*Stritzinger v. U.S. Off. of the Gen. Servs. Admin.*,
    2016 WL 3027582 (D.S.C. May 27, 2016) ............................................................ 12

*Stritzinger v. U.S. Off. of the Gen. Servs. Admin.*,
    658 F. App'x 687 (4th Cir. 2016) ......................................................................... 12

*United States v. Abu-Jihaad*,
    630 F.3d 102 (2d Cir. 2010) ................................................................................ 10

*United States v. Holland*,
    214 F.3d 523 (4th Cir. 2000) ................................................................................. 9

*United States v. Holland*,
    48 F. Supp. 2d 571 (E.D. Va. 1999) ....................................................................... 9

iv

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ............................................................................. 18

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ............................................... 19, 20, 21

*Voice of the Arab World. v. MDTV Med. News Now*,
    645 F.3d 26 (1st Cir. 2011) ................................................................ 7

*W. Virginia v. Thompson*,
    475 F.3d 204 (4th Cir. 2007) ........................................................... 13

*Water Keeper All. v. U.S. Dept. of Defense*,
    271 F.3d 21 (1st Cir. 2001) ............................................................. 22

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) .......................................................................... 8

*Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*,
    934 F. Supp. 2d 1 (D.D.C. 2013) ................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................... 2, 7, 8, 20, 22, 23

**Statutes**

28 U.S.C. § 1491(a)(1) ............................................................................ 12

43 U.S.C. § 1331(a) ................................................................................... 3

43 U.S.C. § 1337(p) ............................................................................ 4, 17

43 U.S.C. § 1337(p)(1) ........................................................................... 17

43 U.S.C. § 1337(p)(1)(C) ........................................................................ 3

43 U.S.C. § 1337(p)(4) ........................................................................... 17

43 U.S.C. § 1337(p)(4)(F) ...................................................................... 11

43 U.S.C. § 1337(p)(5) ............................................................................. 4

43 U.S.C. § 1337(p)(5) ........................................................................... 10

43 U.S.C. § 1341(c) ................................................................................. 11

43 U.S.C. § 1341(d) ........................................................................... 11, 12

5 U.S.C. § 555(e) ..................................................................................... 15

5 U.S.C. § 558(c) ................................................................................. 2, 17

5 U.S.C. § 702 ......................................................................................... 12

5 U.S.C. § 706(2)(A) ............................................................................... 13

**Regulations**

30 C.F.R. § 585.102(a)...................................................................................... 3

30 C.F.R. § 585.200(a)...................................................................................... 3

30 C.F.R. § 585.417(b) .................................................................. 1, 4, 5, 10, 14, 17

30 C.F.R. §§ 585.600 ....................................................................................... 4

30 C.F.R. Part 585 .......................................................................................... 17

**Other Authorities**

Exec. Order 14,156,
    90 Fed. Reg. 8433 (Jan. 20, 2025) ............................................................ 23

Exec. Order No. 13,526,
    75 Fed. Reg. 707, 720 (Dec. 29, 2009) ........................................................ 9

*Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing
    and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects*,
    90 Fed. Reg. 8363 (Jan. 20, 2025) ............................................................. 5

## INTRODUCTION

On December 22, 2025, the Department of the Interior's Bureau of Ocean Energy Management (BOEM) suspended Plaintiff Vineyard Wind I LLC's offshore wind lease based on new national security information provided by the Department of War (DoW). The information that DoW provided "includ[ed] the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Letter from Matthew Giacona to Rachel Pachter (Dec. 22, 2025) (Suspension Order), Ex. C to Declaration of Matthew Giacona (Jan. 20, 2026). BOEM concluded that those national security considerations are implicated by Vineyard Wind's offshore wind project. Giacona Decl. ¶¶ 7, 9. Therefore, BOEM suspended the Vineyard Wind I Project for 90 days, but given that the project is already generating power, BOEM allowed Vineyard Wind to "continue any activities from those wind turbines that are necessary for the current level of power generation." Suspension Order at 1.

Vineyard Wind now seeks to preliminarily enjoin the entirety of the Suspension Order so it can continue construction activities on a project that poses a serious national security risk. But Vineyard has not shown it is entitled to that broad and extraordinary preliminary relief.

First, BOEM had statutory and regulatory authority to issue the Suspension Order to "protect[] national security"—"a government interest of the highest order." *Busic v. Transportation Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023). Indeed, Interior's regulations explicitly set forth the authority to issue the Order, 30 C.F.R. § 585.417(b) ("BOEM may order a suspension . . . [w]hen the suspension is necessary for reasons of national security or defense."), which regulation Vineyard Wind does not seriously contest.

Second, BOEM acted reasonably after DoW provided it with new information about national security risks stemming from offshore wind projects. In so doing, BOEM satisfied notice

requirements under 5 U.S.C. § 558(c)—which exempts proceedings in matters affecting the "public . . . interest"—and constitutional due process.

Third, Vineyard Wind has not established that it will suffer irreparable harm during the pendency of this litigation. In fact, many of its alleged harms are economic, but not the sort of economic harms that inflict existential harm on the enterprise.

Finally, given the significant national security risks at issue here, the balance of equities tips towards the government. Vineyard Wind too quickly dismisses the "professional judgment of military authorities" that that the Court must grant "great deference when balancing the harms." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). BOEM, informed by DoW, concluded that national security risks "arise from the operation of" the Vineyard Wind I Project, and therefore it halted construction to allow time to determine whether those impacts could be mitigated before the Project is fully constructed." Giacona Decl. ¶¶ 4, 10. The government will be submitting classified information related to those risks to the Court for *ex parte*, *in camera* review.

