# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINEYARD WIND 1 LLC,<br><br>    *Plaintiff*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>    *Defendants*. | Civil Action No. 1:26-cv-10156-BEM<br>(leave to file granted January 23, 2026) |

## AMICUS BRIEF OF THE COMMONWEALTH OF MASSACHUSETTS IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND INTEREST OF AMICUS CURIAE ...................................................... 1

ARGUMENT ................................................................................................................... 2

I.   Absent an Injunction, Massachusetts and the Public Interest Will be Irreparably Harmed. .... 3

  A.   The Director's Order Will Hamper Massachusetts's Ability to Obtain Reliable, Affordable Energy. ................................................................................................... 3

  B.   The Director's Order Harms Massachusetts Ratepayers and Will Cause Substantial Economic Damage. .................................................................................................... 6

  C.   The Director's Order Impedes Accomplishment of Statutory Clean Energy and Climate Targets. ......................................................................................................... 9

  D.   The Director's Order Jeopardizes Massachusetts's Ability to Protect Our Residents from Severe Environmental and Public Health Harms. ................................................. 10

II.  Plaintiff Is Likely To Succeed on the Merits. ........................................................... 11

CONCLUSION ................................................................................................................ 12

# TABLE OF AUTHORITIES

**CASES**

*Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441 (D.C. Cir. 1989) ....................................................... 3

*Am. Hosp. Ass'n v. Kennedy*, _ F.4th _, No. 25-2236, 2026 WL 49499 (1st Cir., Jan. 7, 2026)... 12

*Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173 (D.C. Cir. 2022) .................................................. 4

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................. 12

*Empire Leaseholder LLC v. Burgum*, No. 26-cv-00004-CJN (D.D.C. Jan. 15, 2026).................... 1

*FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502 (2009) ................................................................. 12

*Housatonic River Initiative v. EPA*, 75 F.4th 248 (1st Cir. 2023) ................................................. 12

*McKenzie v. Option One Mtge.*, 321 F. Supp. 3d 186 (D. Mass. 2018) .......................................... 3

*New York v. Trump*, _ F. Supp. 3d. _, 2025 WL 3514301 (D. Mass. Dec. 8, 2025)........................ 6

*Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190 (1983) ............. 4

*Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL, 2026 WL 113568 (Jan. 12, 2026).. 1

*Rhode Island v. U.S. Dep't of Interior*, No. 1:25-CV-02999-RCL, 2026 WL 113358 (Jan. 12, 2026) ............................................................................................................................................. 1

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996) ..................................................... 12

*Virginia Elec. & Power Co., et al. v. U.S. Dep't of Interior*, No. 2:25-CV-00830-JKW-LRL (E.D. Va. Jan. 16, 2026)............................................................................................................................ 1

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ................................................................. 3

**STATUTES**

1982 Mass. Acts. ch. 503 ................................................................................................................. 6

2022 Mass. Acts ch. 179, § 61(a)–(b) .............................................................................................. 9

Green Communities Act, Mass. Stat. 2008, ch. 169, § 83C............................................................. 4

Mass. Gen. Law ch. 21N, § 4(h)..................................................................................................... 10

Mass. Gen. Laws ch. 25A, § 11F ..................................................................................................... 7

Mass. Gen. Laws ch. 25A, § 11F(a)................................................................................................. 9

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

The Commonwealth of Massachusetts submits this brief as amicus curiae in support of Plaintiff Vineyard Wind 1 LLC's (Plaintiff or Vineyard Wind) motion for a temporary restraining order (TRO) and a preliminary injunction. Plaintiff seeks to enjoin the Director's Order (the Order) issued by the Bureau of Ocean Energy Management (BOEM) on December 22, 2025, which mandated that Vineyard Wind "suspend all ongoing activities" on the Vineyard Wind 1 Project (the Project) for at least 90 days based on unspecified "impacts to national security." ECF No. 1-1 at 1. To date, the Defendants have not identified any actual "national security" impacts, and numerous courts have preliminarily enjoined other nearly identical orders, ruling that similarly situated projects must be allowed to continue development to mitigate the risk of irreparably harming the project developers, the States counting on those projects, and the public interest.[1]

