IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINEYARD WIND 1 LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES DEPARTMENT OF THE ) <br> INTERIOR, *et al.* ) <br> ) <br> Defendants. ) | Case No.: 1:26-cv-10156-BEM <br><br> **Leave to file granted on January 26, 2026** |

**VINEYARD WIND 1 LLC'S REPLY MEMORANDUM**

In opposing Vineyard Wind's motion, Defendants recognize, as they must, that three federal district courts have enjoined stop work orders BOEM issued against offshore wind projects on December 22, 2025. Those stop work orders were based on the same November 25, 2025 classified national security information at issue here; and Defendants made virtually all the same arguments they are making here to justify the stop work order ("Order") issued to Vineyard Wind and to oppose preliminary injunctive relief. In all of these cases, the courts properly rejected Defendants' arguments and issued injunctions.

The core of Defendants' argument is that the Court "should not follow" those decisions. In addition to advancing legal arguments that those courts uniformly rejected, they claim that this case is factually distinguishable because the Order here allows Vineyard Wind to continue generating power with the 44 operating wind turbines, even as it prohibits construction or commissioning of the remaining 18 wind turbines. The Court should reject Defendants' arguments. First, the fact that BOEM has allowed Vineyard Wind to continue to generate power with its existing turbines significantly undermines Defendants' position as to both the merits of the Order and the balance of harms. It reveals a fundamental misunderstanding of both the construction

schedule and the economics of the Project. Second, Defendants' claim that the harms are simply economic and not specific enough are similar to the arguments the other courts have rejected. More importantly, the claim is inconsistent with binding case law that has found irreparable harm where, as here, the potential economic losses are of such a magnitude that the movant's business is threatened. *See NACM-New Eng., Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5–6 (1st Cir. 2019). The Court should grant the requested injunction.

### A. Vineyard Wind Is Likely To Succeed On The Merits

To obtain preliminary injunctive relief, Vineyard Wind needs to show only that it is likely to succeed on the merits of at least one of its claims. It has easily cleared that bar. Each court to consider the same legal issues presented here has found that the orders are likely arbitrary and capricious. *See* Exhibit 1 (summarizing cases). And for good reason. BOEM issued the Order based on its "initial review" of classified information from the Department of War ("DoW"). Giacona Decl. ¶ 9, Dkt. 19 (quoting Order, Dkt. 1-1). There is no evidence that Mr. Giacona consulted with the DoW experts in the Clearinghouse who developed the mitigation measures for Vineyard Wind's Project. Belote Decl. ¶ 2, Dkt. 10. Nor is there evidence that DoW asked BOEM to issue the Order or determined that a suspension of construction and commissioning wind turbines is needed to protect national security. Mr. Giacona nowhere says, let alone explains, how the Order is "necessary for national security" as required by the regulation cited in the Order, 30 C.F.R. § 585.417(b). BOEM thus "failed to consider important aspects of the problem, all in violation of the [Administrative Procedure Act]." *Am. Hosp. Ass'n v. Kennedy*, --- F.4th ----, 2026 WL 49499, *2 (1st Cir. Jan. 7, 2026).

Second, Vineyard Wind is likely to succeed on the merits because there is no evidence that Mr. Giacona considered Vineyard Wind's significant reliance interests before issuing the Order, which he "was required to do under the APA." *Am. Pub. Health Ass'n v. Nat'l Inst. of Health*, 145

2

F.4th 39, 55 (1st Cir. 2025). Vineyard Wind spent more than three years of consultation and interagency review with DoW and the Air Force before entering the Mitigation Agreement in 2022 to address DoW's national security, National Airspace System protection, and military readiness concerns potentially associated with the Project. Moeller Decl. ¶ 22, Dkt. 5; Pl.'s Br. at 4–5, Dkt. 16. And Defendants do not dispute that Vineyard Wind has expended over $4.5 billion in reliance on BOEM's approval of the COP. Pl.'s Br. at 17–18.