To satisfy its heavy burden to obtain extraordinary injunctive relief, Vineyard Wind will rely on recent court decisions issuing preliminary injunctions against similar suspension orders. *See Revolution Wind LLC v. Burgum*, No. 1:25-cv-2999-RCL (Jan. 12, 2026); *Empire Leaseholder, LLC v. Burgum*, No. 1:26-cv-004 (Jan. 15, 2026); *Virginia Elec. and Power Co. d/b/a/ Dominion Energy Virginia*, No. 2:25-cv-830 (Jan. 16, 2026). But no court has held that BOEM lacked the authority to issue the suspension orders, and the factual circumstances here (and the necessary balance of harms) are different. In none of those other instances did BOEM allow the company to continue producing power. And Vineyard Wind's enterprise-level harm argument is based entirely on the *possibility* that the countersigning party to its power purchase agreement *could* act to

2

terminate that agreement. Accordingly, this Court should not follow those decisions and should instead deny Vineyard Wind's requested injunction.

## BACKGROUND

### I.  Wind Energy Development on the Outer Continental Shelf

This case involves a wind energy project on the Outer Continental Shelf (OCS). The OCS consists of offshore submerged lands, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under the Outer Continental Shelf Lands Act (OCSLA), the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition *and other national needs*[.]" *Id.* § 1332(3) (emphasis added).

Interior approvals related to wind energy development on the OCS are governed by OCSLA and Interior's implementing regulations. *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary of the Interior to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas"); *id.* § 1337(p)(8) (authorizing the Secretary to "issue any necessary regulations to carry out this subsection"); *id.* § 1334(a) ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions.").

In granting Interior that authority, Congress directed that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner" that satisfies multiple criteria. *Id.* § 1337(p)(4). Among them are: "protection of national security interests of the United States." *Id.*

3

§ 1337(p)(4)(F).  Interior regulations delegate to BOEM the responsibility to implement Section 1337(p)(4).  *See* 30 C.F.R. § 585.102(a).

Under the BOEM-administered renewable energy regulations and lease terms, a lease issued under OCSLA does not itself authorize development.  30 C.F.R. § 585.200(a).  A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan (COP).  30 C.F.R. §§ 585.600, 585.605–585.613, 585.620–585.628.  In addition, OCSLA states that the "Secretary shall provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under [43 U.S.C. § 1337(p)]."  43 U.S.C. § 1337(p)(5).  Pursuant to that authority, Interior's regulations provide that "BOEM may order a suspension . . . [w]hen the suspension is necessary for reasons of national security or defense."  30 C.F.R. § 585.417(b).

## II.    Factual and Procedural Background

The Vineyard Wind I Project (the Project) is an offshore wind energy project in Lease Area OCS-A 0501, an area approximately 14 miles southeast of Martha's Vineyard.[1]  BOEM issued a Record of Decision on May 10, 2021, documenting its intent to approve the COP for the Project.  *Id*.  BOEM approved the COP with conditions on July 15, 2021.  *See* Giacona Decl. Ex. A.  Since that time, the Project has been under construction and is nearing completion, but Vineyard Wind has encountered setbacks during the construction process.

For example, in July 2024, a blade on one of the turbines failed and debris from the blade fell into the water.  Vineyard Wind COP Addendum (Dec. 5, 2024) 1, Declaration of Kenneth

---

[1] BOEM, Vineyard Wind 1 Offshore Wind Energy Project, Construction and Operations Plan (May 10, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Final-Record-of-Decision-Vineyard-Wind-1.pdf (last visited Jan. 18, 2026) ("Record of Decision.") 7, 10.

Stevens, Ex. A.  In response, state and federal agencies took emergency measures to contain the debris, and the Bureau of Safety and Environmental Enforcement (BSEE) temporarily suspended further installation of blades and the production of power until Vineyard Wind met certain conditions.  *Id.*  The manufacturer and installer of the turbines, GE Vernova, determined that the failure was caused by a manufacturing defect at the manufacturing facility in Gaspe, Canada.  *Id.*  At BSEE's direction, Vineyard Wind sought to replace other turbine blades that had been manufactured at the same facility, and BOEM approved a COP Addendum, which allowed Vineyard Wind to replace turbine blades at 22 locations.  *Id.*

In January 2025, the President issued a Presidential Memorandum entitled, "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects[.]"  90 Fed. Reg. 8363 (Jan. 20, 2025).  Section One of that memorandum instructs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases[.]"  *Id.*

"In November 2025, [DoW] completed an additional assessment regarding the national security implications of offshore wind projects, and provided senior leadership at the Department of the Interior with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."  Suspension Order at 1.  Given the Project's location and "[b]ased on BOEM's initial review of this classified information," BOEM issued an order, "pursuant to 30 C.F.R. § 585.417(b), to suspend all ongoing activities related to the [Project] on the Outer Continental Shelf for the next 90 days for reasons of national security."  *Id*.  But the order allows Vineyard Wind to "perform any activities that are necessary to respond to emergency situations and/or to prevent impacts to health,

safety, and the environment over the next 90 days." *Id.* And given that the "project is partially generating power," the order allows Vineyard Wind to "continue any activities from those wind turbines that are necessary for the current level of power generation." *Id.*

BOEM based its decision in part on the classified information it received from DoW, assessing that information in the context of existing national security-based mitigation measures for the Project. Giacona Decl. ¶¶ 4, 7, 9-10. BOEM determined that, at present, the Project's activities did not adequately provide for protection of national security interests. *Id.* ¶ 7. Recognizing the national security risks that the Project poses, BOEM acted "with urgency" to assess whether additional mitigation can be imposed to address those risks before Vineyard Wind engaged in more construction. *Id.* ¶ 9. BOEM then determined that "any potential mitigation measures may be more effectively incorporated into the [Project] before it is fully completed." *Id.* ¶ 10. "At this time," however, BOEM "is not aware whether the national security risks can be mitigated[.]" *Id.*