Massachusetts has been planning for the development of Vineyard Wind's Project for nearly a decade, and is depending on prompt completion of the Project to deliver 800 megawatts (MW) of affordable, reliable energy to the Massachusetts grid—enough to power between 313,170 and 417,560 homes. It takes complex, long-term planning to ensure that Massachusetts's hospitals, schools, businesses, and residents have access to affordable and reliable energy. This planning process comes at significant public cost; Massachusetts has made substantial investments in the development of the wind industry and has devoted significant resources to bringing the Project online. And Massachusetts is relying on the development of the wind industry to transition away

---

[1] *See Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL, 2026 WL 113568 (D.D.C. Jan. 12, 2026) (order granting preliminary injunction); *Rhode Island v. U.S. Dep't of Interior*, No. 1:25-CV-02999-RCL, 2026 WL 113358 (D.D.C. Jan. 12, 2026) (order granting preliminary injunction); *Empire Leaseholder LLC v. Burgum*, No. 26-cv-00004-CJN (D.D.C. Jan. 15, 2026) (minute order granting preliminary injunction); *Virginia Elec. & Power Co. v. U.S. Dep't of Interior*, No. 2:25-CV-00830-JKW-LRL (E.D. Va. Jan. 16, 2026), ECF No. 78 (minute of proceedings granting preliminary injunction).

from aging, polluting, and expensive fossil fueled energy generation facilities to protect our residents from rising costs and environmental and public health harms.

Accordingly, Massachusetts and the public interest will be significantly harmed if the Order is not enjoined for at least four reasons. First, Massachusetts's sovereign interest in planning for and obtaining affordable and reliable energy will be compromised. Second, Massachusetts and its ratepayers face the risk of serious economic injury from the Order as the Commonwealth loses the lower-cost energy promised by the Project; the Commonwealth's substantial investments in developing the wind industry, including the Project, are put at risk; and the Project's jobs and associated tax revenue are jeopardized. Third, the Project plays a critical role in meeting Massachusetts's statutory obligations to procure offshore wind, to ensure that increasing percentages of electricity come from renewable energy resources, and to reduce statewide greenhouse gas emissions. Finally, Massachusetts will lose a valuable tool to protect our territory and residents from the severe environmental and public health harms caused by pollution emitted by fossil fueled energy sources. The public interest thus weighs firmly in favor of preliminary relief. Moreover, Defendants' failure to consider any of these reliance interests before suspending the Project provides an additional reason that the Order is arbitrary and capricious and Plaintiff's claims are likely to succeed on the merits. The Commonwealth thus urges the Court to grant Plaintiff's motion, enjoin the Order, and allow lease activities to continue in due course.

## ARGUMENT

Massachusetts supports Plaintiff's motion for a TRO and a preliminary injunction of the Order, which arbitrarily and unlawfully suspended Vineyard Wind's lease activities and thereby halted meaningful progress on the nearly complete Project. Massachusetts submits this amicus brief to make two points. First, preliminary relief will serve the public interest and protect our

residents from the irreparable harms that would otherwise flow from the Order. Second, Defendants have violated the Administrative Procedure Act (APA) by failing to consider serious reliance interests, including those of Massachusetts, when issuing the Order. As a result of that failure, in addition to those outlined by Plaintiff, ECF No. 4-1, at 14–19, Plaintiff is likely to succeed on the merits. Accordingly, preliminary relief is warranted.

### I. Absent an Injunction, Massachusetts and the Public Interest Will be Irreparably Harmed.

The Court should grant Plaintiff's motion for injunctive relief because, absent such relief, the Order will significantly and irreparably harm Amicus Massachusetts, its residents, and its businesses, and thereby will harm the public interest. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (courts must consider the public interest when determining whether to grant injunctive relief); *see also McKenzie v. Option One Mtge.*, 321 F. Supp. 3d 186, 188 (D. Mass. 2018) (same standard applies in evaluating motion for TRO). In particular, absent a TRO or injunction, the Order will (1) hamper Massachusetts's ability to obtain reliable, affordable energy; (2) impose unnecessary costs on Massachusetts ratepayers and damage our economic investments in renewable energy development, related revenue streams, and employment markets; (3) impede our ability to meet statutory climate and clean energy targets; and (4) jeopardize Massachusetts's ability to protect our land and residents from the severe environmental and public health harms caused by pollution emitted by fossil fueled energy sources.