Defendants attempt to excuse BOEM's failure to consider these significant reliance interests on the ground that the Order was not a change in position because it did not "invalidate or modify the lease or COP." Defs.' Resp. at 16, Dkt. 19. That is sophistry. The Order prevents Vineyard Wind from performing activities that were authorized in the COP based on alleged harms to national security that the Mitigation Agreement and COP mitigation measures were designed to address.

Third, as other courts have held, it is arbitrary and capricious for the Order to suspend *construction* activities when "the risks the government is concerned about appear to attend to the *operation* of the project, not its construction." Hearing Tr. at 49:19–21, *Va. Elec. & Power Co. v. U.S. Dep't of Interior* (*Dominion*), No. 25-cv-830 (E.D. Va. Jan. 16, 2026), ECF No. 82 (emphasis added); *see also* Hearing Tr. at 43:16–17, *Revolution Wind, LLC v. Burgum*, No. 25-cv-02999 (D.D.C. Jan. 12, 2026), ECF No. 65 (Order "does not explain why construction cannot continue"). And this Order is particularly arbitrary because it allows continued power production from the 44 operating wind turbines without explaining why it is necessary for the protection of national security to prohibit construction or commissioning of the remaining 18 wind turbines.

Defendants try to justify the inconsistency by citing Mr. Giacona's speculation that if Vineyard Wind is allowed to continue construction, it might be unable to address BOEM's national

security concerns or might ignore those concerns altogether "since the Project is already supplying power to customers." Defs.' Resp. at 15–16, 24–25 (quoting Giacona Decl. ¶ 12). That argument is illogical and has no factual basis. At every stage of the approval process, Vineyard Wind has worked with BOEM and DoW to address their national security concerns, and the Mitigation Agreement "demonstrates that Vineyard Wind agreed to every mitigation measure requested by [DoW]." Belote Decl. ¶ 29; *see also* Pl.'s Br. at 3–5. "Given the rigorous and time-consuming process for researching, selecting, and conditioning offshore wind operations, any appreciable national security risks these projects may pose would have already been flagged and addressed before construction work began." Belote Decl. ¶ 23. Nevertheless, when the Order was issued, Vineyard Wind promptly contacted BOEM to understand the agency's concerns and discuss ideas for a constructive path forward. Pl.'s Br. at 8–9. It was Defendants, not Vineyard Wind, who refused to engage in those discussions and arbitrarily ordered Vineyard Wind to stop work even though "mitigation strategies have proven successful in the past." Hearing Tr. at 49:7–11, *Dominion*, No. 25-cv-830. And that continues to be true: more than 30 days have passed since BOEM issued the Order, and the agencies still have not talked to Vineyard Wind about their alleged national security concerns.

Fourth, BSEE's arbitrary refusal to address the safety issues raised by the Order cannot be dismissed as a mere "quibble." Defs.' Resp. at 9–11. BSEE requires wind farm operators to retain a Certified Verification Agent, approved by BSEE, to ensure that facilities are designed, fabricated and installed in conformance with accepted engineering practices and that critical safety systems and equipment comply with BSEE's safety regulations. 30 C.F.R. § 285.705. Vineyard Wind's BSEE-approved Certified Verification Agent, DNV, has "confirm[ed] that the continued suspension of blade installation will lead to 'impacts to health, safety, and the environment.'" Ex.

1 to Simkins Decl. at 2, Dkt. 6-1. BSEE has simply chosen to ignore that verification, even though its staff advised Vineyard Wind that they were not familiar with the relevant lightning-protection issues. Simkins Decl. ¶ 33, Dkt. 6. That decision, which was unaccompanied by any explanation from BSEE, is clearly arbitrary and capricious.