On December 31, 2025, BSEE Principal Deputy Director Kenneth Stevens informed Vineyward Wind CEO Klaus Møller that the removal of defective turbine blades would be allowed under the exception in the Suspension Order for actions that are necessary to prevent impacts to health and safety. Declaration of Kenneth C. Stevens ¶ 3. Mr. Stevens also informed Vineyard Wind that the installation of new blades would not fall within the exception and therefore such installation was suspended. *Id.* Subsequently, on January 14, 2026, Mr. Stevens responded to an inquiry from Puneet Verma, Senior Vice President for Governmental Affairs for Avangrid, a partner to Vineyard Wind I LLC. *Id.* ¶ 4. Mr. Stevens discussed issues raised by Mr. Verma with BSEE technical staff, who determined that leaving the turbines in place without installing new blades would not pose a safety issue. *Id.* Therefore, Mr. Stevens informed Vineyward Wind that the replacement of turbine blades would not be allowed during the suspension. *Id.*

On January 15, 2026, Vineyard Wind filed a motion for a temporary restraining order and preliminary injunction against the United States Department of the Interior, BOEM, and the heads of both entities (collectively, the government), seeking to enjoin the Suspension Order.  Dkt. No. 3.  The Court set a hearing on the motion for January 23, 2026.  Dkt. No. 14.

Counsel for the government provided Department of Justice security officials with the classified Declaration of Hon. Dale R. Marks, together with the classified information, to provide to the Court for *ex parte*, *in camera* review.  An unclassified version of Mr. Marks's declaration is attached to this brief.  Interior continues to "coordinat[e] with DoW on whether access to the classified material with a secret designation by Owners is possible and/or whether certain information can be declassified or an unclassified summary could be created." Giacona Decl. ¶ 11.

## STANDARD FOR OBTAINING PRELIMINARY INJUNCTIVE RELIEF

Injunctive relief is an "extraordinary and drastic remedy that is never awarded as of right," *Voice of the Arab World. v. MDTV Med. News Now*, 645 F.3d 26, 32 (1st Cir. 2011) (citation and quotation marks omitted), but "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (citation omitted). A plaintiff seeking a preliminary injunction must demonstrate *all* four elements: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) a balance of hardships that tips in their favor; and (4) that the public interest weighs in favor of granting the injunction. *See id.* at 20; *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010); *see also Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) ("The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor."). The balance of the hardships and the public interest factors "merge when the [g]overnment is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556

U.S. 418, 435 (2009)). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of [an] injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## ARGUMENT

Vineyard Wind alleges that the Suspension Order is contrary to the Administrative Procedure Act (APA) and that BOEM lacked authority for its issuance. *See* Mem. In Support of Mot. for a Temp. Restraining Order and Prelim. Inj. (Pl.'s Br.) 12-22, Dkt. No. 16. Vineyard Wind tethers its alleged irreparable harms to economic costs associated with construction delays that could allegedly result in delaying full operation of the Project and argues that preliminarily enjoining the Suspension Order would be in the public interest. *See id.* 26-30.

Addressing the merits first, BOEM reasonably implemented its authority under OCSLA to issue the Suspension Order. Vineyard Wind also fails to show that the purely economic injuries it describes satisfy the irreparable harm requirement, especially given the national security concerns that the Project poses. Even if it had shown some irreparable harm, the Supreme Court has made clear that, as here, national security interests can outweigh irreparable harm. No injunctive relief is necessary to avoid irreparable harm to Vineyard Wind.

## I.    The Government is Not Required to Justify Withholding Classified Information or Provide Unclassified Summaries for the Purpose of Litigation

To begin with, Vineyard Wind claims that "if BOEM seeks to rely on classified information in this Court, it must provide a declassified summary or at least provide the information to the Court *in camera* and provide access to Vineyard Wind's counsel with appropriate conditions to safeguard its secrecy." Pls. Br. 16. But the treatment, handling, and authority to determine access to classified information "is committed by law to the appropriate agency of the Executive Branch." *Dept. of the Navy v. Egan*, 484 U.S. 518, 526–27, 29 (1988) (noting further that classified

information "flows primarily from [a] constitutional investment of power in the President)."  Federal law prohibits disclosure of classified information except to individuals cleared for access to the information by the head of a federal agency or designee; who have signed a nondisclosure agreement; *and* who have a "need to know" that information.  Exec. Order No. 13,526, § 4.1(a)(3), 75 Fed. Reg. 707, 720 (Dec. 29, 2009).  Prosecuting a civil suit challenging agency action does not create the requisite "need to know" classified information.  *See id.* § 6.1(dd), 75 Fed. Reg. at 707, 729 (defining need to know as "a determination within the executive branch . . . that a prospective recipient requires access to specific classified information *in order to perform or assist in a lawful and authorized governmental function*." (emphasis added)).

Courts also regularly accept *ex parte* and *in camera* classified information that is part of the administrative record and upon which the agency intends to rely to defend the challenged agency action.  *See, e.g.*, *United States v. Holland*, 48 F. Supp. 2d 571, 577 (E.D. Va. 1999), *aff'd*, 214 F.3d 523 (4th Cir. 2000); *Rusaviainvest, OOO v. Yellen*, No. 18 CIV. 5676 (PGG), 2023 WL 6198256, at *1 n. 3 (S.D.N.Y. Sept. 21, 2023); *Jifry v. FAA*, 370 F.3d 1174, 1181-82 (D.C. Cir. 2004).  As to the request for a declassified summary, courts routinely consider agency decisions relying on classified materials without requiring agencies to provide unclassified summaries of the classified information. *See e.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (government "need not disclose the classified information to be presented *in camera* and *ex parte*") (quotation marks omitted); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208 (D.C. Cir. 2001) (government "need not disclose the classified information to be presented *in camera* and *ex parte* to the court").