### A. The Director's Order Will Hamper Massachusetts's Ability to Obtain Reliable, Affordable Energy.

It is well established that "States have an interest, as sovereigns, in exercising the power to create and enforce a legal code." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (quotation marks omitted). Courts have repeatedly acknowledged that this sovereign interest

includes the "traditional responsibility in the field of regulating electrical utilities" including "determining questions of need, reliability, cost and other related state concerns." *See Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 205 (1983); *see also Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (recognizing States' interest "in protecting their citizens and electric ratepayers").

As detailed in the declaration of Massachusetts Department of Energy Resources (DOER) Commissioner Elizabeth Mahony, ECF No. 12, Massachusetts has been exercising this sovereign interest by planning for the affordable, reliable energy promised by the Project for nearly a decade. The Commonwealth solicited bids for offshore wind energy projects in 2017 pursuant to the Green Communities Act, Mass. Stat. 2008, ch. 169, § 83C (Section 83C). ECF No. 12, ¶ 8. DOER selected the 800 MW Project as the winning bid, which allowed the Project to proceed to contract negotiations with the Commonwealth and electric distribution companies. *Id.* ¶ 15. The Department of Public Utilities then approved long-term contracts with a negotiated price for the Project's energy in 2019.[2]

Following extensive federal review—including detailed assessments of and mitigation measures for any impacts to national security, as well as consultation with the U.S. Department of Defense[3]—on July 15, 2021, Defendant BOEM approved the final federal permit for the Project. After significant development over the ensuing years, the Vineyard Wind Project is now operational, with over 44 turbines fully installed, together capable of producing 572 MW of energy,

---

[2] *Order Granting Joint Petition for Approval of a Proposed Timetable and Method for the Solicitation and Execution of Long-Term Contracts for Offshore Wind*, D.P.U. 18-76, -77, -78 (Apr. 12, 2019), https://perma.cc/7ECX-LW9T.
[3] Bureau of Ocean Energy Management, *Vineyard Wind 1 Offshore Wind Energy Project Final Environmental Impact Statement* Vol. I, at 3-250 – 3-280 (2021), https://perma.cc/X9YQ-VNSU.

enough to power between 313,170 and 417,560 homes in Massachusetts. ECF No. 12, ¶ 35. If completed, the Project would install an additional 18 turbines to produce 234 MW more, enough energy to power an additional 128,000 to 170,000 homes. *Id.* ¶ 35.

The Order at issue here, however, abruptly and arbitrarily suspended ongoing activities. Plaintiff has made clear in its filings that the Order "poses an existential threat to the Project and the company." ECF No. 4-1 at 3. And the Order's abrupt halt has already caused and will continue to cause significant harm to Massachusetts's ability to secure the affordable, reliable energy that its ratepayers need to serve rising energy demand.

Importantly, the independent operator of New England's energy grid (ISO-NE) expects that over the next 10 years peak energy demand in the summer season will increase by nine percent, and energy demand in the winter months will increase 30 percent. ECF No. 12, ¶ 24; ISO New England, *2025 Final Draft Energy and Seasonal Peak Forecasts* (Mar. 28, 2025), https://perma.cc/3M6Z-YDC3. Offshore wind resources like the Project are crucial energy sources to meet this rising demand, especially in winter months. As ISO-NE recently affirmed, offshore wind projects like the Project are "particularly important to system reliability in the winter when offshore wind output is highest and other forms of fuel supply are constrained." *See* Press Release, ISO-NE, Statement on Department of the Interior Offshore Wind Announcement (Dec. 22, 2025), https://perma.cc/P6PR-GRL7. "[C]anceling or delaying these projects," ISO-NE explained, "will increase costs and risks to reliability in [the] region." *See id.* Doing so would also be wasteful: Massachusetts and southern New England have some of the best wind energy potential in the country. ECF No. 12, ¶ 21.