Finally, Defendants do not—and cannot—justify BOEM's failure to comply with the pre-suspension procedures required by the APA and the Due Process Clause. BOEM cannot show "urgency" needed to dispense with its constitutional obligation to provide notice before issuing the Order. BOEM waited nearly a month to issue the Order after receiving the classified information from the DoW, demonstrating that there was no emergency here. *See* Pl.'s Br. at 26–27. And BOEM's post-hoc rationalization that the APA's procedures for suspension of a license were unnecessary because the "public interest" supposedly demanded immediate action, Defs.' Resp. at 17, comes too late. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 37 F.4th 746, 761 (1st Cir. 2022) (internal quotation omitted). The administrative record contains "no contemporaneous explanation" for bypassing the pre-suspension process. *Am. Hosp. Ass'n*, 2026 WL 49499, at *3; *cf.* Hearing Tr. at 44:24–45:1, *Revolution Wind*, No. 25-cv-2999 (observing that BOEM identified no "new finding of particularized harm such that the government could order an immediate suspension").[1]

---

[1] Defendants' Tucker Act argument is a red herring. Vineyard Wind is not seeking damages or specific performance of a contractual obligation. Defs.' Resp. at 12. It is seeking to enjoin and set aside an Order that is arbitrary and capricious and contrary to the Outer Continental Shelf Lands Act ("OCSLA") and implementing regulations. Defendants wisely do not dispute that the APA authorizes this Court to enjoin enforcement of the Order if the Court finds it arbitrary and capricious as courts have done in three cases brought by other offshore wind projects. *Am. Pub. Health Ass'n*, 145 F.4th at 56 (court had jurisdiction to provide "declaratory relief under the APA independent of any contractual language -- to 'set aside an agency's actions" as arbitrary and capricious") (cleaned up). And OCSLA itself authorizes Vineyard Wind to bring suit to "compel compliance" with OCSLA "against any person, including the United States, and any other governmental instrumentality or agency … for any violation of any provision of [OCSLA] or any regulation promulgated under [OCSLA] or of the terms of any permit or lease issued by the Secretary under [OCSLA]." 43 U.S.C. § 1349(a)(1); *see also id.* § 1349(b)(2) (giving district courts jurisdiction over cases arising out of "the cancellation, suspension, or termination of a lease or permit under [OCSLA]").

### B. The Order Is Irreparably Harming Vineyard Wind

The Order is causing irreparable harm to Vineyard Wind; it does not matter that it allows Vineyard Wind to continue producing power with the 44 wind turbines that were in operation when the Order issued. Defs.' Resp. at 20. In claiming otherwise, Defendants ignore that completion of the Project and the commencement of commercial operations for all 62 turbines is essential to generate sufficient revenue to cover the Project's expenses and repay its construction loans, that the Project is incurring daily costs of approximately $2.0 million under the Order, and that a delay in completion of construction and commissioning of the wind turbines will result in extraordinary financial distress and the likely collapse of the Project. Hortiguela Decl. ¶¶ 7–9, Dkt. 8. If the Project is not completed by March 31, 2026 (the contractual maturity date under the credit agreement and the date *Sea Installer* is scheduled to leave), and with no vessels secured to complete the Project in the foreseeable future, the lenders will have the ability to declare an event of default, accelerate repayment of the loan and foreclose the Project—threatening the financial viability of the entire Project and, consequently, Vineyard Wind's ability to survive. *Id.* ¶ 11.

Defendants claim there is no irreparable harm because Vineyard Wind has not been "actually threatened by the lender." Defs.' Resp. at 22. But that is not required. *See, e.g., Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d. Cir. 1989) (finding irreparable harm where plaintiffs' lenders had not, but "could demand payment at any time and . . . 'bring down the whole house of cards.'"). Regardless, the lenders have questioned the financial viability of the Project in light of the Order, and on January 23, 2026, the lenders' administrative agent sent Vineyard Wind a letter reserving the right to assert that " (i) a Default arises from the BOEM Order as of December 22, 2025 and (ii) the BOEM Order constitutes an Event of Default after any applicable cure periods" under the credit agreement. Supp. Decl. of Klaus Skoust Moeller ¶ 4.

Because the lenders have already advanced $2 billion, this is undoubtedly a case "where the potential economic loss is so great as to threaten the existence of the movant's business." *NACM-New Engl.* 927 F.3d at 5.