Moreover, the process of preparing unclassified summaries of classified information is extremely laborious and time-consuming, particularly where the underlying information might reveal

intelligence sources and methods. The process requires extensive inter-agency consultation and input from intelligence community subject-matter experts to ensure that classified information is not inadvertently disclosed. This can take months. *See United States v. Abu-Jihaad*, 630 F.3d 102, 140-42 (2d Cir. 2010) (describing the extensive process necessary for the district court to determine that unclassified summaries of classified evidence should be provided to a criminal defendant and evaluate the adequacy of proposed summaries). There is no basis to require the extensive preparation of new documents that were not before the agency, and not part of the administrative record, to resolve Vineyard Wind's motion for preliminary injunction or the merits.

## II. Vineyard Wind Is Unlikely to Succeed on the Merits.

Contrary to Vineyard Wind's arguments on the merits, both OCSLA and Interior's regulations give the agency the necessary authority to issue the Suspension Order. *See* Pl.'s Br. 12-14. In addition, Vineyard Wind's argument that BOEM is constrained by the lease and COP effectively asks the Court for an order of specific performance, which the Court lacks jurisdiction to issue. BOEM also reasonably exercised its suspension authority under the circumstances, complying with constitutional due process and all APA requirements.

### A. BOEM Had Authority to Issue the Suspension Order.

Interior's regulations explicitly set forth BOEM's authority to issue the Order: "BOEM may order a suspension … [w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(b). Vineyard Wind does not argue—because it cannot—that the Secretary lacked authority to promulgate 30 C.F.R. § 585.417(b). *See* 43 U.S.C. § 1337(p)(5) ("The Secretary shall provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under this subsection."). Section 585.417(b) alone

provides BOEM authority to suspend a lease when, as here, there are significant risks to national security.

Overlooking BOEM's regulatory authority, Vineyard Wind argues that OCSLA does not authorize the Suspension Order because: (1) 43 U.S.C. § 1341(c), in Vineyard Wind's view, is the sole authority for national security-related suspensions; and (2) there is no recommendation from the Secretary of War or national emergency that would trigger Section 1341(c). Pl.'s Br. 12-14. But Section 1341(c) is not the sole source of statutory authority related to national security issues.

Section 1337(p)(4) grants the Secretary of the Interior broad authority to ensure "protection of national security interests of the United States[.]" 43 U.S.C. § 1337(p)(4)(F). And under Section 1337(p)(5), the Secretary is to "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under this subsection." *Id.* § 1337(p)(5). Neither paragraph limits the Secretary's interest in national security to times of war or national emergency and does not require Interior to be prompted by "a recommendation of the Secretary of Defense." *Compare* 43 U.S.C. § 1341(c) *with id.* § 1337(p)(4)(F). Indeed, OCSLA allows the Secretary to *cancel* leases for national security reasons. *See* 43 U.S.C. § 1334(a)(2)(A)(i). Further, "serious harm or damage . . . to the national security or defense" is a basis for lease cancellation. *Id.* It would be incongruous with this statutory scheme that allows for lease cancellation based on national security or defense to assume Congress meant to withhold the authority to suspend leases for national security reasons.

Vineyard Wind next invokes § 1341(d), *see* Pl.'s Br. 13-14, which "reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the [OCS] needed for national defense[.]" 43 U.S.C. § 1341(d). The rights that Section 1341(d) retains "through the Secretary of

Defense" are separate from the obligations that Section 1337(p) places on the Secretary of the Interior. And national security interests go beyond "need[ing]" "part of the [OCS] . . . for national defense[.]" 43 U.S.C. § 1341(d).

Vineyard Wind argues that the Suspension Order violates the terms of its lease and deprives Vineyard Wind of its right to construct and operate the Project pursuant to the COP. Pls. Br.' 12–14. This Court can make short work of that argument.

Any claim that BOEM has violated the lease is a breach of contract claim over which the Court lacks jurisdiction. The APA's waiver of sovereign immunity does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also id.* § 704 (the APA is only available to challenge "final agency action for which there is no other adequate remedy in a court."). The Tucker Act waives sovereign immunity for suits against the United States alleging a breach of contract, placing jurisdiction exclusively in the Court of Federal Claims for any claim for more than $10,000. 28 U.S.C. § 1491(a)(1). Where "a plaintiff has an adequate remedy by suit under the Tucker Act, they are precluded from review under the APA." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (citation modified and citation omitted). And an injunction based on the alleged violation of a contract is in essence an order for specific performance, which the Tucker Act forbids. The "Tucker and Little Tucker Acts impliedly forbid federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government, and the Administrative Procedure Act thus does not waive sovereign immunity for such claims." *Stritzinger v. U. S. Off. of the Gen. Servs. Admin.*, No. CV 3:15-2978-TLW-PJG, 2016 WL 3035087, at *2 n.4 (D.S.C. Jan. 29, 2016), *R. & R. adopted*, No. 3:15-CV-2978-TLW, 2016 WL 3027582 (D.S.C. May 27, 2016),

*appeal dismissed*, 658 F. App'x 687 (4th Cir. 2016) (citation modified)). The COP is also not at issue here, as BOEM has not directed any COP revisions.