Additionally, offshore wind resources, like the Project, are geographically close to large population centers like Boston, which has the highest electricity demand in New England and is

expected to continue to grow in the future; this proximity mitigates transmission and environmental costs. *Id.* ¶ 22. Moreover, there are currently no electric generation projects of a comparable size to the Vineyard Wind Project proposed in New England that will be able to construct and come online in the same timeframe. *Id.* ¶ 40. For example, there are no new nuclear facilities planned in the region, and Massachusetts law presently prohibits the construction of a new nuclear facility without explicit approval by the Commonwealth's voters through a ballot initiative. *Id.*; 1982 Mass. Acts. ch. 503. As another example, supply chain constraints have delayed and made more expensive the development of natural gas-fired power plants, with a recent report noting that "the cost of building a new combined cycle gas turbine has reached a 10-year high." Lazard, *Lazard Releases Levelized Cost of Energy Report* (June 1, 2025), https://perma.cc/989X-5TVX. Taken together, the suspension and potential collapse of the Project threaten to destroy a significant and crucial supply of energy for which the Commonwealth has long been planning, with no replacement on the horizon to serve growing demand.

### B. The Director's Order Harms Massachusetts Ratepayers and Will Cause Substantial Economic Damage.

The Order also is already causing, and threatens to cause further, significant economic impacts to the Commonwealth and its residents. *See New York v. Trump*, __ F. Supp. 3d. __, 2025 WL 3514301, at *4 (D. Mass. Dec. 8, 2025) (finding that federal government's indefinite suspension of permitting actions for wind projects would harm plaintiff States by, *inter alia*, reducing or deferring tax revenue and investments).

First, the Order is already harming and will continue to harm Massachusetts ratepayers if not enjoined. Massachusetts ratepayers should have the benefit of the approved long-term contracts that guarantee a stable price for both energy and environmental attributes. Without the contract in effect—due to the Order's suspension of lease activities—Massachusetts ratepayers are paying

volatile and expensive wholesale costs for the same amount of energy and attributes. Massachusetts ratepayers will have to pay at least $11 million more in direct wholesale energy market costs between January 2026 and March 2026 without the Project operating at full capacity. ECF No. 12, ¶ 44. And there are additional foregone benefits, as Vineyard Wind's stable contract price is particularly valuable in cold winter months when the electric grid is constrained and market energy prices are volatile. *Id.*

Ratepayers will also foot the bill for higher costs of compliance with Massachusetts's Renewable Portfolio Standard (RPS), the statutorily mandated standard that requires electricity suppliers to purchase clean energy attributes called renewable energy credits (RECs) as proof of regulatory compliance. Mass. Gen. Laws ch. 25A, § 11F. Without the Project operating at full capacity, Massachusetts ratepayers must pay approximately $13 million more than they otherwise would have had to pay to purchase RECs and comply with the RPS between January and March 2026. ECF No. 12, ¶ 45. Indeed, Massachusetts ratepayers have lost over $2 million in contracted-for benefits (both energy prices and REC prices) in just a week, since January 15, 2026, when the approved long-term contracts would have been in effect.[4] If the Order is enjoined, the Project's contracted-for benefits will reduce electricity bills by an estimated 3.5 cents/kWh each month, which translates to $252 of savings per year for an average residential customer.[5] As depicted in

---

[4] This is because the contracted price would have been $69.50 per megawatt-hour while the total market energy and REC cost has been on average $127.83 per megawatt-hour. This calculation is based on the average hourly nodal locational marginal price at UN.VNYRDWND115 VINW and a REC price of $38 per certificate. Nodal pricing is available at ISO-NE Express Pricing Reports for Selectable Final Real-Time Hourly LMPs at https://perma.cc/V6RM-ZS5Y.

[5] Letter from Robert H. Hoaglund II, Gen. Counsel, Dep'r of Energy Res., to Mark D. Marini, Sec'y, Mass. Dep't of Pub. Utils., , re: Petitions for Approval of Proposed Long-Term Contracts for Offshore Wind Energy Pursuant to Section 83C of Chapter 188 of the Acts of 2018, DPU 18-76, 18-77, 18-78 (Aug. 1, 2018), at 4, https://perma.cc/J78R-Q592. The average annual savings

Figure 1, the contracts ensure significant energy savings and protect ratepayers from price volatility. ECF No. 12, ¶ 42. And when indirect benefits are included, the Project is expected to provide total net benefits of approximately $1.4 billion. *Id.*



*Figure 1*: January 15-20, 2026 market price v. contract price showing harm to Massachusetts ratepayers.