Defendants suggest it is relevant that the lenders did not seek to foreclose on the loans when construction was stalled in 2024 after a defective blade failed. Defs.' Resp. at 22. But that situation was entirely different. That delay occurred almost two years before Vineyard Wind was obligated to provide power under the Power Purchase Agreements. Supp. Moeller Decl. ¶ 3. At that point, the Project was not facing the imminent loss of *Sea Installer*, as it is now. *Id.* And Defendants cannot deny that courts have enjoined orders that caused other offshore wind projects to incur millions of dollars of losses and construction delays that threatened their ability to meet contractual obligations. *See* Order Tr. at 10:10–22, *Empire Leaseholder, LLC v. Burgum*, No. 26-cv-004 (D.D.C. Jan. 15, 2026), Dkt. 17-2 (irreparable harm from "losing access to specialized vessels that cannot be replaced in time to meet binding deadlines, will not just cause substantial financial loss, but it will threaten Empire Wind's entire existence"); Hearing Tr. at 45:19–22, *Revolution Wind*, No. 25-cv-2999 ("If Revolution Wind cannot meet its contractual deadlines, then the States of Rhode Island and Connecticut will have the right to terminate their agreements with the company"); *id.* at 45:11–13 ("if Revolution Wind cannot meet certain benchmark deadlines, the entire enterprise could collapse"); Hearing Tr. at 51:2–12, *Dominion*, No. 25-cv-830 (Dominion "has already taken millions of dollars of losses, and even if it could recoup some of that money from the government pursuant to regulation, the costs associated with the ongoing construction delays would be difficult to calculate").

### C. The Balance Of Harms And Public Interest Favor An Injunction Against The Order

Defendants contend that *Winter* effectively forecloses preliminary injunctive relief here

because the Order rests on national security concerns. Defs.' Resp. at 22–24. But *Winter* does not create a categorical "national security" bar to injunctive relief. Rather, it reaffirms the ordinary four-factor test and cautioned that "military interests do not always trump other considerations." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–26 (2008). The Navy prevailed in *Winter* on a highly-developed record showing that the particular injunction would materially impair mission-critical training, supported by detailed declarations from senior Navy officers explaining why realistic sonar training was essential and could not be achieved under the court-imposed restrictions. *Id*. at 24–25, 33. The record in *Winter* stands in stark contrast to the record here. BOEM is relying on an Acting Director's individual review of information in a classified report. Aside from a single conclusory paragraph in an affidavit created as part of litigation (which is not part of the administrative record), there is no evidence that BOEM actually considered how the classified information cannot otherwise be addressed as part of the existing BOEM-approved mitigation measures and the Mitigation Agreement with DoW to "mitigate any potential adverse impacts" and "minimize risks to national security while allowing [the Project] to proceed with development." Mitigation Agreement § 1.A, Dkt. 6-3; *see* Pl.'s Br. at 3–5, 25. *Winter* thus supports a fact-specific balancing of the equities—and tailored relief that preserves national-security protections while allowing the remaining work to be completed under the existing mitigation regime.

## CONCLUSION

For the foregoing reasons, Vineyard Wind respectfully requests that this Court grants its motion for a temporary restraining order and preliminary injunction.

Date:  January 24, 2026                                          Respectfully submitted,

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

Peter C. Whitfield (*pro hac vice*)
Richard W. Smith (*pro hac vice*)
Kathleen Mueller (*pro hac vice*)
Matthew C. Brewer (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, DC 20005
(202) 736-8000
pwhitfield@sidley.com
rwsmith@sidley.com
kmueller@sidley.com
mbrewer@sidley.com

Brooklyn Hildebrandt (*pro hac vice*)
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
(213) 896-6007
bhildebrandt@sidley.com

*Counsel for Vineyard Wind 1 LLC*

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 26th day of January 2026, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system and served on anticipated counsel for Defendants via electronic mail.

                                                             /s/ Jack W. Pirozzolo
                                                             Jack W. Pirozzolo