### B.  BOEM Reasonably Applied its Authority.

Nor has Vineyard Wind met its burden to demonstrate a likelihood of success on its APA claims.  The APA authorizes a reviewing court to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *see also Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 202 (1st Cir. 1999).  Review under this standard is highly deferential, and "is especially marked in technical or scientific matters within the agency's area of expertise." *Citizens Awareness Network v. U.S. NRC*, 59 F.3d 284, 290 (1st Cir. 1995); *see also Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).  Courts are particularly deferential to agencies on matters of national security: "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  *Egan*, 484 U.S. at 530.  Under the arbitrary and capricious standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

An agency acts arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *W.*

*Virginia v. Thompson,* 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). The court may not substitute its judgment for that of the agency and must uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

Here, the Suspension Order on its face provided a reasonable explanation appropriate to the classified nature of the information underlying it. BOEM explained that DoW "completed an additional assessment regarding the national security implications of offshore wind projects" in November 2025 and had provided Interior "with new classified information." Suspension Order at 1. The Order provided that the information concerns "the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." *Id.* And it stated that the Project's "sensitive location on the East Coast" heightened the national security risk. *Id.* The Order cited the legal authority on which BOEM relied, 30 C.F.R. § 585.417(b), and invited engagement from Vineyard Wind during the suspension. Thus, contrary to Vineyard Wind's arguments, Pl.'s Br. 15-17, BOEM provided a reasonable explanation for its order.

There is no APA deficiency in this "reasonable, albeit brief" explanation, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007), particularly given the classified nature of the information underlying the Suspension Order. The Order identified its source of legal authority, generally explained that it was based on national security concerns identified by DoW related to adversary technologies, summarized those concerns, and explained that they were exacerbated by the project's geographic location. This is sufficient. What BOEM could say in the Order to explain its decision was limited both by the classified nature of the information it relied on and by the "urgency" of the circumstances. Giacona Decl. ¶ 10. The APA cannot be read to "compel a breach in the security which th[e Executive] branch is charged to protect." *Fares v. Smith*, 901 F.3d 315,

324 (D.C. Cir. 2018) (citations omitted).[2]

Even if the Court believes BOEM could have explained its reasons in more detail, notwithstanding BOEM's concerns about exposing national security vulnerabilities, that does not warrant granting a preliminary injunction so long as the agency's path "may reasonably be discerned." *Bowman Transp.,* 419 U.S. at 286. The Court should consider its "*ex parte* review of the full administrative record [to] confirm that the agency has not run afoul of [the] requirement" to give reasons for its decision. *Basengezi v. Smith,* No. CV 23-1249 (JEB), 2024 WL 1050340, at *6 (D.D.C. Mar. 11, 2024), *aff'd*, No. 24-5130, 2025 WL 457687 (D.C. Cir. Feb. 11, 2025); *cf. Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 458 (D.C. Cir. 2016) (finding that "[t]he record supporte[d]" petitioner's claim under 5 U.S.C. § 555(e), but that remand of agency's decision "would be pointless" where "internal agency materials" and a sworn declaration from the acting official "expressed the agency's reasoned, contemporaneous explanation for its decision"). And given that BOEM's primary record support for the Suspension Order is classified, Vineyard Wind's argument that BOEM's action is unsupported ignores that the Court will engage in *ex parte*, *in camera* (and necessarily deferential) review of the classified information that BOEM relied on. Similarly, Vineyard Wind's argument that BOEM's reasoning was pretextual (Pl.'s Br. 18-19) is unfounded, and the Court's review of the classified materials will resolve the question of pretext.

Vineyard Wind also suggests that the Order is arbitrary because BOEM previously approved the Project after considering national security concerns. Pl.'s Br. 17-18. But since its prior approval BOEM has considered new information as of November 2025. Suspension Order at 1. BOEM then issued its order to preserve the opportunity to mitigate the new risks to national

---

[2] *Fares* focused on the Due Process Clause, but the plaintiff had brought an APA claim as well. 901 F.3d 315. The plaintiff argued that the APA's protections were "coextensive with those of the Due Process Clause" such that their "APA claim rises and falls with the due process claim." *Id.*

security before additional construction proceeds and the Project become fully operational.  *See* Suspension Order; Giacona Decl. ¶ 10 ("Once BOEM appreciated the national security risk that the Project currently poses as it is operational, as set forth in the classified material . . . , the agency acted with urgency to mitigate further risks that will occur upon the completion of more turbines."). Should additional construction proceed, BOEM—and for that matter, Vineyard Wind, the Department of War, and the public—would lose the opportunity to attempt to resolve or avoid the identified national security risks before they materialize.  *See id.* ¶¶ 10-12.

As to the argument that BOEM has unreasonably changed its position, Pl.'s Br. 16-17, BOEM has not taken any steps to invalidate or modify the lease or COP.  And if there has been a change in position, that is because the agency was confronted with new circumstances of the highest importance: national security risks.  The change-in-position doctrine permits agencies to change existing policies so long as they recognize the change, reasonably explain it, and consider serious reliance interests.  *FDA v. Wages & White Lion Inv., LLC*, 604 U.S. 542, 567-69 (2025).  And the duty to explain the change is curtailed where classified information is involved.  The D.C. Circuit, for example, has stated that it is "arguable" whether the reason for an alleged change in position "would have to be disclosed to the appellants . . . given the role of classified material in reviews under" the statute relevant there.  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 199 (D.C. Cir. 2001).   "Review under the arbitrary and capricious standard is narrow and this court may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions."  *Doe v. Noem*, 152 F.4th 272, 290 (1st Cir. 2025) (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009) (citation modified)).