Massachusetts ratepayers will continue to be harmed in the future if the Order is not enjoined. Offshore wind resources are at their zenith during the winter months, when wind blows hardest. As a result, adding offshore wind resources can greatly reduce winter energy bills. Indeed, a 2018 assessment by ISO-NE found that if a hypothetical 1,600 MW offshore wind project was online during the region's 16-day cold spell in December of 2017 and January of 2018, the project would have saved the region $80 million to $85 million in production costs. ECF No. 12, ¶ 27. Massachusetts ratepayers will be deprived of similar savings this winter without the Project. Additionally, in 2023, more than half of the electricity in New England was produced by burning natural gas, with approximately $3 billion flowing out of the region's economy as a result. *Id.* ¶ 26.

---

of $252 is calculated based on 3.5 cents/kWh of savings for an average Massachusetts residential customer consuming 600 kWh/month for 12 months.

Furthermore, without offshore wind ISO-NE has estimated that energy costs in the New England region could increase by approximately 50% by 2050, and that total annualized costs to development energy infrastructure would increase by $26 billion. *See id.* ¶ 27; Kornitsky et al., *2024 Economic Study*, ISO-NE, at 22–25 (Mar. 19, 2025), https://perma.cc/EDS6-NJZJ.

Second, Massachusetts stands to lose significant economic investments and job opportunities if the Order is not enjoined. As detailed in the declaration of Bruce Carlisle, Managing Director of Offshore Wind at the Massachusetts Clean Energy Technology Center, ECF No. 11, the Commonwealth has invested or committed more than $418 million into the offshore wind industry—investments that have critically supported the development of the Project. *Id.* ¶ 17. Massachusetts's substantial investments will be undermined and are at risk of becoming stranded entirely without the Project—particularly if the offshore wind industry is irreparably chilled by the suspension and risk of collapse of Vineyard Wind. Furthermore, the Project has generated 6,404 full-time equivalent jobs, $623.4 million in labor income, and $1.94 billion in total economic output. ECF No. 12, ¶ 30. These tangible economic benefits, and all associated tax revenue, are on the line if the Order is not enjoined.

    **C. The Director's Order Impedes Accomplishment of Statutory Clean Energy and Climate Targets.**

The Order's existential threat to the Project also threatens Massachusetts's ability to attain its statutory clean energy and climate targets.

First, Massachusetts has enacted into law a requirement to procure 5,600 MW of offshore wind energy by 2027. *See* 2022 Mass. Acts ch. 179, § 61(a)–(b); *see also* ECF No. 12, ¶ 10. The Project represents 800 MW of progress toward that goal—progress that would disappear if the Project cannot move forward. Similarly, the Order stymies the Project's contribution toward attainment of the Commonwealth's RPS, *see* Mass. Gen. Laws ch. 25A, § 11F(a), and, as described

9

above, the Order is already making RPS compliance more expensive for Massachusetts ratepayers. *See* ECF No. 12, ¶ 49 ("Massachusetts is relying on Vineyard Wind 1 to help meet its statutory RPS and offshore wind procurement obligations").

Second, because other forms of energy have far higher rates of greenhouse gas emissions than wind energy, the Order impedes the Commonwealth's progress toward meeting its statutory greenhouse gas emission-reduction targets. *See* Mass. Gen. Law ch. 21N, § 4(h); Mass. Exec. Off. of Energy & Env't Affairs, Massachusetts Clean Energy and Climate Plan for 2025 and 2030 (2022), https://perma.cc/998X-X495 (requiring reductions of 50% below 1990 levels by 2030, 75% by 2040, and net zero by 2050). BOEM estimated that the Project would yield annual avoided emissions of 1,632,822 tons of carbon dioxide[6]—roughly equivalent to the annual emissions of 345,000 cars.[7] The Order thus impedes compliance with statutory clean energy and climate targets.

### D. The Director's Order Jeopardizes Massachusetts's Ability to Protect Our Residents from Severe Environmental and Public Health Harms.

Relatedly, the Order also risks harming the public interest by delaying Massachusetts's ability to transition away from energy resources that produce high levels of greenhouse gas emissions and other pollutants.