### C. The Suspension Order is Consistent with APA and Constitutional Process Requirements.

Vineyard Wind has not established a due process violation either under the APA or the Fifth Amendment.  As to the APA claim, in exercising its Section 585.417(b) authority here, BOEM satisfied APA due process requirements.  Section 558(c) of the APA allows an agency to suspend a license (*e.g.*, lease) without a proceeding when the "public . . . interest" requires it.  5 U.S.C. § 558(c).  Because "protecting national security is a government interest of the highest order," *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023), the "public interest" prong of Section 558(c) is satisfied here.  Given post-Suspension Order meetings with BOEM, court proceedings, and more, Vineyard Wind is unlikely to prevail on any APA due process claim.

As for the constitutional claim, as an initial matter, property interests protected by the Fifth Amendment "are created and their dimensions are defined by existing rules or understandings that stem from an independent source."  *McKinney v. Dist. of Columbia*, 142 F.4th 784, 793 (D.C. Cir. 2025) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)), *reh'g denied en banc*, No. 24-7027, 2025 WL 2551713 (D.C. Cir. Aug. 29, 2025)).  Any property interest for Vineyard Wind arises under Section 1337(p), BOEM's regulations, and the resulting lease.  *See* 43 U.S.C. § 1337(p)(1).  The lease acknowledges that the rights conveyed therein are subject to 43 U.S.C. § 1337(p) and the regulations at 30 C.F.R. Part 585.  Vineyard Wind Lease § 1, Dkt. No. 13-1.  As discussed above, the Suspension Order was issued under 30 C.F.R. § 585.417(b) and was a valid exercise of the authority granted by 43 U.S.C. § 1337(p)(4) and (p)(5).

Even assuming Vineyard Wind had been deprived of a protected property interest (which it has not), pre-deprivation process is not always required by the Due Process Clause.  Due process is "flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 48 (1972).  Post-deprivation procedural protections may be sufficient

"where some valid governmental interest is at stake." *N.B. et al. v. District of Columbia*, 244 F. Supp. 3d 176, 183 (D.D.C. 2017) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)); *see also Gilbert v. Homar*, 520 U.S. 924, 930-31 (1997).  Such a valid governmental interest includes national security—which is the most "compelling . . . governmental interest." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) ("The government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality.").  Activities affecting national security and public safety may require an agency to act quickly before pre-deprivation proceedings may be afforded.  *Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.*, 934 F. Supp. 2d 1, 20 (D.D.C. 2013) ("Deprivation of property to protect the public health and safety is one of the oldest examples of permissible summary action.") (citing *Hodel v. Va. Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 300 (1981) (citation modified).  Accordingly, in determining whether post-deprivation procedural safeguards are sufficient in situations involving risks to national security, courts must balance the national security concerns against the private interests affected.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Vineyard Wind has not established a due process violation.

## III.    The Balance of Harms Weighs Against an Injunction.

Vineyard Wind must demonstrate that irreparable injury will be "likely" absent an injunction.  *Winter,* 555 U.S.  at 21.  Purely economic losses, such as Vineyard Wind describes, rarely satisfy the irreparable harm requirement, and Vineyard Wind has not shown that any of the recognized exceptions applies.  Particularly in light of the national security issues at stake, the balance of harms also militates against the injunction requested.

### A.  Vineyard Wind Has Not Shown Irreparable Harm.

Vineyard Wind argues it will suffer irreparable harm in five ways: (1) immediate monetary costs stemming from "contractor costs, labor costs, interest payments, and loss of revenue"; (2) the potential inability to complete the Project by March 31, 2026, thus increasing the cost of the Project; (3) the potential inability to "generate enough power to meet its obligations under [power purchase agreements (PPA)]"; (4) the inability to replace defective turbines that have been removed; and (5) an "existential threat to the Project and Vineyard Wind" based on the *potential* that lenders will declare Vineyard Wind in default and demand accelerated repayment of the construction loan.  Pl.'s Br. 23-24.  Vineyard Wind has not shown that these alleged injuries warrant the "extraordinary remedy" of a preliminary injunction.

Vineyard Wind has not cleared the very high bar to establish irreparable harm from purely economic injuries, which are the focus of Vineyard Wind's claimed irreparable injury.  *See* Declaration of Klaus Moeller ¶¶ 6-10, Dkt. No. 5.  Financial losses alone generally do not constitute irreparable harm unless the "potential economic loss is so great as to threaten the existence of the movant's business."  *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009); *see also Puerto Rico Hosp. Supply, Inc. v. Boston Scientific Corp.*, 426 F.3d 503, 507 (1st Cir. 2005) (economic losses are not generally considered irreparable); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (Harm may be irreparable if the complaining party "would lose incalculable revenues and sustain harm to its goodwill.").

Here, as to the first three alleged harms, Vineyard Wind has not demonstrated that the financial losses it describes relating to construction delays will bankrupt it.  Vineyard Wind alleges, for example, that the Suspension Order is costing the company approximately $2 million per day in costs associated with vessels, lost revenue, interest on its construction loan ($9 million per day), organizational management, insurance, and other costs.  Decl. of Javier Hortiguela ¶¶ 8-9; *see also*

Moeller Decl. ¶ 10.  Although these amounts are significant, they are not sufficient to show that Vineyard Wind faces an existential threat to its business absent injunctive relief.  *See Vaqueria Tres Monjitas*, 587 F.3d at 485; *Ross-Simons of Warwick*, 102 F.3d at 19.