First, absent preliminary relief, the Order would increase greenhouse gas emissions and exacerbate the devastating effects of climate change on residents, businesses, and communities. ECF No. 12, ¶ 49. For example, warming oceans and more frequent and intense precipitation have already increased the risk of flooding across the Northeast, including in Massachusetts. *See* Allison R. Crimmins et al., U.S. Global Change Research Program, *Fifth National Climate*

---

[6] Bureau of Ocean Energy Management, *Vineyard Wind 1 Offshore Wind Energy Project Final Environmental Impact Statement*, Vol. II, at A-57 (2021), https://perma.cc/35DP-53V7 (hereinafter "FEIS Vol. II").

[7] U.S. Env't Prot. Agency, Greenhouse Gas Equivalencies Calculator, https://perma.cc/VZS4-8UNE.

*Assessment* (Nov. 14, 2023), https://perma.cc/KZM3-RAGY. Without a change of course, coastal property damage in Massachusetts is expected to reach over $1 billion a year, on average, by the 2070s, with over 70% of the damage occurring in the Boston Harbor region, where a large portion of the Commonwealth's commercial economic base is located. Massachusetts Climate Change Assessment Volume II – Statewide Report 72 (2022), https://perma.cc/6TLU-CZR3.

Second, along with helping the energy transition necessary to slow climate change, projects like Vineyard Wind 1 significantly benefit public health by reducing other harmful pollution from fossil fueled power generation. For example, a recent analysis by Synapse Energy Economics projected that there will be substantial health benefits to adding offshore wind to the New England grid, totaling $362 million every year due to reduced criteria pollutants such as nitrogen oxide, sulfur dioxides, and particulates that result from fossil fuel combustion. ECF No. 12, ¶ 26. On its own, the Project is expected to reduce carbon dioxide emissions by more than 1,630,000 tons per year, and the emission of nitrogen oxides and sulfur dioxides by approximately 1,046 tons per year and 855 tons per year, respectively.[8]

In sum, by delaying and threatening the very existence of the Project, the Order is already causing, and threatens to cause further, significant irreparable harm to Massachusetts and its residents, tipping the public interest sharply in favor of preliminary relief.

## II. Plaintiff Is Likely To Succeed on the Merits.

Massachusetts also agrees with Plaintiff that the Order violates the APA in myriad ways, ECF No. 4-1, at 14–19. Massachusetts here underscores one particular APA violation, namely, that the Defendants failed to consider the States' serious reliance interests, detailed *supra* Section I, before issuing the Order and halting work on the project. *See Housatonic River Initiative v. EPA*,

---

[8] *See* FEIS Vol. II, *supra* note 6, at A-57.

11

75 F.4th 248, 270 (1st Cir. 2023) ("'more detailed justification' may be required . . . when the agency's prior position 'has engendered serious reliance interests'" (quoting *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515 (2009)); *accord Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). Relevant reliance interests include those of third parties like the Commonwealth who are affected by Defendants' drastic, and unexplained, reversal here. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31–32 (2020). Yet Defendants failed to conduct any reliance analysis whatsoever. *See Am. Hosp. Ass'n v. Kennedy*, __ F.4th __, No. 25-2236, 2026 WL 49499, at *3 (1st Cir., Jan. 7, 2026) (finding APA violation where the record was "devoid of evidence that the federal government considered … significant reliance interests—a critical factor in the analysis of an arbitrary-and-capricious claim"). For this reason, among others, Plaintiff is likely to succeed on the merits and preliminary relief is warranted.

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiff's motion, the Court should grant Plaintiff's request for a temporary restraining order and preliminary injunction.

Dated: January 23, 2026

Respectfully submitted,

ANDREA JOY CAMPBELL
   Attorney General of Massachusetts

/s/ Turner Smith
Turner Smith, BBO No. 684750
   *Deputy Chief & Assistant Attorney General*
Nathaniel Haviland-Markowitz, BBO No. 713940
   *Assistant Attorney General*
Jon Whitney, BBO No. 694760
   *Special Assistant Attorney General*
Energy and Environment Bureau
One Ashburton Place
Boston, MA 02108
(617) 727-2200
turner.smith@mass.gov

**CERTIFICATE OF SERVICE**

I, Nathaniel Haviland-Markowitz, hereby certify that I have this day, January 23, 2026, served the forgoing document upon all parties of record, by electronically filing to all ECF-parties and by sending a copy, first-class mail, postage prepaid to all unregistered parties.

/s/ Nathaniel Haviland-Markowitz
Nathaniel Haviland-Markowitz
Assistant Attorney General
Commonwealth of Massachusetts