Further, the claim that Massachusetts utilities will declare Vineyard Wind in default of its PPAs if the Project is not fully operational by March 31, 2026, Pl.'s Br. at 23, is not supported by any evidence.  Mr. Hortiguela asserts that "[i]f the Project is not completed before Vineyard Wind loses access to the specialized construction vessel, Vineyard Wind will not be able to meet its obligations under the PPAs and *could* be exposed to a declaration of default."  Hortiguela Decl. ¶ 12 (emphasis added).  Such circumstances "*could* result in [the] forfeiture of . . . (approximately $48 million) and give the electrical utilities a unilateral right to terminate [the] PPAs."  *Id.* (emphasis added).  But Mr. Hortiguela does not assert that it is *likely* that the Massachusetts utilities would terminate the PPAs if the Project is not completed by the end of March.  *See Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.").  Moreover, the cancellation of the PPAs seems unlikely given that a substantial portion of the Project has been constructed and it is producing power.  *See* Hortiguela Decl. ¶ 6.

Moreover, BOEM has limited any economic harm to Vineyard Wind by allowing it to continue operating and producing power during the 90-day suspension period.  Suspension Order at 1; Giacona Decl. ¶ 9.  During this time, Vineyard Wind "may continue any activities from those wind turbines that are necessary for the current level of power generation."  *Id.*  Thus, Vineyard Wind may continue to operate as it has for the past several years since its COP was approved, but it may not continue construction and bring additional turbines online.  Given that BOEM is

allowing Vineyard Wind to continue operating in this manner, the Court should not find that the asserted economic harm to Vineyard Wind is irreparable. *See Vaqueria Tres Monjitas*, 587 F.3d at 484-85.

As to the fourth alleged harm, Vineyward Wind quibbles about the inability to replace defective blades. Pl.'s Br. at 23-24; *see also* Declaration of Steven Simkin ¶¶ 13-23, Dkt. No. 6. Mr. Simkins speculates, for example, that not installing turbine blades creates risks if lightning strikes, impacts climate control in the nacelle, and may cause structural fatigue. *Id.* ¶ 13. He explains that the lightning protection system in the turbines was designed based on the presence of blades and the electrical components in the nacelle could be damaged if the blades are not in place. *Id.* ¶¶ 14-15. But BSEE considered the issues raised by Vineyard Wind and determined that leaving the turbines in place without attaching the new blades did not pose risks for public health and safety. Stevens Decl. ¶ 4. BSEE's determination, in its area of expertise, is entitled to deference and should not be disturbed. *Adams v. U.S. E.P.A.*, 38 F.3d 43, 49 (1st Cir. 1994) ("An agency is entitled to deference with regard to factual questions involving scientific matters in its own area of expertise."); *see also Puerto Rico Aqueduct & Sewer Auth. v. U.S. EPA*, 35 F.3d 600, 604 (1st Cir. 1994).

Finally, Vineyward Wind asserts that the "[Suspension] Order poses an existential threat to the Project and Vineyard Wind." Pl.'s Br. at 24. Mr. Moeller asserts that, "Vineyard Wind's financing arrangements and other commercial commitments depend on the Project meeting operational and revenue milestones; any delay threatens defaults that could trigger accelerated repayment obligations and jeopardize the Project's viability." Moeller Decl. ¶ 10; *see also* Hortiguela Decl. ¶ 11 (asserting that if the Project is not completed by March 31, 2026, "then [Vineyard Wind's] lenders will have the ability to declare an event of default, accelerate repayment of the

21

construction loan, and foreclose on the Project").  Missing from Vineyard Wind's arguments and supporting declarations is that none of these steps—declaring default, accelerated repayment of the loan, and foreclosure of the Project—have actually been threatened by the lender.  Construction on the Project was stalled for the latter half of 2024 while Vineyard Wind dealt with the issue of defective blades, and the lenders apparently did not seek to foreclose on the loan during that period. Such a fact undermines Vineyard Wind's argument that existential harm exists now.

Nor does Vineyard Wind explain what counter measures it might take to avoid such consequences. Given that none of these steps has yet occurred or has been shown to be imminent, these allegations are too speculative to demonstrate irreparable harm and certainly too uncertain to warrant extraordinary injunctive relief. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.")

## B. National Security Concerns Can Outweigh a Plaintiff's Irreparable Harm When Balancing the Harms.

Even if Vineyard Wind had made a showing of irreparable harm, that harm would need to be balanced against the public interest.  In balancing the equities, the public interest in ensuring national security and the national defense may outweigh other interests. *Winter*, 555 U.S. at 26 ("The public interest in conducting training exercises with active sonar under realistic conditions plainly outweighs the interests advanced by the plaintiffs."); *see also Water Keeper All. v. U.S. Dept. of Defense*, 271 F.3d 21, 34-35 (1st Cir. 2001) (denying motion for a preliminary injunction, in part, based on the potential harm to national security from enjoining planned Navy training). BOEM's Suspension Order was based in part on classified national security information from DoW.  Giacona Decl. ¶¶ 4-7, 9-10; Marks Decl. ¶ 7(e).  The government will provide an unredacted, classified version of the Marks Declaration to the Court for *ex parte*, *in camera* review.

In assessing the balance of the harms here, the Court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). Courts do not "second-guess decisions made about national security needs." *Elhady v. Kable*, 993 F.3d 208, 228 (4th Cir. 2021). Indeed, in *Winter*, the Supreme Court concluded that the Navy's (and therefore the public's) interest in military readiness "plainly outweighed" harms to marine mammals that could impact the plaintiffs' ability to study and observe them. *Winter*, 555 U.S. at 33. Other courts have similarly highlighted the importance of national security concerns in considering injunctive relief. *See Stagg, P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 95-96 (2d. Cir. 2016) (noting "matters of national security . . . present the most compelling national interest"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (agency actions that "are particularly important to national security . . . are subject to significant deference").

Based on the classified information from DoW, BOEM issued the Suspension Order to address the national security risk that would be amplified if the Project becomes fully operational and because further mitigation measures would be necessary before the Project reaches that stage. Giacona Decl. ¶¶ 4, 7, 9-12. In asserting that "an injunction that allows the Project to complete construction would serve the public interest and enhance national security by helping to address the national emergency declared by the President," Vineyard Wind ignores that BOEM was acting with knowledge of classified information regarding national security risks. Pl.'s Br. 26 (citing Executive Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025)). The Court, with the benefit of reviewing the classified information, is better positioned to balance the harms here.

With respect to the other side of that balance, Vineyard Wind (as explained above) has not shown that it will suffer irreparable harm from the Suspension Order. But if the Court disagrees with the government on that point, Vineyard Wind has not demonstrated that its alleged harms outweigh the national security concerns set forth in the classified Marks Declaration. In order to address those concerns, "[b]ased on the classified material with secret designation, mitigation measures need to be in place for the Project as it is currently operational." Giacona Decl. ¶ 10. Those of undersigned counsel who have reviewed the classified information submit that it provides a reasonable basis on which to find that the public interest in national security outweighs Vineyard Wind's alleged economic harms and submit that the classified information references this Project. In balancing the national security risks identified by DoW against the costs alleged by Vineyard Wind, "the Executive Branch's judgments in the national security area. . . [are] entitled to deference." *Elhady*, 993 F.3d at 228; *see also Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (denying preliminary injunction despite plaintiffs' "substantial harm" because "[i]n light of the national security interests involved, the equities and public interest d[id] not favor preliminary injunctive relief.").

The Court should also consider that BOEM issued a Suspension Order that reasonably balances Vineyard Wind's financial concerns. BOEM allowed Vineyard Wind to continue its current level of operations while BOEM consults with DoW regarding potential mitigation. Giacona Decl. ¶ 11. BOEM Principal Deputy Director Giacona explains that "BOEM suspended further construction of the Project to prevent the currently present national security risks from increasing while allowing the parties to quickly determine whether mitigation measures are possible and feasible or whether cancellation is the preferred option." *Id.* ¶ 11. But BOEM believed that allowing Vineyard Wind to continue construction and "further increase its operational capacity without

addressing the national security risks may cause [Vineyard Wind] to ignore those risks since the Project is already supplying power to customers." *Id.* ¶ 12.

Thus, the factual circumstances here (and the necessary balance of the harms) are different than those at issue in the injunctions courts have issued with respect to suspension orders for Revolution Wind, Empire Wind, and Coastal Virginia Offshore Wind. *See* Tr. of Prelim. Inj. Hearing, *Revolution Wind LLC v. Burgum*, No. 1:25-cv-2999-RCL (Jan. 12, 2026), Dkt. No. 13-4; Tr. of Prelim. Inj. Hearing, *Empire Leaseholder, LLC v. Burgum*, No. 1:26-cv-004 (Jan. 15, 2026), Dkt. No. 17-2; Order, *Virginia Elec. and Power Co. d/b/a/ Dominion Energy Virginia*, No. 2:25-cv-830 (Jan. 16, 2026), Dkt. No. 17-3; Tr. of Prelim. Inj. Hearing, *Virginia Elec. and Power Co. d/b/a/ Dominion Energy Virginia*, No. 2:25-cv-830 (Jan. 16, 2026), Dkt. No. 17-4. At the time of the suspensions order for those projects, none of them had reached the point of operations and were not generating any income from produced power. Vineyard Wind, by contrast, is 95 percent complete and capable of delivering 572 MW of power. Hortiguela Decl. ¶ 6; Moeller Decl. ¶ 5. In none of those other instances did BOEM allow the company to continue producing power. And Vineyard Wind's enterprise-level harm argument is based entirely on the *possibility* that the countersigning party to its PPA *could* act to terminate that agreement—despite the fact that Vineyard Wind is currently operational and producing enough power for over 400,000 homes in New England. Hortiguela Decl. ¶ 6; Moeller Decl. ¶¶ Declaration of Elizabeth Mahoney ¶ 35, Dkt. No. 12. Vineyard Wind has not provided sufficient facts to support that speculative assertion that the electrical utilities will unilaterally cancel the PPAs. The Court should deny Vineyard Wind's request for injunctive relief.

## CONCLUSION

Vineyard has not shown it is entitled to preliminary injunctive relief. BOEM reasonably exercised its authority under OCSLA to issue the Suspension Order. Vineyard Wind has not met the standard for demonstrating irreparable harm. Any likelihood of success on the merits or harm to Vineyard Wind may be outweighed by the balance of equities and public interest in national security, which the Court may assess through *ex parte*, *in camera* review of the classified information BOEM relied on. Vineyard Wind's motion should be denied.

Respectfully submitted this 21st day of January 2026,

STANLEY E. WOODWARD, JR.
Associate Attorney General

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Peter M. Torstensen Jr.*
PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

KRISTOFOR R. SWANSON*
(Colo. Bar. No. 39378)

*/s/ Luther L. Hajek*
LUTHER L. HAJEK*
JOHN K. ADAMS
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-9646 (Torstensen)
Telephone: (202) 598-1937 (Swanson)
Telephone: (303) 241-0826 (Hajek)
peter.torstensen@usdoj.gov
kristofor.swanson@usdoj.gov
luke.hajek@usdoj.gov

*Attorneys for Defendants*

*Counsel contributed to the drafting of this brief but did not have access to review the classified information.

26

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of the

Court using the CM/ECF system, which will send notification of said filings to the attorneys of

record for Plaintiffs and all other parties, who have registered with the Court's CM/ECF system.

So certified this 21st day of January 2026 by

/s/ Luther L. Hajek
Luther L. Hajek
U.S. Department of Justice